**Kathleen L. Wilde**, OSB No. 971053
kwilde@disabilityrightsoregon.org
**James A. Wrigley**, OSB No. 904134
jwrigley@disabilityrightsoregon.org
**Theodore E. Wenk**, OSB No. 001239
ted@disabilityrightsoregon.org
DISABILITY RIGHTS OREGON
620 S.W. Fifth Avenue, Suite 500
Portland, Oregon 97204
Telephone: (503) 243-2081
Fax: (503) 243-1738
    Attorneys for Plaintiffs

FILED25 JAN '12 08:12USDC-ORP

[ADDITIONAL COUNSEL APPEAR ON SIGNATURE PAGE]

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| PAULA LANE; ANDRES PANIAGUA; ELIZABETH HARRAH; ANGELA KEHLER; GRETCHEN CASON; LORI ROBERTSON; SPARKLE GREEN; and ZAVIER KINVILLE, on behalf of themselves and all others similarly situated, and **UNITED CEREBRAL PALSY ASSOCIATION OF OREGON AND SOUTHWEST WASHINGTON, INC.**, Plaintiffs, v. **JOHN KITZHABER**, Governor of the State of Oregon; **ERINN KELLEY-SIEL**, Director of the Oregon Department of Human Services; **MARY LEE FAY**, Administrator of the Office of Developmental Disability Services; and **STEPHAINE PARRISH TAYLOR**, Administrator of the Office of Vocational Rehabilitation Services, all in their official capacities, Defendants. | CV '12 - 138  Case No.: ____ST____ CLASS ACTION ALLEGATION COMPLAINT |

Page 1 -    Class Action Allegation Complaint

## I.     INTRODUCTION

1.      Plaintiffs Paula Lane, Andres Paniagua, Elizabeth Harrah, Angela Kehler, Gretchen Cason, Lori Robertson, Sparkle Green, and Zavier Kinville are persons with intellectual or developmental disabilities.  Each of these individuals is qualified for and receives employment services from the Oregon Department of Human Services (DHS).  Although each is able and would prefer to work in an integrated employment setting, the plaintiffs remain unnecessarily segregated in sheltered workshops and are denied virtually all contact with non-disabled persons in these workshops, as a result of DHS's administration, management, and funding of its employment service system.

2.      Thousands of other similarly-situated individuals in the State of Oregon also are unnecessarily segregated because of DHS's over-reliance on sheltered workshops, and its failure to timely develop and adequately fund integrated employment services, including supported employment programs.

3.      A sheltered workshop is a segregated employment setting that employs people with disabilities or where people with disabilities work separately from others.  Sheltered workshops are usually located in a large, institutional facility.  Workers with disabilities in these settings have virtually no contact with their non-disabled peers, other than agency staff, and are typically paid sub-minimum wage.

4.      By contrast, integrated employment is a real job in a community-based business setting, where employees have an opportunity to work alongside non-disabled co-workers and earn at least minimum wage.  Supported employment services are vocational training services

that prepare and allow people with intellectual and developmental disabilities to participate in integrated employment.

5.      DHS currently funds some supported employment services that permit some persons with intellectual and developmental disabilities to work in integrated employment settings.  But thousands of other similarly-situated individuals are unable to obtain such supports because DHS administers, manages, and funds an outdated employment service system that primarily relies upon segregated sheltered workshops.

6.      DHS and the other defendants have failed to timely develop and adequately fund supported employment services, despite their demonstrated knowledge of how to provide these services to support people in integrated employment, their acknowledgement of the benefits of integrated employment, and their repeated public commitment to policies designed to expand integrated employment.

7.      The named plaintiffs and the class they seek to represent are harmed by their placement in segregated sheltered workshops.  Without meaningful supported employment services, the named plaintiffs and the plaintiff class are stuck in long-term, dead-end, facility-based sheltered workshops that offer virtually no interaction with non-disabled peers, that do not provide any real pathway to integrated employment, and that provide compensation that is well below minimum wage.

8.      The needless segregation of the named plaintiffs and the plaintiff class is a violation of their rights under federal law.  The defendants are violating the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (ADA) and the Rehabilitation Act, 29 U.S.C. § 794

PDXDOCS:1955628.1

(§ 504), by unnecessarily segregating the named plaintiffs and members of the plaintiff class in sheltered workshops.

9.    Through this action, the named plaintiffs and the plaintiff class seek injunctive and declaratory relief for the defendants' ongoing violation of the ADA and the Rehabilitation Act. They seek an order from this Court directing the defendants to end their needless segregation in sheltered workshops and to provide them with supported employment services so they can participate in competitive employment in integrated settings.

## II.    JURISDICTION AND VENUE

10.    This action is brought pursuant to Title II of the ADA, 42 U.S.C. §§ 12101 and 12131 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. The defendants are all public entities subject to Title II of the ADA and all receive federal funds, thereby subjecting them to Section 504 of the Rehabilitation Act.

11.    This Court has jurisdiction over the claims pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 12133 (ADA claims) and 29 U.S.C. § 794a (Rehabilitation Act claims).

12.    The plaintiffs' request for declaratory relief is brought pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure. Injunctive relief is authorized by 28 U.S.C. § 2202 and Rule 65 of the Federal Rules of Civil Procedure.

13.    Venue is proper in the District of Oregon pursuant to 28 U.S.C. § 1391(b).

## III.    THE PARTIES

### A.    *The Named Plaintiffs*

14.    Plaintiff Paula Lane is a 48-year-old woman with intellectual and developmental disabilities. She resides in Aloha, Oregon.

PDXDOCS:1955628.1

15.     Plaintiff Andres Paniagua is a 32-year-old man with spina bifida.  He lives in Beaverton, Oregon.

16.     Plaintiff Elizabeth Harrah is a 32-year-old woman with Down Syndrome, an intellectual disability, and some medical and mental health conditions.  She resides in Gladstone, Oregon.

17.     Plaintiff Angela Kehler is a 48-year-old woman with developmental disabilities including Down Syndrome.  She lives in Portland, Oregon.

18.     Plaintiff Gretchen Cason is a 27-year-old woman with developmental disabilities including Down Syndrome.  She resides in Portland, Oregon.

19.     Plaintiff Lori Robertson is a 51-year-old woman with intellectual disabilities.  She resides in Portland, Oregon.

20.     Plaintiff Sparkle Green is a 28-year-old woman with intellectual disabilities.  She lives in Beaverton, Oregon.

21.     Plaintiff Zavier Kinville is a 27-year-old man with developmental disabilities.  He resides in Gresham, Oregon.

B.     *The Organizational Plaintiff*

22.     United Cerebral Palsy Association of Oregon and Southwest Washington, Inc. (UCP) is a statewide, nonprofit organization that serves adults, children and families experiencing cerebral palsy and intellectual and developmental disabilities.

23.     UCP's mission is to advance the independence, productivity, and full citizenship of individuals with intellectual and developmental disabilities.  It fulfills that mission by promoting and operating various programs, including:  supported living; community inclusion;

Page 5 -     Class Action Allegation Complaint

support services brokerage; customized and supported employment services to obtain community-based jobs at minimum wage or better; support groups; respite; training for families; outings for children, families and young adults; conferences; advocacy; and information and referral services.

24.     UCP, as a statewide advocacy agency, has long monitored and attempted to influence the actions of the defendants in order to ensure that persons with intellectual and developmental disabilities receive the employment services to which they are entitled.  UCP has expended, and continues to expend, considerable resources attempting to transform Oregon's employment service system by increasing supported employment programs and decreasing its reliance on sheltered workshops.  As a result, UCP's resources have been diverted, and it has been hindered in its ability to serve its clients and to expand the organization's capacity to provide supported employment services.

25.     UCP has been directly harmed by the defendants' failure to implement, fund, and administer employment services in integrated employment settings.  It brings this action on its own behalf.

C.     *The Defendants*

26.     Defendant John Kitzhaber is the Governor of the State of Oregon.  He is responsible for directing, supervising, and controlling the executive departments of state government as well as for seeking and expending funds from the legislature to implement the programs and to deliver the services of those executive agencies.  He is responsible for developing a bi-annual budget proposal, and for approving a final budget and budget modifications that include funding for DHS and the employment service system administered by

DHS. He also has the authority to require executive agencies like DHS to reallocate appropriated funds to address pressing needs or other legal requirements.

27.     Defendant Kitzhaber appoints the Director of DHS, and approves the appointment of the Administrator of the Office of Developmental Disability Services (ODDS) and the Administrator of the Office of Vocational Rehabilitation Services (OVRS). He has authority to issue proclamations and executive orders regarding employment services for individuals with disabilities and has issued several proclamations and orders directly related to employment services for persons with disabilities. He is responsible for ensuring that DHS fully implements the Governor's policies concerning integrated employment for individuals with disabilities. He is sued in his official capacity.

28.     Defendant Erinn Kelley-Siel is the Director of DHS. DHS is the state agency ultimately responsible for the operation of Oregon's programs for people with developmental disabilities, including its employment services for persons with intellectual and developmental disabilities and its vocational rehabilitation services. DHS is a public entity subject to Title II of the ADA and Section 504 of the Rehabilitation Act. DHS receives federal funds for the administration of its programs.

29.     Erinn Kelley-Siel is directly responsible for ensuring that the state programs administered by her office, including the program for Seniors and People with Disabilities, ODDS, and OVRS, are operated in compliance with federal law. Defendant Kelley-Siel is responsible for the oversight, supervision, and control of DHS, including requesting and managing all funds for the employment services system for people with intellectual and developmental disabilities that is funded and operated through the Home and Community-Based

Page 7 -    Class Action Allegation Complaint

Services (HCBS) Waiver program. She is responsible for administering, managing, and determining how available funding will be used by DHS, including the amount of funds allocated to sheltered workshops and supported employment programs. As Director of DHS, defendant Kelley-Siel also oversees the licensing and monitoring of employment services providers, including sheltered workshops. Defendant Kelley-Siel is sued in her official capacity.

30.     Defendant Mary Lee Fay is the Administrator of the Office of Developmental Disability Services within DHS, and is directly responsible for ensuring that that program is operated in compliance with federal law. ODDS is the primary state agency serving persons with intellectual and developmental disabilities. Defendant Fay is responsible for the development, implementation, and oversight of the employment services system for people with intellectual and developmental disabilities, including the development and implementation of priorities, plans, policies, and procedures concerning employment services. She establishes the goals and priorities for the employment services system and collects data on the outcomes of that system. She also is responsible for designing, implementing, and overseeing the development and implementation of Individual Service Plans (ISPs) for individuals with intellectual and developmental disabilities, and for ensuring that employment services are provided consistent with ISPs. She is sued in her official capacity.

31.     Defendant Stephanie Parrish Taylor is the Administrator of the Office of Vocational Rehabilitation Services within DHS, and is directly responsible for ensuring that the state's vocational services are operated in compliance with federal law. Defendant Parrish Taylor is responsible for implementing and overseeing policies and procedures concerning vocational rehabilitation services for individuals with developmental disabilities. She is

Page 8 -     Class Action Allegation Complaint

responsible for development, implementation, and oversight of a system of vocational rehabilitation services for individuals with intellectual and developmental disabilities and for ensuring that this system provides employment services that are consistent with each person's Individualized Plan for Employment.  She is sued in her official capacity.

## IV.    CLASS ACTION ALLEGATIONS

32.    Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, the plaintiffs bring this action on behalf of themselves and other individuals with intellectual or developmental disabilities who are in, or who have been referred to, sheltered workshops.  The plaintiffs seek injunctive and declaratory relief individually and on behalf of the class to remedy and prevent their needless segregation in sheltered workshops.

33.    The plaintiff class is so numerous that joinder of all members is impracticable.  The class consists of several thousand individuals with intellectual and developmental disabilities who are qualified for integrated employment and supported employment services.  Over 2,300 individuals are segregated in sheltered workshops in Oregon at any given time, most of whom could and would prefer to work in an integrated employment setting.  Each year, many more such persons are referred to sheltered workshops, including youth with developmental disabilities who graduate from, or otherwise leave, special education programs.

34.    There are common questions of law, including *inter alia*:

a.    whether the defendants are violating the ADA and Rehabilitation Act by planning, administering, funding and operating an employment services system that unnecessarily relies upon segregated sheltered workshops and

that denies the named plaintiffs and members of the plaintiff class

supported employment services in integrated employment settings;

b.     whether the defendants are violating the ADA and Rehabilitation Act by

failing to provide the named plaintiffs and members of the plaintiff class

with supported employment services in integrated settings, consistent with

their needs; and

c.     whether the defendants are violating the ADA and Rehabilitation Act by

administering the employment services system in a manner that

discriminates against the named plaintiffs and members of the plaintiff

class by providing them employment services in segregated settings and

by failing to provide them supported employment services necessary to

allow them to engage in competitive employment in integrated settings.

35.     There are questions of fact common to the class, including *inter alia*:

a.     whether the named plaintiffs and members of the plaintiff class are

unnecessarily relegated to segregated settings in order to receive

employment services, as a result of the defendants' actions and inactions

in planning, administering, and funding their employment service system

for persons with developmental disabilities;

b.     whether the named plaintiffs and members of the plaintiff class are denied

the opportunity to work with non-disabled peers, as a result of the

defendants' actions and inactions in planning, administering, and funding

Page 10 -    Class Action Allegation Complaint

their employment service system for persons with developmental disabilities;

    c.    whether the named plaintiffs and members of the plaintiff class are given vocational training in segregated work settings that bears little or no connection to their skills, abilities, or interests and that rarely leads to integrated employment at competitive wages, as a result of the defendants' actions and inactions in planning, administering, and funding their employment service system for persons with developmental disabilities; and

    d.    whether the defendants have a comprehensive and effectively working plan for serving the named plaintiffs and members of the plaintiff class in integrated employment settings.

36.    The named plaintiffs' injuries and claims are typical of the class in that all class members are or will be segregated in sheltered workshops and are being denied supported employment services, as a result of the defendants' actions and inactions in planning, administering, and funding their employment service system for persons with developmental disabilities. The named plaintiffs adequately and fairly represent the interest of all class members, will fully and vigorously prosecute this action, and are represented by attorneys experienced in federal class action litigation and disability law. Absent certification, individual members of the class would have difficulty pursuing their own claims or remedying systemic violations on their own.

PDXDOCS:1955628.1

37.     The defendants administer, operate, fund, and oversee Oregon's employment

services system in a way that discriminates against persons with intellectual and developmental

disabilities by failing to provide supported employment services that would enable the named

plaintiffs and members of the plaintiff class to work in integrated employment settings.

Therefore, the defendants have acted or refused to act on grounds generally applicable to the

entire plaintiff class through their planning, administration, and operation of their employment

system, as well as through the policies, practices, and funding decisions that guide that system,

thereby making appropriate injunctive or declaratory relief appropriate with respect to the class

as a whole.  As a result, the plaintiffs seek certification pursuant to Fed. R. Civ. P. 23(b)(2).

V.     **STATEMENT OF FACTS**

    *A.*     *Statutory Framework*

        (1)     <u>The Requirements of the Americans with Disabilities Act and the
Rehabilitation Act</u>.

38.     On July 12, 1990, Congress enacted the ADA, 42 U.S.C. § 12101 *et seq.*,

establishing the most important civil rights laws for persons with disabilities in our nation's

history.

39.     Congress stated in its findings that "historically, society has tended to isolate and

segregate individuals with disabilities, and, despite some improvements, such forms of

discrimination against individuals with disabilities continue to be a serious and pervasive social

problem." 42 U.S.C. § 12101(a)(2).

40.     Congress found that "discrimination against individuals with disabilities persists

in . . . access to public services." 42 U.S.C. § 12101(a)(3).  Congress found that "individuals

with disabilities continually encounter various forms of discrimination, including outright

PDXDOCS:1955628.1

intentional exclusion . . . , segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. § 12101(a)(5).

41.     Congress further concluded that "[i]ndividuals with disabilities . . . have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society." 42 U.S.C. § 12101(a)(7).

42.     A major purpose of the ADA is to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities, and to provide clear, strong, consistent and enforceable standards addressing discrimination against individuals with disabilities.  42 U.S.C. § 12101(b)(1)&(2).

43.     The ADA was intended to promote the full integration of persons with disabilities in the civic, educational, and commercial mainstream of society.  In enacting the ADA, Congress made clear that it sought to ensure meaningful access and full participation of persons with disabilities in all community activities, including employment.

44.     The regulations implementing Title II of the ADA require that:  "a public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d) (the "integration mandate").

45.     The "most integrated setting" means one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible. . ."  28 C.F.R.

Page 13 -    Class Action Allegation Complaint

§ Pt. 35, App. A (2010). *See also,* Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.,* available at *http://www.ada.gov/olmstead/q&a_olmstead.htm* ("DOJ Olmstead Guidance").

46.   Discrimination on the basis of disability also is prohibited by Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). Section 504's implementing regulations provide that recipients of federal funds "shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d).

47.   Discrimination based on disability includes discrimination based on the severity or complexity of a person's disability. *See* 28 C.F.R. §§ 35.130(b)(3), 41.51(b)(3); 45 C.F.R. § 84.4(b)(4). The ADA and § 504 regulations prohibit the differential treatment of individuals with disabilities or any class of individuals with disabilities, such as those with more severe or complex disabilities, with respect to their opportunity to participate in or access the full range of aids, benefits or services in any program operated by a public entity. *See* 28 C.F.R. §§ 35.130(b)(1)(ii) and (b)(1)(iv), 41.51(b)(1)(ii) and (b)(1)(iv); 45 C.F.R. §§ 84.4(b)(1)(ii) and (b)(1)(iv).

48.   The ADA and § 504 regulations similarly prohibit public entities from utilizing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination or "that have the purpose or effect of substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." The Title II regulations preclude public entities from using methods of administration that discriminate against persons with disabilities or that subject such persons to unjustified segregation. 28 C.F.R. § 35.130(b)(3).

Page 14 -   Class Action Allegation Complaint

49.    The ADA regulations further specify that "[a] public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service program or activity unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(8).

50.    Both the ADA and § 504 also require that public entities must make reasonable modifications in their policies, practices or procedures when necessary to avoid discrimination on the basis of disability, including avoiding the unnecessary segregation or institutionalization of such individuals, unless the public entity can demonstrate that such modifications would fundamentally alter the nature of the service, program or activity. 42 U.S.C. §§ 12131, 12132; 29 U.S.C. § 794; 28 C.F.R. § 35.130(b)(7).

(2)    *Olmstead v. L.C.*

51.    The Supreme Court has interpreted the ADA's integration mandate and held that Title II prohibits unjustified segregation of people with disabilities. *Olmstead v. L.C.*, 527 U.S. 581, 600 (1999). In so holding, the Court emphasized that unjustified isolation of individuals with disabilities "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and that it "severely diminishes the everyday life activities of individuals including family relations, social contacts, work options, economic independence, educational advancement and cultural enrichment" *Id.* at 600-601. The Court concluded that Title II requires public entities to offer services in the most integrated setting possible, including shifting programs and services from segregated to integrated settings, unless such a shift would result in a fundamental alteration of their service system. *Id.* at 607.

Page 15 -   Class Action Allegation Complaint

52.    The United States Department of Justice has issued interpretive guidance on enforcement of Title II and *Olmstead* in which it explains that a "public entity may violate the ADA's integration mandate when it: (1) directly or indirectly operates facilities and/or programs that segregate individuals with disabilities; (2) finances the segregation of individuals with disabilities in private facilities and/or (3) through its planning, service system design, funding choices, or service implementation practices, promotes or relies upon the segregation of individuals with disabilities in private facilities or programs." *See* DOJ Olmstead Guidance at 3, Question 2.  The Department of Justice has further explained that ADA's integration mandate and *Olmstead* apply to employment services and that segregated settings include sheltered workshops and segregated day programs. *Id.* at 7, Question 12.

53.    On September 16, 2011, the Center for Medicare and Medicaid Services (CMS) issued guidance in an Informational Bulletin, entitled "Updates to the § 1915(c) Waiver Instructions and Technical Guide, regarding employment and employment-related services." The Bulletin discusses limitations on federal funding for sheltered workshops and strongly endorses the use of federal Medicaid funding for supported employment services.  The Bulletin explicitly recognizes that: "Although this is guidance with respect to the 1915(c) Waiver program, we note that states have obligations pursuant to the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Supreme Court's *Olmstead* decision interpreting the integration regulations of those statutes.  Consistent with the *Olmstead* decision and with person-centered planning principles, an individual's plan of care regarding employment services should be constructed in a manner that reflects individual choice and goals relating to employment and ensures provision of services in the most integrated setting appropriate." (Available at *https://www.cms.gov/CMCSBulletins/downloads/CIB-9-16-11.pdf.*)

Page 16 -    Class Action Allegation Complaint

B.      *People with Intellectual and Developmental Disabilities Have the Desire and Ability to Work.*

54.     In Title I of the Rehabilitation Act, Congress found that disability is a natural part of the human experience that in no way diminishes the right of individuals to live independently, enjoy self-determination, make choices, contribute to society, *pursue meaningful careers*, and enjoy full inclusion and integration in the economic, political, social, cultural, and educational mainstream of society. 29 U.S.C. § 701(a) (emphasis added).

55.     Congress further recognized that work is a valued activity for both individuals and society, and that work fulfills the need of an individual to be productive, promotes independence, enhances self-esteem, and allows for participation in the mainstream of life. 29 U.S.C. § 720(a). Title I of the Rehabilitation Act is based upon Congress's recognition that individuals with disabilities, even individuals with the most significant disabilities, have the ability to achieve gainful employment in integrated settings if appropriate services and supports are provided. 29 U.S.C. § 720(a)(1)(C). Indeed, at the heart of Title I of the Rehabilitation Act is the principle that even "individuals with the most significant disabilities are presumed to be capable of engaging in gainful employment and that the provision of individualized vocational rehabilitation services can improve their ability to become gainfully employed. 29 U.S.C. § 720(a)(3)(A).

56.     In spite of the demonstrated ability and desire of people with disabilities to work, Congress recognized that significant numbers of individuals with disabilities are not able to work at levels commensurate with their capabilities for reasons that include, among others, discrimination and lack of education, training, and supports to meet job qualification standards necessary to secure, retain, regain or advance in employment. 29 U.S.C. § 720(a)(1)(D).

Page 17 -    Class Action Allegation Complaint

57.     To address its finding that even people with significant disabilities can work and to ensure that all individuals with disabilities have access to meaningful employment, Congress included in Title I of the Rehabilitation Act the presumption all individuals can benefit from vocational rehabilitation services unless a state can demonstrate by clear and convincing evidence that an individual is incapable of working due to the severity of the individual's disability.  29 U.S.C. § 722(a)(2)(A).

58.     Oregon has long endorsed and promoted the principles that everyone with a disability can work, that there is a job for everyone, and that people are healthier, safer and happiest with meaningful work.  A guiding tenet of Oregon's Employment First policy is "a fundamental belief that employment is the key to full citizenship." *See Community Leadership for Employment First in Oregon* (2010), available at http://www.dhs.state.or.us/dd/supp_emp/docs/wise.pdf, at 9 (hereafter ODDS' "Call to Action Report").  ODDS has left no doubt that "[i]t is the position of ODDS and the Employment First Outreach Project that *all* people with intellectual and developmental disabilities should be provided the opportunity to work . . .to not live in the shadow as marginalized citizens, but to be fully embraced by their community." *Id.* (emphasis added.)

      *C.*    *Segregation of People with Intellectual and Developmental Disabilities in Sheltered Workshops Constitutes Discrimination Under the ADA.*

59.     Sheltered workshops are an outdated service model which is based upon the stereotype that people with disabilities cannot engage in competitive employment and are not capable of succeeding at real work.  For many years, disability professionals have considered sheltered workshops the last resort, or a hopeless end point, for people with disabilities. *Halderman v. Pennhurst State School & Hosp.,* 154 F.R.D. 594, 601 (E.D. Pa. 1994) ("In the

Page 18 -    Class Action Allegation Complaint

workshop setting, class members earn a fraction of what is available through community employment and they have very little opportunity to interact with nondisabled persons. Accordingly, these mentally retarded plaintiffs are being unnecessarily segregated from the community."); *Homeward Bound, Inc. v. Hissom Memorial Center*, 1987 WL 27104 (N.D. Okla., July 24, 1987).

60.     Sheltered workshops, similar to the segregated institutions which once characterized Oregon's residential service system but have now been shuttered, routinely relegate people with intellectual and developmental disabilities to segregated settings that offer little or no contact with non-disabled peers.  Indeed, sheltered workshops are often operated in conjunction with other segregated facilities.

61.     Sheltered workshop employees are usually paid less, and often far less, than minimum wage, perpetuating the stereotype that people with intellectual and developmental disabilities are incapable of performing productively in a competitive work environment. Compensation at sheltered workshops often bears no reliable correlation to a person's abilities.

62.     Sheltered workshops are funded primarily by State or local governments, and depend upon this public funding, together with income from sub-contracts for the production of goods, to sustain the workshops.

63.     Historically, sheltered workshops were intended as training programs to prepare individuals for work in competitive employment.  But the intended purpose of sheltered workshops -- to prepare individuals for real work -- is rarely realized.  Instead sheltered workshop employees are relegated to separate and unequal jobs, and hardly ever transition to

competitive employment. In fact, nationally, fewer than 5% of individuals in sheltered workshops move to integrated employment.

64.     The work performed at sheltered workshops is typically low-skilled, non-challenging manual labor. This work does not provide training for competitive employment in integrated settings.

65.     Individuals with intellectual and developmental disabilities frequently spend their days at sheltered workshops performing tasks that do not reflect, and often are not relevant to, their individual skills, interests or prior work experience. Moreover, these tasks often bear little resemblance to work performed in most competitive employment settings.

66.     For many employees of sheltered workshops, the unchanging daily routine of performing mundane work causes their social skills to atrophy, leading to an even lower likelihood that they will ever transition to work in the community. It also leads to lower self-esteem and lowered expectations of themselves, similar to the "learned helplessness" described in *DAI v. Paterson*, 653 F. Supp. 2d 184, 214 (E.D. N.Y. 2009) (DAI II) ("When individuals are treated as if they are helpless, the helplessness becomes a learned phenomenon").

67.     The lowered expectations and skill-set that sheltered workshops engender pervade the public consciousness as well, reinforcing and perpetuating negative stereotypes about people with intellectual and developmental disabilities.

68.     Oregon has concluded, and research has shown, that sheltered workshops are more expensive per person than supported employment services and that most individuals never "graduate" from sheltered workshops to real employment.

Page 20 -    Class Action Allegation Complaint

D.    *Supported Employment Provides the Most Integrated Work Services for Individuals with Intellectual and Developmental Disabilities.*

69.    Virtually all persons with disabilities in sheltered workshops are capable of working in integrated employment settings.  Supported employment services are a critical component to helping persons with intellectual and developmental disabilities transition to competitive employment in integrated settings.

70.    Supported employment services in integrated settings, unlike segregated sheltered workshops, foster community integration by providing regular contact and interaction with non-disabled peers.

71.    By providing opportunities for individuals with intellectual and developmental disabilities to work alongside non-disabled peers, supported employment is consistent with the ADA and its implementing regulations.

72.    Supported employment is defined by the Rehabilitation Act Amendments of 1986 as "competitive work in integrated work settings, or employment in integrated work settings in which individuals are working toward competitive work, consistent with the strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice of the individuals, for individuals with the most significant disabilities." 29 U.S.C. § 705(35); 39 C.F.R. § 361.5(b).

73.    Supported employment generally includes four key elements:  integration, paid work at or above the minimum wage, individualized services, and ongoing supports.

74.    Unlike sheltered workshops which tend to use a "one size fits all" approach to employment by assigning individuals with a wide range of abilities and interests to identical tasks, supported employment utilizes a person-centered planning model that assesses each individual's unique skills, needs and preferences.

Page 21 -    Class Action Allegation Complaint

75.     Supported employment providers match the strengths and needs of individual clients to specific jobs, in contrast to sheltered workshops that fill job slots based upon the demands of its contracts or creating "make work" when insufficient contract work is available.

76.     Supported employment promotes economic independence by compensating individuals with disabilities at prevailing wages and always at the state minimum wage or above. Studies have shown that supported employees regularly out-earn sheltered employees.

77.     For over three decades, the national trend in the provision of publicly-funded employment services for persons with mental disabilities has been away from the sheltered workshop model and toward supported employment.  Today, professionals in the field of developmental disabilities strongly favor supported employment services.

78.     In 2001, the federal agency which oversees the State Vocational Rehabilitation Services Program eliminated all funding for the permanent placement of persons with disabilities in sheltered workshops.  The federal agency endorses and funds supported employment services for clients of state vocational rehabilitation programs.

79.     Research also demonstrates that the cumulative and per person cost of supported employment to the state and specifically to its developmental disabilities and vocational rehabilitation agencies is less, over time, than sheltered workshops, as individuals become more independent and competent in performing their job duties.

E.      *Oregon Administers and Funds a System of Employment Services that Unnecessarily Relies Upon Segregated Sheltered Workshops.*

        (1)     Oregon's Employment Services System

80.     The defendants administer, fund, manage, license, and oversee the employment service system for individuals with intellectual and developmental disabilities in Oregon.

Page 22 -    Class Action Allegation Complaint

81.     Specifically, DHS plans, funds, and oversees all developmental disability services and vocational rehabilitation services, including the employment service system, for persons with intellectual and developmental disabilities in Oregon. It determines the amount and allocation of funding for these services and that system, including the range of employment services, the licensing of employment providers, and the level of funding for sheltered workshops versus supported employment programs. The current employment service system, which relegates over 2,000 persons with disabilities to sheltered workshops and allocates far more than half of all employment funding to segregated workshops, is the direct result of decisions, actions, and inactions of DHS.

82.     ODDS plans, administers, and directly manages the long-term employment service system for persons with developmental disabilities, including all sheltered workshops and supported employment services. Specifically, ODDS has the primary responsibility for developing, implementing, and overseeing all employment programs for persons with intellectual and developmental disabilities. It sets goals, establishes priorities, creates plans, adopts policies and procedures, determines reimbursement rates, collects data, and takes actions with respect to the statewide employment service system.

83.     On an individual level, ODDS is responsible for overseeing the development and implementation of ISPs for individuals with intellectual and developmental disabilities, which must include professionally-appropriate assessments for employment services. ODDS also is responsible for ensuring that employment services are provided consistent with each individual's needs, interests, and abilities.

84.    ODDS has developed, adopted and promoted an Employment First Policy based on the premise that integrated employment has better outcomes than segregated employment and that through a person-centered planning process people with disabilities can and do succeed at integrated employment.

85.    ODDS has not taken effective action to implement its Employment First Policy, to ensure that its ISP system requires consideration of Employment First, to implement the integrated employment goals of persons with intellectual and developmental disabilities, and most importantly, to ensure there is a sufficient capacity of supported employment services to allow persons with intellectual and developmental disabilities to work in integrated settings. As a result, the current employment service system, and specifically its excessive reliance on segregated workshops, is the direct result of the actions and inactions of ODDS.

86.    OVRS is responsible for completing a comprehensive vocational assessment and determining the employment needs and potential of individuals with intellectual and developmental disabilities. OVRS must prioritize individuals with severe disabilities in that process. OVRS identifies jobs, contracts with supported employment agencies, and provides job training, job coaching and support for up to 18 months. Pursuant to various provisions of the Rehabilitation Act, OVRS should be both the entry point and the initial provider of supported employment services for persons with intellectual and developmental disabilities, including those with the most severe disabilities.

87.    The defendants administer two community service waiver programs, approved by CMS and funded pursuant to Section 1915(c) of the Social Security Act. A waiver allows a state to provide a variety of services with Medicaid funds, such as employment services, without

Page 24 -    Class Action Allegation Complaint

having to meet certain Medicaid statutory requirements. Oregon's Comprehensive Waiver and its Support Services Waiver both fund employment services, including many sheltered workshops and some supported employment services.

88.    According to ODDS data, Oregon invests a total of approximately $30 million in sheltered workshops annually, which segregates 2,300 of people with intellectual and developmental disabilities in facilities, at a cost of roughly $2,500,000 per month.

89.    Oregon has recognized that sheltered workshops cost substantially more than integrated employment, at least over the long term. In its Call to Action Report, ODDS endorsed research studies which find that "the cumulative costs generated by sheltered employees may be as much as three times higher than the cumulative costs generated by supported employees – $19,388 versus $6,618". *See* Call to Action Report at 10.

90.    Over 1,500 persons, or more than 42% of persons receiving services through the Comprehensive Waiver, are relegated to segregated sheltered workshops. Only 7% of the persons in this waiver program participate in individualized, integrated employment.

91.    In the Support Services Waiver, over 900 persons, or 37% of those in this program, are segregated in sheltered workshops, while approximately 450 persons, or 19%, participate in integrated employment.

92.    Today there are over 2,300 Oregonians with intellectual and developmental disabilities in segregated employment. Each year, many more are referred for admission to sheltered workshops, including youth graduating or otherwise leaving special education programs who have the ability and interest to work in integrated employment settings. Many youth in transition from special education already have actual work experience from placements

Page 25 -    Class Action Allegation Complaint

in integrated employment, but have no post-graduation employment option other than sheltered workshops.

(2)    <u>Oregon's Initial Commitment to Provide Integrated Employment</u>.

93.    Oregon was once a leader in recommending and promoting integrated employment, such as supported employment services, for individuals with developmental disabilities.

94.    The federally-funded Specialized Training Program at the University of Oregon served as a national Research and Training Center on Employment, providing leadership, models, data, research, and technical assistance to other States on the potential of supported employment to transform day services for people with developmental disabilities, to increase their productivity and income, and to facilitate their integration into the community.

95.    For almost two decades, Oregon also sought to transform its own services system for persons with developmental disabilities by dramatically decreasing its reliance on sheltered workshops, and concomitantly expanding its capacity to provide supported employment.

96.    Through the 1980s and early 1990s, Oregon's community employment initiatives gained momentum. Oregon was awarded three federal Systems Change grants to support the development of supported employment and high school transition services. *See* Jane Steveley, *Supported Employment for Oregonians with Developmental Disabilities: Recommendations for Action* (2005), available at *http://www.oregon.gov/DHS/vr/eep/se_dd_stevely.doc* (hereafter "the White Paper"). These projects focused primarily on: (1) converting sheltered employment programs to supported employment; (2) developing new programs that provided supported

Page 26 -    Class Action Allegation Complaint

employment services; and (3) focusing on client choice and control of both funding and the job search process.

97.     Unfortunately, since the mid-1990s Oregon has reversed course, increasing its reliance on segregated workshops while simultaneously decreasing its development and use of supported employment services. The raw number and percentage of people served in sheltered workshops has more than doubled, while the number and percentage served in supported employment has decreased by half. For example, in 1988, 50% of the 2,300 people served in the Comprehensive Waiver were in supported employment. By 2010, that number had dropped to approximately 23%, and to only 7% in individualized employment.

98.     Since the early 1990s, Oregon's disability agencies have made little effort to expand supported employment services or to restore Oregon's commitment to providing integrated employment opportunities for individuals with intellectual and developmental disabilities.

99.     In 2005, a collection of stakeholders including the Oregon Council on Developmental Disabilities (DD Council) and representatives of ODDS issued the White Paper, a comprehensive assessment of the DHS employment service system. The White Paper found: (1) a significant decline in the number of individuals who have access to supported employment; and (2) the loss of the state's focus and training efforts on supported employment.

100.    The White Paper called upon state officials to expand supported employment. Among other recommendations, the White Paper emphasized the need to examine the policies of other states that had successfully implemented supported employment programs for individuals

with developmental disabilities, as well as the need to build provider capacity to deliver supported employment services.

101.    In response to one of the recommendations of the White Paper, Oregon adopted its Employment First policy in 2008. The policy requires employment in integrated work settings to be the first priority option that is explored in the service planning process for adults with developmental disabilities. In adopting its Employment First policy, DHS declared that "[b]ehind the Employment First policy is a fundamental belief that employment is the key to full citizenship."

102.    The Employment First Policy is based upon the principles that: (1) integrated employment has better outcomes than non-employment, segregated employment, facility-based employment, or day habilitation in terms of employment outcomes; (2) employment services should be considered and provided using person-centered planning concepts, based on informed choice, and consistent with the philosophy of self-determination; and (3) minimum wage and competitive wages shall be the goal of integrated employment.

103.    Five years after the DD Council's White Paper and two years after the Employment First Policy were issued, the Oregon Employment First Outreach Project, comprised of representatives from ODDS, OVRS, and the DD Council, acknowledged, once again, that the state had failed to make supported employment available to thousands of individuals who remained needlessly segregated in sheltered workshops. Call to Action Report, at 6.

104.    In 2009, Oregon received a Medicaid Infrastructure Grant from the federal Center for Medicare and Medicaid Services (CMS), which it used to fund the Competitive Employment

Page 28 -    Class Action Allegation Complaint

Project administered by OVRS for individuals with a wide range of disabilities. A portion of the Competitive Employment Project funds are allocated to Employment First activities for individuals with intellectual and developmental disabilities, but these funds are primarily targeted toward training for providers. None of the Medicaid Infrastructure Grant funds are specifically targeted toward reducing Oregon's reliance on sheltered workshop programs.

105.    The Call to Action Report contained numerous recommendations for effectuating Employment First's mission, but DHS and ODDS have not implemented most of those recommendations. Thus, despite acknowledgement of their failure to reduce segregated employment and its recognition that supported employment offers better outcomes and greater integration and independence, Oregon, and particularly ODDS, has continued to segregate thousands of individuals with intellectual or developmental disabilities in sheltered workshops, rather than offering them supported employment services in integrated settings.

106.    Furthermore, ODDS' Employment First does not prioritize individuals in sheltered workshops for transition to supported employment or otherwise focus on reducing segregated employment.

107.    OVRS is required by federal law to provide vocational assessments and time-limited employment services to people with disabilities, and particularly persons with severe disabilities. However, OVRS does not use available resources to provide vocational assessments and supported employment services to all qualified individuals with intellectual and developmental disabilities. In addition, OVRS often employs methods for administering its federal funds that favor individuals with less severe disabilities and disfavor those with more severe intellectual or developmental disabilities. ODDS funds services for people with

intellectual and developmental disabilities in sheltered workshops, and administers its vocational services so that persons with intellectual and developmental disabilities often are required to obtain segregated employment through sheltered workshops, even when they desire and are capable of performing integrated employment.

108.    As a result of the defendants' policies and practices, thousands of people with intellectual and developmental disabilities are denied the opportunity to participate in meaningful work, and are, instead, relegated to a lifetime of segregation in sheltered workshops.  They are harmed by having virtually no opportunity to work with non-disabled peers, the inability to earn competitive wages, the diminishment of self-esteem, and the loss of learned skills.

109.    Each year, several hundred young people with intellectual and developmental disabilities graduate, age out or otherwise leave special education vocational training programs. Despite their prior training, a significant number of those young people are referred to sheltered workshops, even though they have the ability to succeed in integrated employment.

110.    As a result of the defendants' policies and practices, youth with intellectual and developmental disabilities are harmed by being relegated to segregated employment in sheltered workshops, despite their training, talents, interests and ambitions.

111.    As demonstrated by Oregon's own experience, its professed policies, and professional research, supported employment services in integrated settings are the most effective method for assisting persons with intellectual and developmental disabilities to participate in integrated employment in the community.  Oregon's experience and professional research demonstrate that supported employment services are more cost-effective than sheltered workshops, and thus would, over time, result in cost savings to the defendants.

Page 30 -    Class Action Allegation Complaint

F.    *Impact on the Named Plaintiffs*

      (1)    <u>Paula Lane</u>

112.    Paula Lane is 48 years old and has an intellectual disability, autism, and an anxiety disorder. She has a Social Security representative payee, but is competent to make her own decisions. She lives in an apartment with staff support.

113.    Ms. Lane attends a sheltered workshop in Beaverton, Oregon. She began working at the sheltered workshop in March 2000, when she moved from Oklahoma to Oregon. Ms. Lane has never had the opportunity to work in competitive employment. She only has worked in segregated sheltered workshops in Oklahoma and now Oregon.

114.    The sheltered workshop that Ms. Lane now attends has a total of 138 participants, 129 of whom work in one large room on various assembly lines doing rote tasks. The vocational agency describes its business as "packaging fulfillment," meaning that the various tasks are all related to packaging. The worksite is segregated, crowded, and distracting. Workshop participants have little or no contact with people without disabilities, other than paid staff.

115.    Ms. Lane's employment records indicate that from March 2010 through February 2011, the highest amount that she earned was $53.66 for 81 hours in September 2010; the lowest was $26.82 for 66 hours in March 2010, or approximately $.40 per hour. She presently works putting parts into boxes, putting bits into slots in a tool holder, folding UPS bags, packaging gloves, and similar tasks.

116.    Ms. Lane has consistently asked the vocational agency to help her find competitive employment. In a 2001 survey by the workshop, Ms. Lane said that she would like them "to find me an outside job." She said that she would like to work in a daycare center.

Page 31 -    Class Action Allegation Complaint

Despite repeated requests for a real job, there has been only one effort in 2007-2008 to identify a community position for Ms. Lane, which was unsuccessful. Ms. Lane's 2009 ISP said that the program would "explore community-based job opportunities," but this was not mentioned in later ISPs. Ms. Lane continues to express an interest in being competitively employed.

117.    Ms. Lane's 2011 ISP has no goals or action plans related to employment. Her work record from March 2010 through February 2011 notes that she received top scores of 5 regarding working continuously without prompting, independently producing acceptable quality and quantity of work or product, and following one step and multiple step directions willingly and correctly.

118.    Ms. Lane is very social. Her most recent ISP indicates that she spends money on pizza parties and goes out for dinner. The ISP also states that she wanted to attend a country music concert through a travel agency and to go to an Upward Bound camp. However, given her lack of income despite working many hours each week, she cannot afford to participate in as many community activities, as she would prefer. Ms. Lane believes that she can work competitively and would like the opportunity to do so.

119.    Neither Ms. Lane's case manager nor the sheltered workshop provider has taken the actions necessary to assist Ms. Lane in obtaining supported employment. Similarly, DHS and OVRS have not offered supported employment services that would allow Ms. Lane to work in an integrated environment, as she prefers.

(2)    Andres Paniagua

120.    Andres Paniagua is 32 years old and lives with his mother in Beaverton, Oregon. He has spina bifida, memory challenges, and several health-related conditions. He uses a large

Page 32 -    Class Action Allegation Complaint

wheelchair and requires seating accommodations. Because of his short-term memory loss, he frequently needs to have directions repeated, but is capable, willing, and determined to work in a real job. Mr. Paniagua has a Social Security representative payee, but is competent to make his own decisions.

121.    Mr. Paniagua was placed in his current sheltered workshop in September 2008. Previously, he was segregated in other sheltered workshops in Oregon. In fact, he was first placed in a sheltered workshop as part of his transition from high school, and has never been offered the opportunity to work in a real job, despite his interest, ability, and repeated requests to do so. His support services survey, dated August 22, 2011, states that it is important to Mr. Paniagua "to have enough money so that he can live on his own" and that he "is incredibly motivated to work and earn a living."

122.    Mr. Paniagua has to commute as much as two hours each way to his workshop by bus. He works with approximately 70 people in the vocational program's sheltered workshop. He works in a segregated and noisy setting that cuts steel and does packaging and assembly under contract. He has little choice in the tasks he performs because available work is dependent upon contracts chosen by the sheltered workshop provider. Workshop participants have little or no contact with individuals without disabilities, other than paid staff.

123.    At his current sheltered workshop, he has demonstrated many work skills. As a result, according to a monthly progress report by his vocational provider, "[h]e works in every department from the machine shop to the front office." Among other responsibilities, he assembles linebackers, a type of fishing equipment that requires multi-step assembly. His productivity is high, as demonstrated by his September 2011 wages of $341.99 for 59.98 hours

Page 33 -    Class Action Allegation Complaint

or work; October 2011 wages of $290.55 for 43.7 hours of work; and November 2011 wages of $309.39 for 46.28 hours of work. Because he is allotted a fixed amount of money per year through the support services waiver, he is only able to attend the workshop for a total of 200 days.

124.    In spite of the fact that these wages are considered "high" for a sheltered workshop employee, Mr. Paniagua still does not earn anywhere near as much as he would if he received minimum wage, which he clearly is capable of doing. Mr. Paniagua is very interested in working competitively. The vocational program's progress notes say that he is a very good worker, with good attention to detail, and is well-liked.

125.    Mr. Paniagua has expressed many times that he would like to work for at least minimum wage in an integrated employment environment. In spite of his expressed preference to work in competitive employment and his demonstrated ability to work in integrated settings, he remains in a sheltered workshop.

126.    Mr. Paniagua's current ISP does not explain why Mr. Paniagua is not a candidate for competitive employment, or even mention this option. Nor do earlier ISPs. The goal is simply for him "[t]o continue to have opportunities for employment in a workshop setting and opportunities for activities and socialization with other people with disabilities."

127.    Mr. Paniagua is frustrated by the fact that he has never had the opportunity to work competitively in the community. He would like to be integrated into the community work life and make at least minimum wage. He is clearly capable of doing so. He would also like to make more money so he can live independently and have a more active social life like other young people his age.

Page 34 -    Class Action Allegation Complaint

128.    Mr. Paniagua's brokerage personal agent, who is ultimately overseen by DHS, has

failed to ensure that Mr. Paniagua's ISP includes supports and services that will reasonably allow

him to attain his goal of community employment.  Additionally, DHS and OVRS have not

provided supported employment services available to meet the integrated employment goals

contained in his ISP.

(3)    Elizabeth Harrah

129.    Elizabeth Harrah is 32 years old and has Down Syndrome and an intellectual

disability, as well as some medical and mental health conditions.  She is competent to make her

own decisions, but has a Social Security representative payee.  She lives in an adult foster home.

130.    Ms. Harrah has attended a sheltered workshop in Gresham, Oregon since

November 2004, where she works five days a week on various rote tasks for sub-minimum

wage.  The workshop that Ms. Harrah attends is a large, institutional setting where Ms. Harrah

and other individuals with disabilities are assigned tasks based upon work chosen by the

sheltered workshop provider.  Ms. Harrah has little choice in the tasks she performs at the

sheltered workshop and has little opportunity to interact with non-disabled individuals, other

than paid staff.

131.    In December 2011, she earned $112.76 for 27.43 hours of work; in November

2011, she earned $63.90 for 15.07 hours of work, and in October 2011, she earned $106.16 for

20.28 hours of work.

132.    Ms. Harrah has several years of experience working in competitive employment

with supports.  She worked for approximately two years at McDonald's performing janitorial

tasks.  She also worked for approximately two years as a stock clerk at Safeway.  Ms. Harrah

Page 35 -    Class Action Allegation Complaint

enjoyed working in integrated settings in the community and suffered distress when she lost this opportunity. She also was employed at a car wash earning sub-minimum wages, but her vocational program closed this enclave. Ms. Harrah is very interested in returning to competitive employment, but has not been given the opportunity or supports to allow her to do so.

133.    Ms. Harrah's current vocational ISP states that she works on an average of six tasks per month at the sheltered workshop. However, the ISP does not include goals or supports that would allow Ms. Harrah to return to competitive employment, despite her prior work history and her demonstrated ability to participate in competitive employment.

134.    In spite of Ms. Harrah's expressed desire to return to competitive employment, her case manager has failed to take the actions necessary to assist Ms. Harrah in attaining her employment goal. Similarly, DHS, which ultimately oversees both the case manager and sheltered workshop provider, and OVRS have not created or made available sufficient supported employment services to allow Ms. Harrah to return to an integrated work environment.

(4)    Angela Kehler

135.    Angela Kehler is 48 years old, and has Down Syndrome and an intellectual disability. She also has a number of medical problems, including complications of diabetes and asthma. She is competent to make her own decisions, but has a Social Security representative payee. She lives in a group home with other residents with disabilities.

136.    Ms. Kehler participates in a sheltered work program in Gresham, Oregon. She has been stuck in this program for over two decades. Ms. Kehler is currently working in a silk screen shop operated by the vocational provider. The screen shop has a sales area and a work area where clothes are decorated with silk screens. Approximately ten people with

Page 36 -    Class Action Allegation Complaint

developmental disabilities work in this program, where Ms. Kehler rarely interacts with people without disabilities, aside from paid staff.

137.    According to her ISP, Ms. Kehler folds shirts and does janitorial tasks at the screen shop.  In September 2011, she received $24.28 for 19.33 hours of work; in October 2011, she earned $19.53 for 8.83 hours; and in November 2011, she was paid $27.23 for 13.9 hours.

138.    Ms. Kehler was competitively employed at a large drugstore from October 2009 to July 2010, when she was laid off.  In this job she organized merchandise on display shelves, and returned unwanted merchandise to its proper location.  She received instruction and support from the store manager, when necessary.  Ms. Kehler initially worked in the drugstore twice per week, two hours each day, but her schedule later was increased to three days a week, four hours a day.  Although her 2010 ISP included a commitment that Ms. Kehler would have staff supports if she faced obstacles in her job performance at the drugstore, these were never provided.

139.    Ms. Kehler is able to use the bus, transferring without assistance.  She has also worked in enclaves that washed cars and cleaned a movie theater, but was only paid sub-minimum wages.  These enclaves have been discontinued.

140.    Ms. Kehler's current ISP indicates that she has told staff that she would like to be competitively employed in the community in a craft or food store.  The ISP concludes that she is employable, but little has been done to achieve her employment goals, reflect her work interests, or assist her in obtaining a real job in the community.

141.    Ms. Kehler's current ISP concedes that her vocational program no longer has a job developer, so there is no one to assist in her obtaining competitive employment and supporting her in a real job.  The ISP says that "Angela and her supervisor will continue to

Page 37 -    Class Action Allegation Complaint

discuss community jobs; should the economy improve and a Job Developer is available community employment will be developed."

142.    In spite of Ms. Kehler's expressed desire to work in competitive employment, neither her case manager nor the sheltered workshop provider has taken the necessary actions to assist Ms. Kehler in obtaining supported employment. Similarly, DHS and OVRS have not provided supported employment services that would allow Ms. Kehler to work in an integrated environment, as she prefers.

143.    Ms. Kehler likes going out on dates. At some point, she would like to live independently. She also likes to travel. Receiving sub-minimum wages makes it virtually impossible to fulfill her ambitions and to enjoy her most treasured experiences. Ms. Kehler relished the opportunity to make a competitive wage at the drugstore and to be in an integrated employment setting. Absent assistance in locating and support in maintaining integrated employment, Ms. Kehler will remain segregated at her current workshop, earning less than $2.00/hour.

(5)    Gretchen Cason

144.    Gretchen Cason is a 27 year old woman with Down Syndrome. She is competent to make her own decisions. She lives with her parents in Portland, Oregon.

145.    Ms. Cason had several integrated, community work experiences during her high school transition program. She volunteered in the cafeteria of a hospital and at a small retail chain store straightening magazines and other displays. She volunteered once a week from fall 2002 through graduation spring 2005.

Page 38 -    Class Action Allegation Complaint

146.     After her high school transition program ended and she graduated from school, Ms. Cason was referred to a sheltered workshop. She worked in this segregated program for three years. It purported to provide employment services, but primarily provided craft activities. Between 2005-2008, she worked 1 to 2 hours per week on a computer in this segregated program. Most her time at this sheltered workshop was spent watching TV or coloring in books.

147.     Ms. Cason then attended a sheltered work program in Portland, Oregon, from July 2008 through April 2010. In this segregated setting, there were about 50 individuals with development disabilities. Ms. Cason had virtually no interaction with individuals without disabilities, other than staff. Her workshop hours were supposed to be from 8:30 a.m. to 2:00 p.m., two days per week, but typically Ms. Cason only worked for 1 to 2 hours per week sorting donated goods. Her largest monthly paycheck was $20.

148.     Ms. Cason was then transferred to a retail location with the same provider, where she sorted clothes and straightened displays on the store floor from April through December 2010. At the store location she worked 3 days per week and earned up to $100 per month. She was then transferred back to the sheltered workshop location in December 2010, where she only worked for a few more weeks. The transfers were implemented unilaterally by the provider, without input from Ms. Cason and without holding a meeting of her ISP team.

149.     Ms. Cason's most recent ISP includes seeking services from OVRS. Ms. Cason has received little support from her current support brokerage and personal agent in attaining her goal of supported employment through OVRS.

150.     Ms. Cason applied for OVRS services in February 2011 and was determined eligible for services. In April 2011, she was given a ten-day work evaluation as a donation

Page 39 -    Class Action Allegation Complaint

attendant at William Temple House. The evaluation report concluded: "We believe that Gretchen is a good candidate for supported employment or alternatives to employment program, through her brokerage." In May 2011, OVRS sent Ms. Cason a letter closing her file "because the Community Based Work Assessment showed you need more skills to get competitive work."

151.   Ms. Cason expresses a strong interest in working in the community at a competitive wage. She would like to work with music, such as at a music store. Alternatively, she would like to work with food, but in a smaller environment such as an ice cream parlor. Primarily however, she wants "a job that isn't boring."

152.   Neither Ms. Cason's brokerage personal agent nor her previous employment provider provided the services and supports necessary to help Ms. Cason fulfill her desire to work in the community at competitive employment. DHS and OVRS failed to adequately oversee the brokerage personal agent and employment provider in the development and implementation of an appropriate ISP for Ms. Cason. Additionally, DHS and OVRS have not provided supported employment services to allow Ms. Cason to work in the community.

153.   Ms. Cason enjoys social interaction in the community and would benefit from a work opportunity with other individuals, including individuals without disabilities. She has expressed very clearly that she has been uninterested in and unchallenged by her workshop placements. Yet, in spite of her expressed preferences, Ms. Cason has not been offered or provided any services to assist her in obtaining integrated employment.

(6)   Lori Robertson

154.   Lori Robertson is 51 years old. She has an intellectual disability. She is competent to make her own decisions. She lives in a group home in Portland, Oregon.

155.    Ms. Robertson has attended a sheltered workshop in Gresham, Oregon since 1981. She has been in this program for over three decades, yet has never had the opportunity to work in competitive employment.

156.    The segregated sheltered workshop Ms. Robertson attends is large, segregated, and crowded with approximately 70 individuals with disabilities performing mostly rote tasks.

157.    A recent Personal Focus Worksheet in Ms. Robertson's ISP indicates that she performs an average of ten different tasks per month at the workshop. In December 2011, she earned $126.15 for 53.9 hours work; in November 2011, she earned $102.87 for 41.4 hours work; and in October 2011, she earned $128.43 for 52.5 hours work.

158.    Ms. Robertson was referred to her current segregated workshop after graduating from school. From 2004-2008, she participated in an enclave that performed janitorial work at the Department of Motor Vehicles. She also was part of another enclave that washed cars for the City of Portland. Both enclaves paid sub-minimum wages and were discontinued by the vocational agency. Since then, Ms. Robertson has had no other employment options other than the segregated sheltered workshop.

159.    Ms. Robertson would like to earn at least minimum wage in an integrated environment in the community. Ms. Robertson enjoys many social activities in the community, including bowling, horseback riding, attending movies, and going out for meals. She also likes going on dates with her boyfriend and shopping. A Personal Focus Worksheet in her ISP states that she has very little money left after paying her bills. Ms. Robertson would clearly benefit from earning at least minimum wage and spending her day in the community, working at a real job.

Page 41 -    Class Action Allegation Complaint

160.   Ms. Robertson's current ISP sets a workshop production goal so she can earn more money for recreational activities. The ISP states that the vocational program's supported employment department will reopen when more funding is available.

161.   Despite the inclusion of a supported employment goal in her ISP and Ms. Robertson's express preference to work in the community, neither her case manager nor the employment provider has taken any actions to assist Ms. Robertson in attaining her goal of working in supported employment. Similarly, DHS and OVRS have failed to provide supported employment services to allow Ms. Robertson to achieve her employment goals and work in a real job in the community.

(7)   <u>Sparkle Green</u>

162.   Sparkle Green is 28 years old and has an intellectual disability, obesity, asthma and depression. She is competent to make her own decisions, although her mother is her Social Security representative payee. She lives in an adult foster home in Beaverton, Oregon.

163.   Ms. Green has attended a sheltered workshop located in Beaverton, Oregon since December 2009. The workshop Ms. Green attends is a segregated, institution-like setting where individuals with disabilities have few opportunities to interact with non-disabled peers and little choice in determining which tasks they perform each day.

164.   Her work record indicates her tasks at the sheltered workshop are mainly bagging, packaging and assembling items. Her Work/Activity Participation Records for December 2009 through November 2010 indicated that she was a good worker with almost perfect performance scores. Nevertheless, her pay records for December 2010 through October 2011 show that she is making very little money. For example, in August 2011, she earned $26.59 for 58 hours work

Page 42 -   Class Action Allegation Complaint

(less than 46 cents per hour); in September, $28.01 for 71 hours (39 cents per hour); and in October, $9.90 for 34 hours (29 cents per hour).

165.    Ms. Green had experience with various integrated, volunteer work placements in her high school transition program, including stocking shelves in a drugstore, and boxing and stacking items at the Oregon Food Bank. Nevertheless, she was referred to a segregated sheltered workshop after transitioning from high school. She has never had the opportunity to work in competitive employment.

166.    Ms. Green would very much like to work in an integrated job in the community that pays at least minimum wage. In the most recent ISP, Ms. Green states in the section about what is most important to her: "I would like a community job. . ." Her work records reflect that on April 5, 2011, she expressed frustration concerning her low wages and the workshop manager told her that although she was a very good worker, jobs in the community were not available at that time. No one has offered Ms. Green supported employment services or discussed integrated employment options.

167.    Ms. Green's 2010 ISP includes as an employment goal that Ms. Green remain at the sheltered workshop as a production worker. Ms. Green's 2011 ISP also contains the same goal, but states that "job developer will consider Sparkle for appropriate jobs being developed as opportunities arise." However, the 2011 ISP contains no measurable action items, timelines, or responsibilities for achieving this goal, other than a mere notation that being a greeter would be a good job fit for Ms. Green.

168.    Ms. Green's case manager, who is ultimately overseen by DHS, has failed to take any actions to meaningfully address, either through the ISP process or otherwise, Ms. Green's

desire to work in integrated employment in the community. DHS and OVRS have not provided sufficient supported employment services that would allow Ms. Green to work in an integrated environment.

169.    Ms. Green is frustrated that she is being paid such little money for performing unstimulating and unrewarding tasks at the segregated sheltered workshop. She enjoys shopping, going to movies, and other activities that require financial resources that she would be better able to earn in a competitive employment setting.

(8)    Zavier Kinville

170.    Zavier Kinville is 27 years old and has an intellectual disability and glaucoma. He is competent to make his own decisions. He lives with his father in Gresham, Oregon.

171.    Mr. Kinville started attending a segregated sheltered workshop in Gresham, Oregon in June, 2011. The sheltered workshop that Mr. Kinville attends has approximately 70 participants with disabilities, most of whom work together in two segregated, noisy rooms performing primarily rote tasks. Participants have little choice about the jobs they work on and have little or no contact with individuals without disabilities, other than paid staff.

172.    Mr. Kinville's most recent earnings at the workshop were $223.06 for 44.87 hours in December 2011; $136.88 for 27.07 hours in November 2011; and $ 278.89 for 40 hours in October 2011.

173.    Before coming to the workshop, Mr. Kinville was engaged in a number of volunteer activities in the community. His favorite job was being a volunteer reading to children for a semester.

PDXDOCS:1955628.1

174.    Mr. Kinville would like to be in competitive employment with more challenges and the opportunity to earn at least minimum wage.

175.    Mr. Kinville's 2010 ISP stated that he had worked with OVRS for several months but then his vocational training was terminated.  His 2011 ISP contains a goal to attend a facility-based employment program to learn job skills, earn money, and participate in socialized activities and supervised activities with his peers.  Although his ISPs state that he wants to find a program that will prepare him for a community job, the ISP contains no specific tasks, time frames, or benchmarks for beginning a search for integrated community employment. Mr. Kinville has proven himself to be a motivated, productive worker, but there are no supports or opportunities available that would allow him to move from the segregated sheltered workshop to integrated employment.

176.    Mr. Kinville's brokerage personal agent, who is ultimately overseen by DHS, has failed to ensure that Mr. Kinville's ISP includes supports and services to reasonably allow Mr. Kinville to attain his goal of community employment.  DHS and OVRS have not offered Mr. Kinville supported employment services that would allow him to meet his integrated employment goals.

(9)    United Cerebral Palsy (UCP)

177.    A core portion of UCP's mission, and a central aspect of its organization's activities, is to expand integrated employment for persons with intellectual and developmental disabilities.  UCP, like several other organizations that assist and serve persons with intellectual and developmental disabilities, have devoted countless hours attempting – mostly unsuccessfully

– to reducing DHS' excessive reliance on sheltered workshops and to expanding its provision of supported employment services.

178.    UCP participates on several ODDS and OVRS task forces and committees concerning employment, in an effort to enhance integrated employment. It has attended numerous meetings with representatives of ODDS, OVRS, and other state and local entities; testified at legislative hearings and in other forums; identified state-created barriers to integrated employment; helped draft reports and papers on improving access to competitive employment; and, together with other organizations, issued findings and formulated recommendations for reducing segregated workshops and expanding supported employment services. None of these efforts have substantially reduced ODDS' reliance on sheltered workshops nor resulted in a substantial increase in supported employment services.

179.    As a result, UCP is substantially limited in its ability to provide supported employment services to individuals with disabilities whom it serves. These individuals are then denied the employment supports they need to obtain and maintain competitive employment in integrated settings.

## VI.    LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF

### (The Americans with Disabilities Act)

180.    The plaintiffs reallege paragraphs 1 through 179 as though fully set forth herein.

181.    The named plaintiffs and the members of the plaintiff class, due to their intellectual and developmental disabilities, are individuals with disabilities within the meaning of

PDXDOCS:1955628.1

the ADA. 42 U.S.C. § 12131(2). Plaintiffs and class members are substantially limited in major life activities such as learning, working, and brain function.

182.    The defendants, acting in their official capacities, are public entities within the meaning of the ADA.

183.    The named plaintiffs and the plaintiff class are qualified to participate in Oregon's system of employment services for individuals with intellectual and developmental disabilities.

184.    The defendants are violating Title II of the ADA and its implementing regulations by administering, funding, and operating its employment services system in a manner that unduly relies on segregated sheltered workshops and that fails to offer an adequate array of integrated employment and supported employment services to qualified persons with disabilities.

185.    The defendants are violating Title II of the ADA and its implementing regulations by unnecessarily segregating the named plaintiffs and members of the plaintiff class in sheltered workshops and by failing to provide them with supported employment services that would enable them to work in integrated employment settings.

186.    The defendants are violating Title II of the ADA and its implementing regulations by discriminating against the named plaintiffs and members of the plaintiff class on the basis of the severity of their disabilities, through their eligibility criteria, funding, and administration of supported employment services.

187.    It would not fundamentally alter the defendants' employment service system to provide the named plaintiffs and members of the plaintiff class with integrated employment and supported employment services that they need to avoid segregation in sheltered workshops.

Page 47 -    Class Action Allegation Complaint

188.    The defendants lack a comprehensive and effectively working plan of serving persons with intellectual and developmental disabilities in integrated settings rather than segregated workshops.

## SECOND CLAIM FOR RELIEF

### (Section 504 of the Rehabilitation Act)

189.    The plaintiffs reallege paragraphs 1 through 188 as though fully set forth herein.

190.    The named plaintiffs and the members of the plaintiff class are qualified individuals with disabilities under Section 504 of the Rehabilitation Act.  29 U.S.C. § 794a. They are capable of working in integrated employment settings.

191.    The defendants receive federal financial assistance for their programs and activities.

192.    The defendants are violating Section 504 of the Rehabilitation Act and its implementing regulations by administering, funding, and operating its employment services system in a manner that unduly relies on segregated sheltered workshops and that fails to offer an adequate array of integrated employment and supported employment services to qualified persons with disabilities.

193.    The defendants are violating Section 504 and its regulations by subjecting the named plaintiffs and members of the plaintiff class to unnecessary segregation at sheltered workshops and by failing to provide them with supported employment services that would enable them to work in integrated employment settings.

194.    The defendants are violating Section 504 and its implementing regulations by discriminating against the named plaintiffs and members of the plaintiff class on the basis of the

Page 48 -    Class Action Allegation Complaint

severity of their disabilities, through their eligibility criteria, funding, and administration of supported employment services.

196. The defendants lack a comprehensive and effectively working plan of serving persons with intellectual and developmental disabilities in integrated settings rather than segregated workshops.

195. It would not fundamentally alter the defendants' employment service system to provide the named plaintiffs and members of the plaintiff class with integrated employment and supported employment services that they need to avoid segregation in sheltered workshops.

196. The defendants lack a comprehensive and effectively working plan of serving persons with intellectual and developmental disabilities in integrated settings rather than segregated workshops.

## VII. PRAYERS FOR RELIEF

WHEREFORE, the named plaintiffs respectfully request that this Court:

1. Certify this case as a class action pursuant to Fed. R. Civ. P. 23;

2. Issue a declaratory judgment that the defendants are violating the ADA and the Rehabilitation Act by needlessly segregating the named plaintiffs and members of the plaintiff class in sheltered workshops and failing to provide them with supported employment programs in integrated settings.

3. Issue preliminary and permanent injunctions requiring the defendants:

   a. To administer, fund, and operate its employment services system in a manner which does not relegate persons with intellectual and developmental disabilities to segregated workshops and which includes an adequate array of integrated employment and supported employment services, as to avoid unnecessary segregation;

b.  To provide supported employment programs in integrated employment settings for all qualified class members, consistent with their individual needs;

c.  To develop and implement an Implementation Plan, approved by the Court, that describes each of the activities that must be undertaken to modify the defendants' employment service system, including infrastructure modifications, service definitions, provider development, staff training, family education, and interagency coordination.

4.  Award the plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 12205 and 29 U.S.C. § 794a; and

5.  Grant any other relief which is necessary and proper to protect the federal rights of the named plaintiffs and the class they represent.

DATED this 25th day of January, 2012.

Respectfully submitted,

DISABILITY RIGHTS OREGON

Kathleen L. Wilde, OSB No. 971053
E-mail: kwilde@disabilityrightsoregon.org
James A. Wrigley, OSB No. 904134
E-mail: jwrigley@disabilityrightsoregon.org
Theodore E. Wenk, OSB No. 001239
E-mail: ted@disabilityrightsoregon.org
620 S.W. Fifth Avenue, Suite 500
Portland, Oregon 97204
Telephone: (503) 243-2081
Fax: (503) 243-1738

MILLER NASH LLP

*Bruce A. Rubin*

Bruce A. Rubin, OSB No. 763185
E-mail: bruce.rubin@millernash.com
Justin C. Sawyer, OSB No. 014057
E-mail: justin.sawyer@millernash.com
Jennifer J. Roof, OSB No. 001586
E-mail: jennifer.roof@millernash.com
111 S.W. Fifth Avenue, Suite 3400
Portland, Oregon 97204
Telephone: (503) 224-5858
Fax: (503) 224-0155


PERKINS COIE LLP

Stephen F. English, OSB No. 730843
E-mail: senglish@perkinscoie.com
Lawrence H. Reichman, OSB No. 860836
E-mail: lreichman@perkinscoie.com
Nathan R. Christensen, OSB No. 093129
E-mail: nchristensen@perkinscoie.com
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209
Telephone: (503) 727-2000
Fax: (503) 727-2222


CENTER FOR PUBLIC REPRESENTATION
Steven J. Schwartz (*pro hac vice* application pending)
E-mail: sschwartz@cpr-ma.org
Cathy E. Costanzo (*pro hac vice* application pending)
E-mail: ccostanzo@cpr-ma.org
Bettina Toner (*pro hac vice* application pending)
E-mail: btoner@cpr-ma.org
22 Green Street
Northampton, Massachusetts 01060
Telephone: (413) 586-6024
Fax: (413) 586-5711

*Attorneys for Plaintiffs*