UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| PAULA LANE; ANDRES PANIAGUA; ELIZABETH HARRAH; ANGELA KEHLER; GRETCHEN CASON; LORI ROBERTSON; SPARKLE GREEN; and ZAVIER KINVILLE, on behalf of themselves and all other similarly situated, and UNITED CEREBRAL PALSY ASSOCIATION OF OREGON AND SOUTHWEST WASHINGTON, INC., | 3:12-cv-00138 -ST<br><br>OPINION AND ORDER |
| Plaintiffs, | |
| v. | |
| JOHN KITZHABER, Governor of the State of Oregon; ERINN KELLEY-SIEL, Director of the Oregon Department of Human Services; MARY LEE FAY, Administrator of the Office of Developmental Disability Services; and STEPHAINE PARRISH TAYLOR, Administrator of the Office of Vocational Rehabilitation Services, | |
| Defendants. | |

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiffs filed this class action alleging violations of Title II of the Americans with

Disabilities Act of 1990 ("ADA"), 42 USC §§ 12131-34 ("First Claim") and Section 504 of the

1 – OPINION AND ORDER

Rehabilitation Act of 1973, 29 USC § 794(a) ("Second Claim") against the Oregon Department of Human Services ("DHS") and various state officials including Oregon's governor (John Kitzhaber), the Director of DHS (Erinn Kelley-Siel), the Administrator of the Office of Developmental Disability Services ("ODDS") (Mary Lee Fay), and the Administrator of the Office of Vocational Rehabilitation Services ("OVRS") (Stephaine Parrish Taylor).

Plaintiffs are eight individuals with intellectual or developmental disabilities, each of whom qualifies for and receives employment services from DHS. Each plaintiff is able and would prefer to work in an integrated employment setting. Plaintiffs allege that, despite their preference to work in such a setting, they and thousands of similarly situated individuals remain unnecessarily segregated in sheltered workshops and are denied virtually all contact with non-disabled persons in these workshops as a result of DHS's administration, management, and funding of its employment service system.

Defendants have now filed a Motion to Dismiss (docket #29). All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c) (docket #38). For the reasons that follow, defendants' motion is GRANTED and plaintiffs' claims are DISMISSED WITH LEAVE TO AMEND.

## DISCUSSION

### I. Legislative and Regulatory Scheme

The ADA and the Rehabilitation Act impose virtually identical obligations on public entities or programs receiving federal financial assistance. Both prohibit discrimination, mandate the administration of services in the most integrated setting appropriate, and relieve affected entities of that obligation only where the modifications would fundamentally alter the nature of the service (ADA) or impose an undue hardship (Rehabilitation Act).

Title II of the ADA prohibits discrimination against disabled persons by any public entity: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 USC § 12132. A "qualified individual with a disability" is one who, "with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 USC § 12131(2). The term "public entity" is defined to include "any State or local government," as well as "any department, agency, special purpose district or other instrumentality of a State . . . or local government." 42 USC § 12131(1)(a)(A), (B).

Pursuant to Title II of the ADA, the Attorney General has promulgated a regulation providing that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 CFR § 35.130(d) (Complaint, ¶ 44). The "most integrated setting appropriate" is defined as "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 CFR Pt. 35, App. A (2010) (Complaint, ¶ 45). However, this so-called "integration mandate" is not unqualified. A public entity must make "reasonable modifications" to avoid unduly segregating the disabled, but is relieved of that obligation if it can show "that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 CFR § 35.130(b)(7) (Complaint, ¶ 50).

The Rehabilitation Act, which applies to programs receiving federal financial assistance, contains a similar anti-discrimination provision, 29 USC § 794(a), and a parallel regulation

requiring that an agency administer its programs and activities "in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 CFR § 41.51(d) (Complaint, ¶ 46). Consistent with the ADA's regulatory scheme, the integration mandate of the Rehabilitation Act is limited by regulatory provisions indicating that a recipient of federal funding need not accommodate a disabled person when the proposed accommodation would impose an "undue hardship" on the recipient. 28 CFR §§ 41.53, 42.511(c); 45 CFR § 84.12(c).

## II. Allegations

The eight individual plaintiffs are intellectually or developmentally disabled persons who reside in the community. Complaint, ¶¶ 112 (Paula Lane lives in an apartment with staff support), 120 (Andres Paniagua lives with his mother), 129 (Elizabeth Harrah lives in an adult foster home), 135 (Angela Kehler lives in a group home with other disabled individuals), 144 (Gretchen Cason lives with her parents), 154 (Lori Robertson lives in a group home), 162 (Sparkle Green lives in an adult foster home), 170 (Zavier Kinville lives with his father). Plaintiffs do not allege that defendants' alleged actions or inactions have created a risk that any of them will be forced to live in an institution.

Seven of the eight plaintiffs work in sheltered workshops. *Id*, ¶¶ 113, 121, 130, 136, 155, 163, 171. Ms. Cason, worked at a sheltered workshop in and prior to December 2010. *Id*, ¶¶ 146-48. Sheltered workshops are segregated employment settings that employ people with disabilities or where people with disabilities work separately from others. *Id*, ¶ 3. Plaintiffs prefer to receive supported employment services[1] which would prepare and allow them to work in an "integrated employment setting," which they define as a "real job in a community-based

---

[1] Plaintiffs define supported employment services as "vocational training services that prepare and allow people with intellectual and developmental disabilities to participate in integrated employment." Complaint, ¶ 4.

4 – OPINION AND ORDER

business setting, where employees have an opportunity to work alongside non-disabled co-workers and earn at least minimum wage." *Id*, ¶¶ 2, 4, 119, 125-28, 132-34, 140-43, 151-53, 159-61, 166-68, 174-76.

DHS has developed, adopted, and promoted an "Employment First Policy" premised on data indicating that integrated employment has better outcomes than segregated employment and that through a person-centered planning process, individuals with disabilities can and do succeed at integrated employment. *Id*, ¶ 84. It is actively pursuing goals to expand access to supported employment services for intellectually and developmentally disabled Oregonians. *Id*, ¶¶ 84, 96, 101-02. As part of that effort, DHS commissioned the preparation of the "Call to Action" report in order to help develop strategies for implementing its "Employment First" policy at the community level. *Id*, ¶ 89; *see* Community Leadership for Employment First in Oregon (2010), http://www.dhs.state.or.us/dd/supp_emp/docs/wise.pdf, p. 12 (last accessed May 17, 2012).

### III.  Motion to Dismiss

Defendants seek dismissal of plaintiffs' claims because: (1) employment claims are not cognizable under Title II of the ADA; (2) even if plaintiffs get past that hurdle, the integration mandate does not apply because the denial of employment services does not place any plaintiff at risk of institutionalization; (3) plaintiffs' claims improperly seek to require defendants to provide a service that the state does not and cannot provide, namely integrated employment in a community business; and (4) plaintiffs' claims improperly seek to impose a certain standard of care on the state's provision of employment services.

///

///

///

5 – OPINION AND ORDER

### A. Employment Claims Under Title II

In their Reply, defendants seek dismissal of the ADA claim on the basis that plaintiffs are raising an "employment claim" not cognizable under Title II of the ADA. Plaintiffs rely on *Zimmerman v. Oregon Dept. of Justice*, 170 F3d 1169, 1176 (9th Cir), *reh'g en banc denied*, 183 F3d 1161 (1999), *cert denied*, 531 US 1189 (2001), which upheld dismissal of a Title II claim premised upon an allegation that the state refused to accommodate his visual impairment and then terminated him. Based on a contextual reading of the structure of the ADA, the Ninth Circuit concluded that Congress had "unambiguously expressed its intent that Title II not apply to employment" and granted "no weight" to the Attorney General's implementing regulation which found that Title II applied to employment. *Id* at 1172-73, citing 28 CFR § 35.140(a) (1998). Defendants contend that *Zimmerman* mandates dismissal of plaintiffs' ADA claim because it similarly involves employment, employment training, and employment services.

However, contrary to defendants' argument, this case does not involve "employment," but instead involves the state's provision (or failure to provide) "integrated employment *services*, including supported employment programs." Complaint, ¶¶ 2, 6 (emphasis added). Even a cursory review of the "inputs" versus "outputs" analysis cited in *Zimmerman* reveals that the integrated employment services sought by plaintiffs are "services, programs, and activities" offered by defendants, not merely the "means to deliver the services, programs, and activities." *Zimmerman*, 170 F3d at 1174, citing *Decker v. Univ. of Houston*, 970 F Supp 575, 578 (SD Tex 1997), *affirmed*, 159 F3d 1355 (5th Cir 1998). Plaintiffs simply do not seek to become state employees or contend that the state discriminates against them in employing them. Instead, they contend that the state has failed to provide services to them which would make it possible for them to become and remain competitively employed in the community.

Thus, this court concludes that *Zimmerman* is no barrier to plaintiffs' claim under Title II of the ADA.

### B. <u>Applicability of Integration Mandate to Employment-Related Services</u>

Defendants also contend that the integration mandate does not apply to the provision of employment-related services. They raise several arguments to support this contention.

First, defendants contend that the court should give no deference to the Department of Justice's recent interpretation of the integration mandate which prohibits the unnecessary provision of services to persons with disabilities in non-residential settings, including segregated sheltered workshops. "Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.*," p. 3 (June 22, 2011) ("2011 DOJ Statement"), available at: http://www.ada.gov/olmstead/q&a_olmstead.htm (last accessed May 17, 2012). The reference to "*Olmstead v. L.C.*" is to a 1999 decision by the Supreme Court holding that under the ADA:

> States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Olmstead v. L.C. ex rel. Zimring*, 527 US 581, 607 (1999).

In the 2011 DOJ Statement under Question 1, "What is the most integrated setting under the ADA and Olmstead," the Department of Justice states:

> Integrated services are those that provide individuals with disabilities opportunities to live, work, and receive services in the greater community, like individuals without disabilities. Integrated settings are located in mainstream society; offer access to community activities and opportunities at times, frequencies and with persons of an individual's choosing; afford individuals choice

7 – OPINION AND ORDER

> in their daily life activities; and provide individuals with
> disabilities the opportunity to interact with non-disabled persons to
> the fullest extent possible. … Segregated settings include, but are
> not limited to, … settings that provide for daytime activities
> primarily with other individuals with disabilities.

2011 DOJ Statement, p. 3.

The Department of Justice further states that a "comprehensive, effectively working plan" written pursuant to *Olmstead* must "include commitments for each group of persons who are unnecessarily segregated," including "individuals spending their days in sheltered workshops or segregated day programs." *Id* at 7. Finally, the Department of Justice states that appropriate remedies under the integration mandate include "supported employment." *Id* at 8.

Although the Ninth Circuit recently accorded deference to another portion of the 2011 DOJ Statement in *M.R. v. Dreyfus*, 663 F3d 1100, 1117 (9th Cir 2011), defendants argue that it should be given no weight here because it is inconsistent with the Department of Justice's earlier proclamation in 1991 when the integration mandate regulation was promulgated. The 1991 commentary to the publication of the proposed regulation stated that: "These provisions should not be construed to jeopardize in any way the continued viability of separate schools providing education for particular categories of children with disabilities, *sheltered workshops*, special recreational programs, and other similar programs." Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 Fed Reg 8538-01, 8543 (proposed Feb 28, 1991), 1991 WL 311707 (emphasis added). Defendants contend that this language means that the Department of Justice did not consider sheltered workshops to violate the proposed integration mandate regulation. However, that contention plainly is at odds with the next two paragraphs of the 1991 commentary which unequivocally demonstrate that the Department of Justice also did not consider it appropriate to strip disabled individuals of the opportunity to

choose participation in integrated activities over participation in special programs such as sheltered workshops:

> At the same time, *individuals with disabilities cannot be denied the opportunity to participate in programs that are not separate or different*. This is an important and overarching principle of the Americans with Disabilities Act. *Separate, special, or different programs* that are designed to provide a benefit to persons with disabilities *cannot be used to restrict the participation of persons with disabilities in general, integrated activities*.
>
> For example, a person who is blind may wish to decline participating in a special museum tour that allows persons to touch sculptures in an exhibit and instead tour the exhibit at his or her own pace with the museum's recorded tour. It is not the intent of this section to require the person who is blind to avail himself or herself of the special tour. Modified participation for persons with disabilities must be a choice, not a requirement.

*Id* (emphasis added).

As in these examples, plaintiffs contend that sheltered workshops – ostensibly "designed to provide a benefit to persons with disabilities" – cannot be used to restrict the participation of persons with disabilities in general, integrated employment. Plaintiffs do not argue that sheltered workshops must be eliminated because they are *per se* illegal, but instead argue that, in most instances, a more integrated setting is appropriate and, therefore, required by the integration mandate. Complaint, ¶ 33 ("most" of the members of the plaintiff class could and would prefer to work in an integrated employment setting). Accordingly, participation for persons with disabilities in sheltered workshops "must be a choice, not a requirement." No meaningful conflict exists between the 1991 commentary by the Department of Justice on the integration mandate and the recent 2011 DOJ Statement on its enforcement following *Olmstead*.

///

Next, citing *Dreyfus,* defendants contend that the integration mandate does not apply to plaintiffs' claims. In *Dreyfus,* the Ninth Circuit granted a preliminary injunction to Medicaid beneficiaries with severe mental and physical disabilities on their ADA claims against the state for reducing the available amount of in-home personal care services which placed them at serious risk of institutionalization. Applying *Olmstead*, the Ninth Circuit held that in order to state a violation of the integration mandate, "a plaintiff need only show that the challenged state action creates a serious risk of institutionalization." *Dreyfus*, 663 F3d at 1116 Because plaintiffs in this case do not allege that they are at risk for institutionalization, defendants contend that the integration mandate simply does not cover their claims.

In addition to *Dreyfus*, defendants cite a host of other cases which they contend demonstrate that a violation of Title II of the ADA requires a showing that the policies, activities, or programs plaintiffs challenge have resulted in their institutionalization or create a risk of institutionalization.[2] Because those cases were premised upon state action creating a risk of residential institutionalization, that risk naturally was discussed. However, the cases do not otherwise suggest that such a risk is the *sine qua non* of a Title II claim.

As defendants correctly note, no other case has applied the integration mandate in a context other than one in which the state's action places plaintiffs at risk for institutionalization. However, that dearth of authority does not lead inexorably to the conclusion that the integration

---

[2] *See Radaszewski v. Maram*, 383 F3d 599 (7th Cir 2004) (at-home private-duty nursing services); *Fisher v. Oklahoma Health Care Auth.*, 335 F3d 1175 (10th Cir 2003) (cessation of unlimited medically-necessary prescription benefits); *Helen L. v. DiDario*, 46 F3d 325 (3rd Cir), *cert denied*, 516 US 813 (1995) (requiring basic and ancillary services to be provided only in nursing home, rather than in recipient's home); *Hiltbran v. Levy*, 793 F Supp2d 1108 (WD Mo 2011) (risk of forcing institutionalization in order to obtain Medicaid coverage of medically necessary incontinence briefs); *Peter B. v. Sanford*, 2010 WL 5912259 (Report and Recommendation, Nov 24, 2010), *adopted*, 2011 WL 824584 (D SC Mar 7, 2011) (risk of forcing institutionalization due to reduction or termination of medical and personal-care services); *Pitts v. Greenstein*, 2011 WL 2193398 (MD La June 6, 2011) (reduction in maximum number of home and community-based health service hours); *Cruz v. Dudek*, 2010 WL 4284955 (SD Fla Oct 12, 2010) (risk of forcing institutionalization of quadriplegics due to inadequate in-home health services); *Brantley v. Maxwell-Jolly*, 656 F Supp 2d 1161 (ND Cal 2009) (funding cuts in adult health day-care program); *Mental Disability Law Clinic v. Hogan*, 2008 WL 4104460 (ED NY 2008) (requiring hospitalization for receipt of outpatient mental health services).

10 – OPINION AND ORDER

mandate is inapplicable to plaintiffs' claims. To the contrary, the broad language and remedial purposes of the ADA,[3] the corresponding lack of any limiting language in either the ADA or the integration mandate itself, and the lack of any case law restricting the reach of the integration mandate suggest just the opposite conclusion. It is particularly noteworthy that the Supreme Court levied the following criticisms against institutionalization in *Olmstead*:

> Recognition that unjustified institutional isolation of persons with disabilities is a form of discrimination reflects two evident judgments. First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life. Second, confinement in an institution severely diminishes the everyday life activities of individual, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment.

*Olmstead*, 527 US at 600-01 (citations omitted).

Those same criticisms apply equally to offering no choice of employment services other than working in a sheltered workshop. This case is notably different than any prior case, including *Dreyfus*, because it does not involve a claim to restore services in order to prevent confinement in a residential institution. Instead, it seeks to ensure the provision of available employment-related services in order to prevent unnecessary segregation in employment. Although the means and settings differ, the end goal is the same, namely to prevent the "unjustified institutional isolation of persons with disabilities." Thus, this court concludes that

---

[3] *See Lee v. City of Los Angeles*, 250 F3d 668, 691 (9th Cir 2001), quoting *Yeskey v. Pa. Dep't of Corr.*, 118 F3d 168, 171 & n5 (3rd Cir 1997), aff'd, 524 US 206 (1998) ("Quite simply, the ADA's broad language brings within its scope 'anything a public entity does.'"); *Hason v. Med. Bd. of Cal.*, 279 F3d 1167, 1172 (9th Cir 2002), quoting *Arnold v. United Parcel Serv., Inc.*, 136 F3d 854, 861 (1st Cir 1998) ("Courts must construe the language of the ADA broadly in order to effectively implement the ADA's fundamental purpose of 'providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'").

11 – OPINION AND ORDER

the risk of institutionalization addressed in both *Olmstead* and *Dreyfus* includes segregation in the employment setting.

Defendants also argue that the integration mandate is inapplicable in this context because plaintiffs do not allege that they are working against their will, unlike the plaintiffs in other cases who faced involuntary institutionalization by the state's action. They also argue that several of the plaintiffs work as little as a couple of hours per week, which they contend does not qualify as "institutionalization." This argument improperly attempts to shift the focus of the inquiry toward plaintiffs' choices and away from the issue of defendants' actions relative to the services provided. Defendants' obligation is to administer their services and programs "in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 CFR §§ 35.130(d), 41.51(d). Plaintiffs allege that they are "unnecessarily segregated" – *i.e.* forced to work in a segregated setting if they are to work at all − due to defendants' overreliance on sheltered workshops and corresponding "failure to timely develop and adequately fund integrated employment services, including supported employment programs." Complaint, ¶¶ 2, 5-6, 34-37, 81, 88-92, 97-98, 107. Those allegations sufficiently assert that defendants have failed to meet their obligation under the integration mandate.

In sum, this court discerns no statutory or regulatory basis for concluding that the integration mandate to provide services in the most integrated setting appropriate applies only where the plaintiff faces a risk of institutionalization in a residential setting.

///

///

///

///

12 – OPINION AND ORDER

### C. Imposition of a Standard of Care or Demand for Level of Benefits

The central theme of plaintiffs' claims is that defendants are violating the anti-discrimination laws by dedicating a disproportionate amount of their resources to fund sheltered workshops at the expense of supported employment services.[4] Complaint, ¶¶ 2, 5-6, 34-37, 81, 85 (describing problem as a "capacity" issue), 88-92, 97-99, 107. Nevertheless, defendants contend that plaintiffs' ultimate goal is to obtain two forms of impermissible relief. First, defendants argue that the ultimate goal of "integrated employment," as that term is defined by plaintiffs, is not a "service" that the state does or can provide. They point out that some allegations − read literally and collectively − seek the ultimate goal of a "real job in a community-based business setting" for all plaintiffs and class members. *See* Complaint, ¶ 4 (defining "integrated employment" as a "real job in a community-based business setting"); Prayer, ¶ 2 ("failing to provide [plaintiffs] with supported employment programs in integrated settings"); Prayer, ¶ 3(b) (seeking "supported employment programs in integrated employment settings for all qualified class members"). Second, defendants contend that plaintiffs seek either to impose a standard of care on the services defendants provide or seek to obtain a particular level of benefits, neither of which is a permissible form of relief. Again, some of the allegations in the pleadings support this argument. *Id*, ¶¶ 184 (failing to "offer an *adequate array* of integrated employment and supported employment services to qualified persons with disabilities") (emphasis added), 192 (same), and Prayer, ¶ 3(a) (same).

---

[4] Plaintiffs also allege that OVRS administers its federal funds in a manner that favors individuals with less severe disabilities and disfavors those with more severe disabilities and "does not use available resources to provide vocational assessments and supported employment services to all qualified individuals with intellectual and developmental disabilities." Complaint, ¶¶ 86, 107. It is unclear whether or to what extent plaintiffs base their claims on the contention that defendants favor less severely disabled individuals, as opposed to failing to offer a meaningful opportunity to obtain supported employment services to any qualified disabled individual.

13 – OPINION AND ORDER

As defendants acknowledge, *Olmstead* admonishes that a disability discrimination claim may not be premised upon allegations that defendants failed to meet a particular standard of care with regard to the services provided or upon a request for a particular level of benefits:

> We do not in this opinion hold that the ADA imposes on the States a "standard of care" for whatever medical services they render, or that the ADA requires States to "provide a certain level of benefits to individuals with disabilities." . . . We do hold, however, that States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide.

*Olmstead*, 527 US at 603 n14.

Thus, a claim survives only if it truly alleges a "discriminatory denial of services" and must be dismissed if it instead concerns the "adequacy" of the services provided. *See Buchanan v. Maine*, 469 F3d 158, 174-75 (1st Cir 2006) (discussing *Olmstead* and its progeny). Accordingly, claims by qualified individuals who both meet the eligibility requirements for a particular program and are willing participants may properly allege a claim for a denial of the services provided by a program, but not a claim for providing inadequate services.

At oral argument, plaintiffs clarified that they are not seeking a guarantee that the employment services they desire will result in community-based or competitive employment. Instead, they seek the provision of employment services that would allow them the opportunity to work in an integrated setting. *Id*, ¶¶ 4 (defining "[s]upported employment services" as those "vocational training services that *prepare and allow* people with intellectual and developmental disabilities to participate in integrated employment") (emphasis added), 85 (alleging that ODDS has failed "to ensure there is a sufficient capacity of supported employment services *to allow* persons with intellectual and developmental disabilities to *work in integrated settings*") (emphasis added), 119 (Lane not offered supported employment services that would allow her to work in an integrated environment), 128 (Peniagua), 132-34 (Harrah), 142 (Kehler), 152

(Cason), 161 (Robertson), 168 (Green), 175-76 (Kinville).  In particular, plaintiffs seek to have defendants reallocate their available resources in a way that does not unjustifiably favor segregated employment in sheltered workshops at the expense of providing supported employment services to qualified individuals.  Accordingly, they seek a court order mandating: (1) a treatment planning process that properly and fairly assesses the individuals' ability and interest in supported employment;[5] (2) provision of supported employment services to those individuals who qualify for and are interested in them; and (3) a supported employment program that complies with CMS and other national accrediting standards.

However, some of allegations in the Complaint go beyond the clarification offered by plaintiffs at the hearing and seek the forbidden remedy of requiring defendants to provide an adequate level of employment services to enable plaintiffs to obtain a competitive job.  In particular, plaintiffs allege that defendants are violating Title II of the ADA and the Rehabilitation Act by failing "to offer an *adequate array* of integrated employment and supported employment services" (Complaint, ¶¶ 184, 192) (emphasis added) and "to provide them with supporting employment services that *would enable them to work in integrated employment settings*" (*id,* ¶¶ 185, 193) (emphasis added).  These allegations are subject to dismissal because they demand that defendants provide a competitive job in the community and a certain standard of care or level of benefits.  Instead, to comply with the scope of plaintiffs' claims as described at the hearing, these allegations (and other related allegations) must be

---

[5] Plaintiffs contend that defendants already have an assessment process in place to determine whether an individual qualifies for supported employment services.  Complaint, ¶ 83.  They also allege that they qualify for and receive such services.  *Id*, ¶ 1.  Several of the plaintiffs previously worked or volunteered in integrated settings.  *Id*, ¶¶ 132 (Harrah), 138 (Kehler), 145 (Cason), 165 (Green), and 173 (Kinville).  Others have entries in one or more of their annual Individual Support Plans that indicate they qualify for community or competitive employment.  *Id*, ¶¶ 116 (Lane), 140-41 (Kehler), 150 (Cason), 160-61 (Robertson), 167 (Green), 175 (Kinville).  The sole remaining plaintiff, Mr. Paniagua, has a favorable work history in sheltered settings (*id,* ¶¶123), the ability to successfully navigate the public transportation system (*id,* ¶ 122), and work skills which he contends demonstrate he is capable of working in an integrated setting (*id,* ¶ 123-25).  Despite those skills and his oft-expressed interest in working competitively, he has never been offered the opportunity to work outside the sheltered workshop and his ISPs do not mention the option of competitive employment.  *Id*, ¶¶ 121, 126.

15 – OPINION AND ORDER

amended to clarify that defendants are violating Title II of the ADA and the Rehabilitation Act by denying employment services to plaintiffs for which they are eligible with the result of unnecessarily segregating them in sheltered workshops.

## **ORDER**

For the reasons stated above, defendants' Motion to Dismiss (docket #29) is GRANTED. Plaintiffs' claims are dismissed WITHOUT PREJUDICE and WITH LEAVE TO AMEND. Plaintiffs shall file their First Amended Complaint to cure the problems identified in this Opinion and Order on or before May 29, 2012.

DATED May 17, 2012.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge