UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

PAULA LANE; ANDRES PANIAGUA;
ELIZABETH HARRAH; ANGELA KEHLER;
GRETCHEN CASON; LORI ROBERTSON;
SPARKLE GREEN; and ZAVIER KINVILLE,
on behalf of themselves and all other similarly
situated, and UNITED CEREBRAL PALSY
OF OREGON AND SOUTHWEST
WASHINGTON, INC.,

               Plaintiffs,

    v.

JOHN KITZHABER, Governor of the State of
Oregon; ERINN KELLEY-SIEL, Director of
the Oregon Department of Human Services;
MARY LEE FAY, Administrator of the Office
of Developmental Disability Services; and
STEPHAINE PARRISH TAYLOR,
Administrator of the Office of Vocational
Rehabilitation Services,

               Defendants.

Case No. 3:12-cv-00138 -ST

OPINION AND ORDER

STEWART, Magistrate Judge:

**<u>INTRODUCTION</u>**

Pursuant to FRCP 23(a) and (b)(2), eight individuals and an institution, United Cerebral

Palsy of Oregon and Southwest Washington ("UCP"), have filed a Motion for Class Certification

(docket #11) to certify a class defined as "all individuals in Oregon with intellectual or

1 – OPINION AND ORDER

developmental disabilities who are in, or who have been referred to, sheltered workshops" and "who are qualified for supported employment services."  First Amended Complaint, ¶¶ 32-33.

Plaintiffs seek injunctive relief based on alleged violations of Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 USC §§ 12131-34 ("First Claim"), and Section 504 of the Rehabilitation Act of 1973, 29 USC § 794(a) ("Second Claim").  The named defendants are various state officials, including the Governor (John Kitzhaber), the Director of the Oregon Department of Human Services ("DHS") (Erinn Kelley-Siel), the Administrator of the Office of Developmental Disability Services ("ODDS") (Mary Lee Fay), and the Administrator of the Office of Vocational Rehabilitation Services ("OVRS") (Stephanie Parrish Taylor).

Defendants oppose class certification due to the lack of commonality and typicality, as well as the unavailability of classwide injunctive relief.

For the reasons that follow, the Motion for Class Certification is granted.

## BACKGROUND

### I.  Legislative Scheme

The ADA and the Rehabilitation Act impose virtually identical obligations on public entities or programs receiving federal financial assistance.  Both prohibit discrimination, mandate the administration of services in the most integrated setting appropriate, and relieve affected entities of that obligation only where the modifications would fundamentally alter the nature of the service (ADA) or impose an undue hardship (Rehabilitation Act).

Title II of the ADA prohibits discrimination against disabled persons by any public entity.  42 USC § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." ).  A

"qualified individual with a disability" is one who, "with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 USC § 12131(2). The definition of "public entity" includes "any State or local government," as well as "any department, agency, special purpose district or other instrumentality of a State . . . or local government." 42 USC § 12131(1)(a)(A) & (B).

Pursuant to Title II of the ADA, the Attorney General has promulgated a regulation providing that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 CFR § 35.130(d); First Amended Complaint, ¶ 44. The "most integrated setting appropriate" is defined as "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.*, available at http://www.ada.gov/olmstead/ q&a_olmstead.htm, citing 28 CFR Pt. 35, App. A (2010); First Amended Complaint, ¶ 45. However, this so-called "integration mandate" is not unqualified. A public entity must make "reasonable modifications" to avoid unduly segregating the disabled, but is relieved of that obligation if it can show "that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 CFR § 35.130(b)(7); First Amended Complaint, ¶ 50.

The Rehabilitation Act, which applies to programs receiving federal financial assistance, contains a similar anti-discrimination provision, 29 USC § 794(a), and a parallel regulation requiring that an agency administer its programs and activities "in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 CFR § 41.51(d); First Amended

3 – OPINION AND ORDER

Complaint, ¶ 46.  Consistent with the ADA's regulatory scheme, the integration mandate of the

Rehabilitation Act is limited by regulatory provisions indicating that a recipient of federal

funding need not accommodate a disabled person when the proposed accommodation would

impose an "undue hardship" on the recipient.  28 CFR §§ 41.53, 42.511(c); 45 CFR § 84.12(c).

## II.    <u>Named Plaintiffs</u>

The eight individual plaintiffs are persons with intellectual or developmental disabilities

("I/DD") who either reside in group homes or in the community.  First Amended Complaint,

¶¶ 112 (Paula Lane lives in an apartment with staff support), 120 (Andres Paniagua lives with his

mother), 129 (Elizabeth Harrah lives in an adult foster home), 135 (Angela Kehler lives in a

group home with other disabled individuals), 144 (Gretchen Cason lives with her parents), 154

(Lori Robertson lives in a group home), 162 (Sparkle Green lives in an adult foster home), 170

(Zavier Kinville lives with his father).  Each is qualified for employment services from DHS.

Seven of the eight plaintiffs currently work in sheltered workshops.  *Id*, ¶¶ 113, 121, 130,

136, 155, 163, 171.  One plaintiff (Gretchen Cason) worked at a sheltered workshop prior to

December 2010 and is currently unemployed.  *Id*, ¶¶ 146-48.  A sheltered workshop is a

segregated employment setting, usually located in a large, institutional facility, that employs

people with disabilities or where people with disabilities work separately from others.  *Id*, ¶ 3.

Workers in sheltered workshops have virtually no contact with their non-disabled peers, other

than agency staff, and are typically paid sub-minimum wage.  *Id.*

In contrast, integrated employment involves a "real job in a community-based business

setting where employees have an opportunity to work alongside non-disabled co-workers and

earn at least minimum wage."  *Id*, ¶ 4.  To prepare and allow people with I/DD to participate in

integrated employment, DHS "funds some supported employment services" which are in the

nature of "vocational training services." *Id*, ¶¶ 4-5. Supported employment services generally include integration, paid work at or above the minimum wage, individualized services and ongoing supports. *Id*, ¶ 73. Such services include helping an individual apply for a job and one-on-one coaching by assigned staff at the work site. Norman Depo., pp. 18, 84, 89. Unlike a sheltered workshop which assigns individuals with varying abilities and interests to identical tasks, supported employment services "utilize a person-centered planning model that assesses each individual's unique skills, needs and preferences." First Amended Complaint, ¶ 74. Supported employment service providers match the strengths and needs of individuals to specific jobs, in contrast to sheltered workshops that fill job slots based upon the demands of its contracts or create "make work" when insufficient contract work is available. *Id,* ¶ 75. Supported employment services promote economic independence by paying prevailing wages at or above the state minimum wage. *Id*, ¶¶ 76, 79. The national trend has been moving away from the sheltered workshop model and toward supported employment. *Id*, ¶ 77.

Plaintiffs prefer to receive supported employment services which would prepare and allow them to work at a "real job in a community-based business setting where employees have an opportunity to work alongside non-disabled co-workers and earn at least minimum wage." *Id*, ¶¶ 2, 4, 119, 125-28, 132-34, 140-43, 151-53, 159-61, 166-68, 174-76. However, as a direct result of DHS's administration, management and funding of its employment service system, they and similarly situated individuals remain unnecessarily segregated in sheltered workshops and are denied virtually all contact with non-disabled persons, "any real pathway to integrated employment," and a minimum wage that would lead to economic independence. *Id*, ¶¶ 1-2, 5-7; Coffey Decl., ¶¶ 5, 6.

The organizational plaintiff, UCP, is a statewide, nonprofit organization that serves adults, children and families experiencing cerebral palsy and I/DD.  First Amended Complaint, ¶ 22.  It has monitored and attempted to influence defendants in order to ensure that persons with I/DD receive the employment services to which they are entitled.  *Id*, ¶ 23.  That effort has diverted its resources and hindered its ability to serve its clients and expand its capacity to provide supported employment services.  *Id*, ¶ 24.

### III.    <u>Oregon's Employment Services System</u>

DHS plans, funds and oversees all developmental disability services and vocational rehabilitation services for adults with I/DD in Oregon.  *Id*, ¶¶ 28, 81.  It determines the amount and allocation of funding, including the range of employment services and the level of funding for sheltered workshops versus supported employment programs.  *Id*, ¶ 81.  It receives federal funds for the administration of its programs.  *Id*, ¶¶ 28, 29.

ODDS (part of DHS) plans, administers, and directly manages the long-term employment service systems for adults with I/DD, including all sheltered workshops and supported employment services.  *Id*, ¶¶ 30, 82.  It has the primary responsibility for developing, implementing, and overseeing all employment programs for persons with I/DD.  *Id*, ¶ 82.  ODDS has developed, adopted and promoted an Employment First Policy directing that integrated employment is the first and priority option to be explored in planning for day services.  *Id*, ¶ 84.  However, it has not taken effective action to implement the Employment First Policy, resulting in excessive reliance on segregated workshops.  *Id,* ¶ 85.

OVRS (also part of DHS) is responsible for completing a comprehensive vocational assessment and determining the employment needs and potential of adults with I/DD.  *Id*, ¶¶ 31,

86. It identifies jobs, contracts with supported employment agencies, and provides job training, job coaching, and support for up to 18 months. *Id*, ¶ 86.

Defendants administer two Medicaid waivers approved by the Center for Medicare and Medicaid Services ("CMS") and funded pursuant to § 1915(c) of the Social Security Act. *Id,* ¶¶ 53, 87. A waiver allows a state to provide a variety of services with Medicaid funds, such as employment services, without having to meet certain Medicaid requirements. *Id*, ¶ 87. Oregon's Medicaid waivers fund employment services, including many sheltered workshops and some supported employment services. *Id*.

Oregon serves adults with I/DD under two Medicaid Home and Community Based Services ("HCBS") waiver programs. Fay Decl., ¶ 5. The Comprehensive Waiver provides persons with funds for 24-hour care in both residential programs and non-residential day services. *Id*. These persons are assigned a case manager who is employed by a Community Development Disability Program ("CDDP"). *Id*. CDDPs are typically run by the county. *Id*. The CDDPs establish and confirm the rates for individuals' service needs. *Id*. Case managers are tasked with helping individuals determine the goals and outcomes of their services and drafting an Individual Support Plan ("ISP") consistent with the Employment First Policy. *Id*. Case managers are also responsible for referring clients to service providers. *Id*.

In contrast, the Support Services Waiver provides funds for individuals living on their own or with their families. *Id*, ¶ 6. Each person served by the Support Services Waiver is enrolled in a brokerage, which is an independent entity certified by Oregon. *Id*. Brokerages employ personal agents. *Id*. Each person under this waiver is assigned a personal agent who is charged with helping the person develop an annual ISP that identifies support needs and goals for the year. *Id*. Each person receives a set amount of Medicaid funds for the month and has a

choice from a menu of available options as to how to spend those funds.  *Id.*  Personal agents are responsible for helping their clients select services and providers that will best meet their clients' goals and needs.  *Id.*  Personal agents, like case managers, are subject to the Employment First policy.  *Id*, ¶ 6.

Sheltered workshops are facilities controlled by certified services providers where individuals with I/DD perform contract work.  *Id*, ¶ 10.  They are available to any Oregonian served by one of the waivers at any time.  *Id*.  An enclave is a small group of up to eight individuals with I/DD who are employed by a provider agency and who work in a community business worksite with staff of the provider agency.  *Id*.  Provider agencies provide employment or alternatives to employment services for persons under the comprehensive waiver at a rate assigned to each person in accordance with the Oregon Administrative Rules and the person's ISP.  *Id*, ¶ 11.  ODDS does not make a separate payment to providers who operate sheltered workshops.  *Id*, ¶ 12.  According to ODDS data, Oregon invests a total of approximately $30 million in sheltered workshops annually.  First Amended Complaint, ¶ 88.

Oregon is one of only three states with no state-run or private institutions housing individuals with I/DD.  Fay Decl., ¶ 4.  In the mid-1980s and mid-1990s, a greater percentage of Oregonians with I/DD worked in supported employment.  *Id,* ¶ 7.  However, Oregon closed the last state-run institution in 2009.  *Id*, ¶ 4.  As a result, the number of adults with I/DD served in the community increased from less than 3,000 in 1989 to over 12,000 today.  *Id,* ¶ 7.  In addition, the population now served by ODDS has a greater level of disabilities, which makes finding employment for each person more challenging.  *Id*.

Among states, Oregon is considered a leader in the provision of supported employment

services for individuals with I/DD.  *Id*, ¶ 8.  It was one of three states that developed an early

Employment First Policy in 2008.  *Id*, ¶¶ 8-9.  Oregon was also one of the 13 states to join the

Supported Employment Learning Network, a group formed to use collective experience to

determine the best policies and strategies for increasing employment outcomes.  *Id*, ¶ 8.  In

Oregon, based on data collected in March 2012, of the more than 10,000 adults receiving some

form of day services, 2,469 persons work in sheltered workshops and 2,273 persons work in

integrated employment settings.  *Id*, ¶ 20.

Despite the Employment First Policy, Oregon has increased its reliance on segregated

workshops and decreased its development and use of supported employment services.  First

Amended Complaint, ¶ 97.  According to the Call to Action Report issued in 2010 by the Oregon

Employment First Outreach Project of the relevant Oregon state agencies, Oregon lost its

momentum by 2010 for supported employment with 42% of persons under the Comprehensive

Waiver in sheltered employment and 12.3% of persons under the Support Services Waiver in

sheltered employment.  Wenk Decl., Ex. 2 ("Community Leadership for Employment First in

Oregon"), p. 6.  At that time, an estimated 60% of those under the Support Services Waiver were

not in a job and not receiving employment-related support services.  *Id.*  That report made

numerous recommendations (*id*, pp. 13-24), most of which have not been implemented.  First

Amended Complaint, ¶ 105.

## STANDARDS FOR CLASS CERTIFICATION

Plaintiffs seeking to represent a class must satisfy the threshold requirements of

FRCP 23(a), as well as the requirements under one of the subsections of FRCP 23(b).  Pursuant

to FRCP 23(a), a case is appropriate for certification as a class action if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) questions of law or fact are common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Plaintiffs seek class certification under FRCP 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

Plaintiffs bear the burden of demonstrating that each element of FRCP 23 is satisfied. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 US 147, 158-61 (1982); *Hanon v. Dataproducts Corp.*, 976 F2d 497, 508 (9th Cir 1992). While the primary focus is not on the merits of the plaintiff's claims, courts "must perform 'a rigorous analysis [to ensure] that the prerequisites of Rule 23(a) have been satisfied.'" *Ellis v. Costco Wholesale Corp.*, 657 F3d 970, 980 (9th Cir 2011), quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S Ct 2541, 2551 (2011). As the Supreme Court has stressed, "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, *etc*." *Wal-Mart*, 131 S Ct at 2551. In addition, the court's "rigorous analysis" under FRCP 23 frequently "will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Id*.

To determine whether class certification is proper, the court may consider material beyond the pleadings and require supplemental evidentiary submissions by the parties. *Blackie v. Barrack*, 524 F2d 891, 901 n17 (9th Cir 1975).

## ANALYSIS

Plaintiffs seek certification of a class in Oregon for claims arising under the ADA and the Rehabilitation Act. The proposed class definition is: "Individuals with intellectual or developmental disabilities who are in, or who have been referred to, sheltered workshops" and "who are qualified for supported employment services." First Amended Complaint, ¶¶ 32-33.

## I.    FRCP 23(a)

Defendants do not contest that plaintiffs satisfy the requirements of FRCP 23(a) as to numerosity and adequate representation by counsel. Instead, they argue that commonality is lacking and that the class representatives are not typical and, thus, do not adequately represent the proposed members of the class.

### A.    Commonality

#### 1.    Legal Standard

FRCP 23(a)(2) requires the existence of "questions of law or fact common to the class." This standard is not strictly construed, but "has been construed permissively. All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F3d 1011, 1019 (9th Cir 1998). The Supreme Court has recently clarified the commonality requirement, at least in employment discrimination cases, by requiring "the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal–Mart*, 131 S Ct at 2551 (quotation omitted). "This does not mean merely that they have all suffered a violation of the same provision of law," but instead that their claims "depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will

resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id*.

Although "[e]ven a single [common] question will do," *id* at 2556 (internal citation and

quotation marks omitted), "[w]hat matters to class certification is not the raising of common

'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate

common answers apt to drive the resolution of the litigation."  *Id* at 2551 (emphasis omitted).

## 2.    **Parties' Arguments**

Plaintiffs contend that this case is a quintessential civil rights action appropriate for class

certification because it challenges defendants' system-wide policies, practices, and failures

which have allegedly damaged all class members by unnecessarily segregating them in sheltered

workshops.  Plaintiffs allege four common questions of fact[1] and three common questions of

law[2] and argue that the evidence needed to resolve these common questions is the same for all

class members.

---

[1]  Those common questions of fact are:
1. whether the named plaintiffs and class members are unnecessarily relegated to segregated settings in order to receive employment services, as a result of defendants' actions and inactions in planning, administering, and funding their employment service system for persons with I/DD;
2. whether the named plaintiffs and class members are denied the opportunity to work with non-disabled peers, as a result of defendants' actions and inactions in planning, administering, and funding their employment service system for persons with I/DD;
3. whether the named plaintiffs and class members are given vocational training in segregated work settings that bears little or no connection to their skills, abilities, or interests and that rarely leads to integrated employment at competitive wages, as a result of defendants' actions and inactions in planning, administering, and funding their employment service system for persons with I/DD; and
4. whether defendants have a comprehensive and effectively working plan for serving the named plaintiffs and class members in integrated employment settings.
First Amended Complaint, ¶ 35.

[2] Those common questions of law are whether defendants are violating the ADA and Rehabilitation Act by:
1. planning, administering, funding and operating an employment services system that unnecessarily relies upon segregated sheltered workshops and that denies the named plaintiffs and class members supported employment services in integrated employment settings;
2. failing to provide the named plaintiffs and class members supported employment services in integrated settings, consistent with their needs; and
3. administering the employment services system in a manner that discriminates against the named plaintiffs and class members by providing them employment services in segregated settings and by failing to provide them supported employment services necessary to allow them to engage in competitive employment in integrated settings.
First Amended Complaint, ¶ 34.

Primarily relying on *Wal-Mart*, defendants respond that no common questions of law or fact exist and that resolution of this case will necessitate numerous fact-intensive, individualized inquiries in light of the differing types of disabilities and differing needs for employment services for each class member.

As discussed below, this court concludes that a class of disabled individuals seeking reasonable accommodation may be certified without the need for an individualized assessment of each class member's disability or the type of accommodation needed. On balance plaintiffs have met their burden of satisfying commonality for purposes of class certification.

### 3.    **Impact of *Wal-Mart***

Prior to *Wal–Mart*, commonality in disability discrimination suits was generally satisfied "where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F3d 849, 868 (9th Cir 2001), *cert denied*, 537 US 812 (2002) (commonality met for a class of individuals with different types of disabilities "all of whom suffer from the Board's failure to accommodate their disabilities"), citing *LaDuke v. Nelson*, 762 F2d 1318, 1332 (9th Cir 1985) (commonality met where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members), and *Baby Neal ex rel. Kanter v. Casey*, 43 F3d 48, 56 (3rd Cir 1994) (commonality not precluded by individual factual differences). As plaintiffs note, in almost every case involving a challenge under Title II of the ADA and/or Section 504 of the Rehabilitation Act to discriminatory governmental policies and practices, courts have certified a class. *See, e.g.,* 7 NEWBERG ON CLASS ACTIONS § 23:10 (4th ed. 2011). This is particularly true with respect to cases alleging a violation of the integration mandate of the ADA. *See* List of Selected ADA Class Action Cases, attached as Appendix to Plaintiffs' Memorandum in Support of Their Motion for Class Certification (docket # 12-2).

Defendants contend that *Wal-Mart* has changed the landscape by tightening the standard for proving commonality under FRCP 23(a)(2). *Wal-Mart* emphasized that a common contention is not sufficient if its resolution may be impeded by "[d]issimilarities within the proposed class." *Wal-Mart*, 131 S Ct at 2551. The claims of every class member must "depend upon a common contention . . . of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the [class member's] claims in one stroke." *Id*.

Unlike this case, *Wal-Mart* was a Title VII gender discrimination case in which the plaintiffs sought damages. The Supreme Court found that the evidence was insufficient to support commonality by failing to show a common reason for the alleged disparate treatment of female employees. Instead, the evidence showed significant localized discretionary decision-making among thousands of stores nationwide potentially impacting a class of approximately 1.5 million women. In contrast, the Rehabilitation Act claims alleged in this case do not require proof of the intent behind the alleged discrimination, but instead rely on a denial of benefits to disabled persons. Thus, the Title VII analysis in *Wal-Mart* is not closely on point. Moreover, plaintiffs in this case point to a common policy and practice of unnecessary segregation by DHS and its programs which is capable of classwide resolution.

Nonetheless, to support a heightened standard of proof, defendants point to two post-*Wal-Mart* appellate opinions, *M.D. ex rel Stukenberg v. Perry*, 675 F3d 832 (5th Cir 2012), and *Jamie S. v. Milwaukee Pub. Sch.*, 668 F3d 481 (7th Cir 2012), which refused to certify class actions challenging systemic deficiencies. Neither opinion supports defendants' position.

In *M.D.,* the proposed class of children in long-term foster care sought declaratory and injunctive relief to redress classwide injuries caused by systemic deficiencies in the

administration of Texas's child welfare system.  Although the Fifth Circuit stated that *Wal-Mart* "has heightened the standards for establishing commonality under Rule 23(a)(2)," it made that statement in the context of finding that the district court failed to perform a sufficient analysis. *M.D.*, 675 F3d at 839.  The Fifth Circuit did not conclude that the common questions were insufficient, as in *Wal-Mart*, but held only that the district court "failed to perform the 'rigorous analysis' required" to explain how the numerous systemic deficiencies gave rise to a common solution for the three differing constitutional claims of all class members. *Id* at 844.  In fact, it acknowledged that "the class claims could conceivably be based on an allegation that the State engages in a pattern or practice of agency action or inaction – including a failure to correct a structural deficiency within the agency, such as insufficient staffing . . ." *Id* at 847.  In contrast here, plaintiffs allege that defendants are engaging in a pattern or practice of inaction, including a failure to correct several structural deficiencies which the Fifth Circuit expressly recognized as a viable class claim.

*Jamie S.* involved a proposed class of special education students in Milwaukie, Wisconsin, alleging a violation of the school district's Child Find obligations under the Individuals with Disabilities Education Act ("IDEA") and seeking structural reform in the manner of providing special education services.  The Seventh Circuit denied certification based on two factors not present here.  First, the IDEA requires individualized determinations of each child's educational needs and precludes judicial relief without first exhausting all administrative remedies.  The plaintiffs sought to circumvent that requirement by challenging a systemic deficiency.  The Seventh Circuit found that the class definition was too indefinite and could not be invoked to accomplish such circumvention. *Jamie S.*, 668 F3d at 493-96.  Neither the ADA nor the Rehabilitation Act at issue in this case impose such an exhaustion requirement or demand

such individualized determinations.  Second, and perhaps more importantly, the elaborate court-monitored remedial scheme established an individualized child review process that resulted in separate injunctive orders for each child.  Such separate injunctions did not generate a common answer that applied to the class as a whole.  *Id* at 498-99.  No such remedial scheme exists – or is being sought – in this case.

Based on *Wal-Mart*, no court has yet declined to certify an ADA Title II case.  To the contrary, after *Wal-Mart*, several courts have certified class actions in ADA or Rehabilitation Act cases.  In *Oster v. Lightbourne*, 2012 WL 685808, at *6 (ND Cal March 2, 2012), alleging claims for violations of the ADA, the Rehabilitation Act, and the Medicaid Act, the court certified a class of persons whose state in-home support services would be "limited, cut, or terminated" by 20% under a new law.  Given the lack of discretion in the reduction, the court found that the case was "readily distinguishable" from *Wal-Mart*.  *Id* at *5.  Similarly, the court in *Pashby v. Cansler,* 279 FRD 347 (ED NC Dec. 8, 2011), certified a class of eligible adult Medicaid recipients challenging the legality of a new rule that would terminate eligibility for in-home care.  Unlike *Wal-Mart,* the court concluded that plaintiffs "sufficiently alleged commonality of their claims" because a determination that the rule "is valid or invalid on its face will resolve the claims of all potential plaintiffs, irrespective of their particular factual circumstances."  *Id* at 353.

As defendants point out, those cases, as in other pre-*Wal-Mart* cases, are distinguishable on the basis that they challenged reductions according to some formula.  In contrast, plaintiffs in this case do not challenge the legality of a law or rule to reduce services by a set amount to every eligible recipient.  However, two other cases post-*Wal-Mart* have certified classes in situations similar to this case.

In *Gray v. Golden Gate Nat'l Recreation Area*, 279 FRD 501 (ND Cal 2011),

*reconsideration denied in part*, No. C 08-00722 EDL, 2011 WL 5573466 (ND Cal Nov. 15,

2011), the court thoroughly analyzed *Wal-Mart* before certifying a class of persons with mobility

and/or vision disabilities challenging the barriers at a national recreation area under the

Rehabilitation Act.  It concluded that the commonality requirement was met by the general

policies and practices of failing to address access barriers despite the differing types and levels of

disabilities of the class members.  In doing so, it relied on *Armstrong* which affirmed the

certification of a class of life-with-parole prisoners with differing disabilities who claimed that

the Board of Parole's policies and practices for parole hearings violated the ADA and

Rehabilitation Act.  Upon reconsideration after the Ninth Circuit's decision in *Ellis v. Costco*

*Wholesale Corp.*, 657 F3d 970 (9th Cir 2011) (declining to certify a class action alleging gender

discrimination in violation of Title VII), the court refused to de-certify the class.

In *D.L. v. Dist. of Columbia*, 277 FRD 38 (D DC Nov 16, 2011), after analyzing *Wal-*

*Mart,* the court refused to decertify a class of preschool-aged children eligible for, but not

identified to receive, special education and related services in violation of the IDEA and the

Rehabilitation Act.[3]  The court concluded that "plaintiffs have amply demonstrated"

commonality because "[a]ll of the class members have suffered the same injury:  denial of their

statutory right to a free appropriate public education."  *Id* at 45.  It characterized the multiple

allegations of violations of various laws as "only represent[ing] the differing ways in which

defendants have caused class members' common injury."  *Id.*  It also found that "unlike in *Wal-*

*Mart*, this common question of *whether* class members received a [Free Appropriate Public

Education] is susceptible to classwide proof – *e.g.,* statistical evidence indicating that, compared

---

[3]  As in *Jamie S.*, decided later, plaintiffs alleged a violation of the Child Find obligations under the IDEA.

to similar jurisdictions, the District of Columbia is underserving its population of disabled children." *Id.* Also, unlike *Wal-Mart*, the court pointed out that liability "does not hinge on [defendants'] state of mind when they denied disabled children a FAPE, or on any particular cause." *Id* at 46 (emphasis in original; citation omitted). Finally, it concluded that "plaintiffs have presented significant proof or 'glue' binding together the various reasons why individual class members were denied a FAPE – namely, 'systemic failures' within defendants' education system." *Id* at 46.

Defendants do not contend, nor can they, that *Wal-Mart* overruled all prior cases and now bars certifying class actions by persons with differing disabilities for violations of the ADA and Rehabilitation Act. Instead, as was the situation before *Wal-Mart*, despite the individual dissimilarities among class members, "commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong,* 275 F3d at 868.

### 4.    **Analysis**

Defendants assert that a single answer cannot be given to any of the four allegedly common questions of fact, pointing to differences among the named plaintiffs. For example, not all of the named plaintiffs work in sheltered workshops[4]; some have worked in[5] (or declined the opportunity to work in[6]) integrated settings; and appropriate vocational training will differ for each individual. However, commonality only requires a single common question of law *or* fact. A common question of law posed in this case is whether defendants have failed to plan,

---

[4]  Ms. Cason is not currently employed and does not want to return to a sheltered workshop which is the only employment she has been offered. Ms. Kehler works in an enclave (a segregated setting which offers no regular contact with non-disabled peers).
[5]  Ms. Robertson, Ms. Cason and Ms. Harrah have worked in integrated settings.
[6]  Ms. Robertson declined a night janitorial position, the only community job then available, due to logistical difficulties working at night.

administer, operate and fund a system that provides employment services that allow persons with disabilities to work in the most integrated setting.  As in other cases certifying class actions under the ADA and Rehabilitation Act, commonality exists even where class members are not identically situated.

As defendants correctly note, some plaintiffs or putative class members may need more or different employment services than others.  However, all plaintiffs are qualified for, but not receiving the full benefit of, supported employment services; all lack regular contact with non-disabled peers (other than paid staff); and all want to work, but are not working, in an integrated setting.  As a result, they and all similarly situated persons suffer the same injury of unnecessary segregation in the employment setting.  It is not necessary, as defendants contend, for plaintiffs to prove at this stage that they and all putative class members are unnecessarily segregated and would benefit from employment services.  That is, in effect, the answer to the common question and not the common question of whether they are being denied supported employment services for which they are qualified.

Under defendants' interpretation, differences with respect to the needs and preferences of persons with disabilities would always preclude the certification of a class in virtually all ADA Title II cases.  This court rejects that interpretation and concludes that plaintiffs satisfy the commonality requirement of FRCP 23(a).

///

## B.    <u>Typicality</u>

FRCP 23(a)(3) further requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Typicality is similar to the commonality requirement.  "Under the rule's permissive standards, representative claims are 'typical' if they

are reasonably coextensive with those of absent class members; they need not be substantially

identical." *Hanlon*, 150 F3d at 1020.  Because the alleged cause of plaintiffs' injury is a

discriminatory policy and practice, the "typicality inquiry involves comparing the injury asserted

in the claims raised by the named plaintiffs with those of the rest of the class." *Armstrong*, 275

F3d at 869.  Although the claims of the class representative need not be identical to the claims of

other class members, the class representative "must be part of the class and possess the same

interest and suffer the same injury as the class members." *Falcon*, 457 US at 156 (internal

quotation marks and citation omitted).

      Plaintiffs argue that they are typical of the proposed class (qualified persons with I/DD

who are in, or who have been referred to, sheltered workshops) because they have I/DD, require

employment services, are currently working in (or referred to) a segregated setting, have no

contact with non-disabled peers other than paid staff, want to work in an integrated setting, are

not working in an integrated setting, are qualified for supported employment services, and, as a

result, are suffering unnecessary segregation.  In sum, they all have suffered the same type and

manner of injury (segregated employment) stemming from the same discriminatory practice

(systemic failure to provide supported employment services).

      Defendants do not dispute that two plaintiffs (Paula Lane and Sparkle Green) work in a

sheltered workshop (Edwards Center in Beaverton, Oregon), want to be in an integrated setting,

and are not receiving any form of supported employment.  However, they challenge whether the

six remaining plaintiffs are typical of the putative class members.  They argue that some of the

named plaintiffs have not been denied supported employment services or do not want such

services and, thus, have suffered no injury.  They also contend that plaintiffs have submitted no

evidence that they are capable of working in an integrated setting.  These arguments are premised, in part, on inaccurate, incomplete or misleading information.

Defendants misconstrue the deposition testimony of Andres Paniagua to suggest that he does not want to work in a community job.  He testified that he wants a job in the community in order to make more money and has requested help for the past four years to obtain a community job without success.  Paniagua Depo., pp. 12, 18, 80; Toner Depo., Ex. 14.

Plaintiffs concede that five of them working at Eastco's sheltered workshop may have received some supported employment services, but only after Eastco hired a new job developer in April 2012 after this lawsuit was filed.  Eastco had to lay off its previous job developer in July 2010 due to budget cuts.  Norman Depo. (docket #75-2), pp. 21, 101.  The newly hired job developer is only able to provide services to 14 of 57 qualified individuals.  *Id*, pp. 105-06. Typicality is not defeated by the fact that representative plaintiffs have had some limited mitigation of their damages.  *Wolin v. Jaguar Land Rover N. Am, LLC,* 617 F3d 1168 (9th Cir 2010) (typicality not defeated by two class representatives who had already received some discounts and free services for faulty tires).  Moreover, Eastco had no job developer at the time this lawsuit was filed.  A plaintiff does not lose standing to seek injunctive relief when the unlawful conduct ceases after a lawsuit is filed.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv.,* 528 US 167, 185 (2000).  In any event, these five named plaintiffs continue to be segregated at Eastco's sheltered workshop.   As defendants correctly point out, Ms. Cason is currently unemployed.  She previously worked in a community job, but now is being offered only work in a sheltered workshop.  She alleges that she is not receiving the supported employment services through OVRS that would enable her to return to a community job.

Therefore, she is typical of those putative class members who have been referred to work in a sheltered workshop.

Some of the named plaintiffs are clearly capable of working in an integrated setting based on their past work experience in community jobs (Ms. Cason, Ms. Kehler, Ms. Robertson, and Ms. Harrah). The others may or may not be capable of working in an integrated setting, but that is not the issue. The issue is whether they are typical of the class because they are qualified for supported employment services that would allow them the opportunity to work in integrated employment settings. All of them have expressed the desire for such services. Whether those services will ultimately place them in an integrated setting cannot be known until the services are provided in a nondiscriminatory manner.

Defendants also presume that sheltered workshops employing both disabled and non-disabled persons are integrated settings. Fay Decl., ¶ 14. Plaintiffs disagree with the terminology used by defendants. They concede that some enclaves (workshops with eight or fewer persons) are integrated settings, such as a factory that employs many non-disabled persons and pays at least minimum wage. However, some enclaves are segregated settings with no contact with non-disabled peers and with payment of sub-minimum wages. Norman Depo., pp. 47-48, 90-91. For example, Ms. Kehler works in Eastco's screen printing shop. Kehler Depo., p. 14. Although it is an enclave, plaintiffs have submitted evidence that it is a segregated setting similar to a sheltered workshop because, with the exception of the manager and screener, it employs only disabled workers. Norman Depo., pp. 15-17, 93-94. Based on the evidence submitted by plaintiffs, all of the named plaintiffs fall within the proposed class definition.

Defendants also argue that the class definition is fatally overbroad to the extent that it includes individuals who: (1) work in sheltered workshops that are actually integrated; (2) also

work in an integrated setting; or (3) do not wish to leave the sheltered workshop. That argument is rejected. With respect to the first category, as discussed above, plaintiffs' evidence supports their allegation that no sheltered workshop is truly integrated. With respect to the second category, the proposed class definition may well include some individuals who work in both a sheltered workshop and an integrated setting. However, according to plaintiffs' allegations and evidence, any work in a sheltered workshop, even if part-time, is unnecessary segregation. With respect to the third category, plaintiffs do not seek to close all sheltered workshops or force people to leave the workshop if that is not their preference. They simply seek the opportunity to leave a sheltered workshop by receiving those services. Due to their disability, many individuals with I/DD may not ask for supported employment services because they are not aware of them or because they are not aware that they have any choices as to services that they are entitled to receive. *See Disability Advocates, Inc. v. Patterson*, 653 F Supp2d 184, 254 (EDNY 2009), *vacated on other grounds*, 675 F3d 149 (2nd Cir 2012) (rejecting the need for adult home residents to be "qualified" for supported housing unless they submit an application because they "lack a meaningful opportunity to submit an application to HRA for the housing of their choice.")

Defendants correctly note that due to the two different Medicaid Waivers, the plaintiffs and putative class members have differing abilities to access employment services. Case managers develop the ISP and monitor its implementation with the providers for those under the Comprehensive Waiver, while personal agents provide assistance to those under the Support Services Waiver to develop the ISP and select the necessary services and providers. However, under both waivers, the employment services provided through Medicaid funds are allegedly failing to satisfy the integration mandate. The issue is the menu of employment services and

providers available under either waiver.  If the providers are only offering employment in a

segregated setting, then it makes little difference whether the choice of provider and service is

made by a case manager for the person with I/DD or by the person with I/DD with the assistance

of a personal agent.

Thus, this court concludes that plaintiffs satisfy the typicality requirement of FRCP 23(a).

### C.    <u>Adequacy of Representation</u>

The final FRCP 23(a) prerequisite, adequacy of representation, is satisfied if "the

representative parties will fairly and adequately protect the interests of the class."  The

satisfaction of constitutional due process concerns requires that absent class members be

afforded adequate representation prior to an entry of judgment, which binds them.  *Hanlon*, 150

F3d at 1020.  Determining the adequacy of representation requires consideration of two

questions:  "(1) do the named plaintiffs and their counsel have any conflicts of interest with other

class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously

on behalf of the class?"  *Id* (citation omitted).  The adequacy of representation is satisfied as long

as one of the plaintiffs is an adequate class representative.  *Local Joint Executive Bd. of*

*Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F3d 1152, 1162 (9th Cir), *cert*

*denied,* 534 US 973 (2001).

Defendants argue that the named plaintiffs cannot adequately represent class members in

other parts of Oregon because they all reside in the Portland area.  However, they cite no case

law to support the need for adequate class representatives to be geographically diverse.  Instead,

they simply offer evidence that the opportunities for employment for individuals with I/DD in

rural areas are significantly fewer than in the Portland metropolitan area.  Fay Decl., ¶ 16.  But

they fail to explain how any particular named plaintiff from the Portland metropolitan area would

have antagonistic interests to class members from elsewhere in Oregon. All want the same thing, namely an integrated employment setting.

The named plaintiffs have the same interests as the putative class members. In addition, there is no apparent conflict of interest between the named plaintiffs' claims and those of the other class members, particularly because they have no separate and individual claims apart from the class. Thus, this court concludes that the named plaintiffs are adequate representatives of the proposed class.

## II.    FRCP 23(b)

Defendants contend that class certification is not appropriate under FRCP 23(b)(2) because a single injunction cannot possibly provide final relief to each member of the class due to the need to make individual determinations. They view this class action as a vehicle to mandate a process that will necessarily involve individualized determinations as to what level of employment services must be provided to each plaintiff and class member in order to comply with the integration mandate.

Unlike other class actions in ADA and Rehabilitation Act cases, defendants have adopted the Employment First Policy that plaintiffs fully support and do provide some supported employment services in order to implement that policy. The problem, according to plaintiffs, is that despite their acknowledgment of deficiencies in that policy, defendants are not remedying those deficiencies, such that not all qualified persons are able to access integrated employment settings. Unlike *M.D.*, and *Jamie S.*, which explicitly sought or resulted in a judicial process that used court-created expert panels or a hybrid IEP system to determine a separate injunctive order for each class member, plaintiffs seek to enforce the Employment First Policy by ordering defendants to take specific classwide operational actions to comply with the integration mandate.

This issue harkens back to defendants' prior motion to dismiss which contended that plaintiffs seek to impose an impermissible "standard of care" or to "provide a certain level of benefits" which the ADA does not require. *Olmstead v. L.C. ex rel. Zimring*, 527 US 581, 603 n14 (1999). Plaintiffs steadfastly deny that the "level" of supported employment services provided by defendants is at issue. Instead, they seek to modify the planning, administration, operation and funding of DHS's employment service program to ensure that all class members have access to integrated employment. They emphasize that the specific "level" of supported employment services needed to accomplish that goal for each class member is determined not by the court, but by treatment professionals through the existing ISP process. *See* OAR 411-341-1300.

Unlike many other cases, this case does not involve a wholesale denial, or even an across-the-board reduction, of benefits to every qualified recipient. Instead, defendants are providing some supported employment services to some qualified recipients. However, plaintiffs contend that because the services provided are inadequate based on structural deficiencies in the program, they and others similarly situated remain unnecessarily segregated in employment which is a form of discrimination on the basis of disability. The adequacy of such services can be measured, at least in part, by the level of such services provided. After all, more supported employment services will presumably provide more access to employment in integrated settings. However, a claim for more services is not necessarily the same as requiring "a certain level of benefits" which *Olmstead* expressly disavows.

*Townsend v. Quasim,* 328 F3d 511 (9th Cir 2003), is instructive in this regard. In that case, plaintiffs alleged that Washington's Medicaid program violated the ADA by providing long-term care services only to disabled recipients living in nursing homes (due to lower income

levels) and not to those living in integrated community-based settings.  Distinguishing *Olmstead*, the district court relied on *Rodriguez v. City of New York,* 197 F3d 611 (2nd Cir 1999), *cert denied*, 531 US 864 (2000), which held that New York did not violate the ADA by failing to provide safety monitoring services as part of its Medicaid program because "the plaintiff class was demanding a separate service, one not already provided by the City."  *Townsend*, 328 F3d at 517.  The Ninth Circuit found the district court's reliance on *Rodriguez* to be "misplaced," explaining that "where the issue is the *location* of services, not *whether* services will be provided, *Olmstead* controls."  *Id* (emphasis in original).  Since Washington was already providing the services, the court held that it violated the ADA by failing to provide them in a different location, namely an integrated setting.  *Id* at 518.  Because Washington claimed that providing community-based services would present a fiscal burden, the Ninth Circuit remanded the case to evaluate this fundamental alteration defense.

Similar to *Townsend,* plaintiffs are not demanding new services, but seek the provision of existing supported employment services to qualified individuals not only in segregated settings, but also in integrated employment settings.  The supported employment services at issue include one-on-one job coaching to the individual, as well as support to the employer, which is provided only in the integrated employment setting.  In essence, plaintiffs allege that through their management of employment services, defendants are dedicating a disproportionate amount of their resources in favor of segregated employment settings over integrated employment settings.  That claim involves not only what employment services are provided, but how, when and where they are provided.  This is a permissible claim under *Olmstead.  Also see Disability Advocates, Inc.,* 653 F Supp2d at 218-19 (defendants violated ADA by not providing services to mentally disabled individuals living in community-based supported housing, as well as in adult care

facilities).  Plaintiffs seek to have defendants administer their employment services to persons

with I/DD in order to place them in the most integrated setting appropriate to their needs.  While

*Olmstead* does not impose a " 'standard of care' for whatever medical services [states] render," it

requires states to "adhere to the ADA's nondiscrimination requirement with regard to the services

they in fact provide" in the most integrated setting appropriate to their needs.  527 US at 603

n14.

  As required by *Wal-Mart,* this class action can be resolved "in one stroke" with an

appropriate injunction applicable to all class members.  As outlined in the Prayer to the First

Amended Complaint, that injunction would require defendants to "administer, fund and operate

its employment services system in a manner that does not relegate persons with [I/DD] to

segregated workshops and which includes supported employment services that allow persons

with disabilities the opportunity to work in integrated settings."  That does not mean that

defendants must provide a community job to every qualified individual who wants one, but only

that it must "provide supported employment services to all qualified class members, consistent

with their individual needs."  As in *Olmstead,* whether a class member is qualified for the

services he or she seeks is determined by the reasonable judgments of professionals.  But those

judgments must actually be reasonable and based on professional assessments, rather than simply

the exigencies of available services or providers.  Plaintiffs seek a court-approved

Implementation Plan "that describes each of the activities that must be undertaken to modify the

defendants' employment service system, including infrastructure modifications, service

definitions, provider development, staff training, family education, and interagency

coordination."  This type of injunctive relief focuses on defendants' conduct, not on the

treatment needs of each class member.  It is aimed at providing classwide alternatives to

segregated employment, regardless of a person's individualized support needs, by modifying the way defendants fund, plan, and administer the existing employment service system.

### **ORDER**

For the reasons stated above, Motion for Class Certification (docket #11) to certify a class defined as "all individuals in Oregon with intellectual or developmental disabilities who are in, or who have been referred to, sheltered workshops" and "who are qualified for supported employment services" is GRANTED.

DATED August 6, 2012.

s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge