UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

PAULA LANE, *et al*, on behalf of themselves
and all others similarly situated, and

UNITED CEREBRAL PALSY OF OREGON                    Case No. 3:12-cv-00138 -ST
AND S.W. WASHINGTON,

                         Plaintiffs,                    ORDER APPROVING CLASS
                                                   ACTION SETTLEMENT

      v.

KATE BROWN, Governor of the State of
Oregon, *et al*,

                         Defendants.


UNITED STATES OF AMERICA,

                    Plaintiff-Intervenor,

      v.

STATE OF OREGON,

                    Defendant.

STEWART, Magistrate Judge:

       Plaintiffs, eight individuals with intellectual and developmental disabilities ("I/DD") and

one institution, filed this action on January 25, 2012, to challenge the State of Oregon's

overreliance on segregated sheltered workshops for employment services based on Title II of the

Americans with Disabilities Act of 1990 ("ADA"), 42 USC §§ 12131-34, Section 504 of the

Rehabilitation Act of 1973, 29 USC § 794(a), and *Olmstead v. L.C. ex rel. Zimring*, 527 US 581

(1999) .  On August 6, 2012, the Court certified a class of "all individuals with intellectual and

developmental disabilities in Oregon who are in, or have been referred to, sheltered workshops,"

and who are "qualified for supported employment services, meaning that they must be eligible

for and desire those services."  *See Lane v. Kitzhaber,* No. 3:12-cv-00138-ST, 2014 WL

2807701, at *8 (D Or 2014).  On May 24, 2013, the United States filed its Complaint in

Intervention adding a second target population of transition-aged youth with I/DD who were "at

risk" of being "placed in sheltered workshops."

After almost four years of litigation, extensive fact and expert discovery, and prior

unsuccessful efforts to resolve the dispute, the parties engaged in lengthy settlement negotiations

a few months before trial and signed a Proposed Settlement Agreement ("Agreement").  On

September 17, 2015, the Court preliminarily approved the Agreement and set a date for a

fairness hearing.  Pursuant to the Court's Order, the parties gave notice to plaintiff class

members and provided extensive outreach and education about the Agreement to class members

and families throughout the State.  Before the fairness hearing, 32 persons, not all of whom are

class members, filed objections to or comments on the Agreement.

On November 13, 2015, the parties filed a Joint Motion for Final Approval of Proposed

Settlement Agreement (docket #352).  At the fairness hearing held on December 7, 2015, the

Court heard argument from the parties and received testimony from 12 witnesses (four experts,

seven persons with I/DD (including two plaintiffs) and one parent of a person with I/DD) and

two dissidents.[1]  For the following reasons, the Joint Motion is granted.

///

---

[1]  Based on the parties' objections, the Court has not considered objections received after the fairness hearing.

## BACKGROUND

Prior to entering into the Agreement, the parties fought a number of battles in this Court while dealing with several regulatory changes.  Defendants initially moved to dismiss the Complaint on multiple grounds, including the argument that Title II's integration mandate and *Olmstead* did not apply to sheltered workshops or other nonresidential services.  The Court disagreed and held that the ADA's integration mandate applied to nonresidential employment services, that "employment claims" were cognizable under Title II of the ADA, and that claims for "integrated employment services" properly fell within Title II.  *Lane v. Kitzhaber*, 841 F Supp2d 1199, 1202, 1205 (D Or 2012).  Defendants also claimed that the Complaint impermissibly sought to ensure a "level of benefits."  The Court held that plaintiffs' overall claims did not seek a specific level of benefits, but, rather "to have defendants reallocate their available resources in a way that does not unjustifiably favor segregated employment in sheltered workshops" in lieu of integrated employment services.  *Id* at 1207.  However, the Court dismissed the Complaint with leave to re-file because a few allegations could be read as seeking an impermissible "level of benefits."  *Id* at 1208.

Plaintiffs then filed their First Amended Complaint on May 29, 2012.  After the Court certified a class, the United States notified the State that it was in violation of Title II's integration mandate with regard to employment services for persons with I/DD in sheltered workshops, as well as for youth and other individuals at risk of sheltered workshop placement, and had authorized a lawsuit to redress this discrimination.  The United States and plaintiffs met with defendants for approximately six months to attempt to resolve their respective claims.  When those attempts were ultimately unsuccessful, the United States obtained permission from the Court to intervene in this action.

On April 10, 2013, Governor Kitzhaber issued Executive Order 13-04 to prohibit funding for sheltered workshop placements after July 1, 2015 ("closing the front door"), as well as funding for vocational assessments within sheltered workshops after July 1, 2014, and to increase the provision of employment services to achieve integrated employment. Although the Order proposed various actions to expand employment services, it did not include any commitment to expand jobs in integrated settings, but explicitly noted that:

> Nothing in this Order is intended to or does create enforceable rights that do not already exist under current state of federal law. The terms of this Order do not provide a right to any person to individually claim that he or she has not received services under a state or federal statute or regulation.

Executive Order 13-04, p. 15.

Over the next two years, the State developed numerous additional planning documents, including two versions of a lengthy Integrated Employment Plan ("IEP"),[2] a Quality Assurance Plan, a Capacity Building and Training and Technical Assistance Strategic Plan, an Outreach and Awareness Strategic Plan, various policy transmittals and procedures, statements, regulations, and initiatives – all of which the State designated as part of this plan. The parties held a brief mediation in July 2013 which was unsuccessful.

On June 20, 2014, the Court denied intervention by seven individuals and their families who sought, with the State's support, to decertify the class.

On September 5, 2014, defendants moved to stay the trial and all other case deadlines for one year, citing their need to comply with the federal Workforce Innovation and Opportunity Act ("WIOA") and new regulations by the Centers for Medicare and Medicaid Services ("CMS"). These provisions placed new requirements and restrictions on a state's ability to fund segregated

---

[2] Oregon Department of Human Services, Integrated Employment Plan Individuals with Intellectual and Developmental Disabilities (July 6, 2015), http://www.oregon.gov/dhs/employment/employment-first/Documents/7-6-15%20Integrated%20Employment%20Plan.pdf.

services under Medicaid home and community-based services waivers.  The Court extended most deadlines by four months and reset the trial for December 1, 2015.

On February 2, 2015, Governor Kitzhaber issued Executive Order 15-01[3] which superseded the previous Executive Order 13-04 and expanded some of its goals, including increasing the number of people who would receive "employment services" from 2,000 to 7,000 by 2022.

From late 2013 to early 2015, the parties engaged in extensive fact discovery which involved taking over 45 fact depositions and producing and reviewing millions of pages of documents from plaintiffs, the United States Department of Justice, three other federal agencies, other States, and non-profit agencies across the United States in the field of supported employment.  Disputes over discovery and document production were the subject of over a dozen in-person and telephonic hearings before the Court.  The parties also exchanged initial and rebuttal reports from approximately 43 experts – 21 from plaintiffs and the United States and 22 from defendants.

Following expert disclosures, the parties engaged in settlement talks before Magistrate Judge John Acosta over 14 days in June, July and August 2015, resulting in the Agreement.

## SUMMARY OF AGREEMENT

The Agreement converts all of the structural reforms to Oregon's employment service system identified in Executive Order 15-01 into binding and enforceable legal obligations, and significantly expands on those requirements by establishing new systemic requirements, firm implementation dates, and integration criteria for the provision of supported employment services.  The key terms are as follows:

---

[3]  State of Oregon, Office of the Governor, Executive Order No. 15-01 (Feb. 2, 2015)
http://www.oregon.gov/dhs/employment/employment-first/Documents/Executive%20Order%2015-01.pdf.

1. The Agreement acknowledges that "Oregon has made substantial progress in providing employment services to and improving employment outcomes" for persons with I/DD. The Agreement is intended to "reflect and take into account this substantial progress." Agreement, § I.4.

2. The settlement is built largely around what the State already set out to do. The State will continue to carry out a broad range of system reforms instituted under Executive Orders 13-04 and 15-01. These reforms include "closing the front door" (ending new entries) to sheltered workshops, training, certifying service providers, coordinating more closely with the schools, and increasing services designed to achieve integrated employment. Under Executive Order 15-01, the State will provide employment services to 7,000 persons with I/DD, including persons in workshops and transition-aged youth.

3. The State will help 1,115 persons who have worked in sheltered workshops (out of about 4,000 persons who have worked in sheltered workshops since 2012) to obtain community jobs at a competitive wage. Agreement, § V.3. That number was taken directly from the State's existing IEP.

4. The State will issue "guidance" that the recommended standard for services is the "opportunity" to work at least 20 hours per week, if that is what the individual wants. Agreement, § VII.1

5. In the next two years, the State will carry out its plan to reduce the number of persons with I/DD in sheltered workshops (from 1,926 to 1,530) and reduce the hours they work each month (from 93,530 hours to 66,100 hours). Agreement, § IV.2. These goals are also generally drawn from the State's existing IEP.

6. As of July 1, 2015, the Office of Vocational Rehabilitation Services and Office of Developmental Disabilities Services may not fund new entrants into sheltered workshops. Agreement, § IV.1.

7. Subject to the terms of the Agreement, the State is given flexibility to revise Executive Order 15-01 and can seek relief from the requirements in the Agreement, such as the one requiring 1,115 community jobs, in the event of an economic downturn or other events. *E.g*., Agreement, §§ V.A.1, XV.1.

In sum, the Agreement ensures that at least 1,115 adults with I/DD will obtain

Competitive Integrated Employment, that at least 4,900 youth in transition will receive

employment services, and that approximately 1,000 youth likely will achieve the Competitive

Integrated Employment.  As described by the parties at the fairness hearing, these goals will be

achieved through clear and measurable outcomes and the expansion of various initiatives.

## LEGAL STANDARD

Unlike the settlement of most private civil actions, a class action settlement requires

approval by the district court.   FRCP 23(e).  "The primary concern of this subsection is the

protection of those class members, including the named plaintiffs, whose rights may not have

been given due regard by the negotiating parties."  *Officers for Justice v. Civil Serv. Comm'n of*

*the City and Cty. of San Francisco*, 688 F2d 615, 624 (9th Cir 1982).  "[T]here is a strong judicial

policy that favors settlements, particularly where complex class action litigation is concerned."

*In re Syncor ERISA Litig.*, 516 F3d 1095, 1101 (9th Cir 2008) (citations omitted); *see also*

*Officers for Justice*, 688 F2d at 625 ("voluntary conciliation and settlement are the preferred

means of dispute resolution").  However, before granting final approval to a class action

settlement, the court must find that it is "fundamentally fair, adequate, and reasonable."  *Hanlon*

*v. Chrysler Corp.*, 150 F3d 1011, 1026 (9th Cir 1998), citing *Class Plaintiffs v. City of Seattle*,

955 F2d 1268, 1276 (9th Cir 1992).  "It is the settlement taken as a whole, rather than the

individual component parts, that must be examined for overall fairness."  *Id*, citing *Officers for*

*Justice*, 688 F2d at 628.  The assessment of fairness includes the balancing of several factors,

including but not limited to:

> the strength of plaintiffs' case; the risk, expense, complexity, and
> likely duration of further litigation; the risk of maintaining class
> action status throughout the trial; the amount offered in settlement;
> the extent of discovery completed and the stage of the proceedings;
> the experience and views of counsel; the presence of a
> governmental participant; and the reaction of the class members to
> the proposed settlement.

*Id* (citations omitted).

Not all factors will apply to every class action settlement, and certain factors may predominate depending on the nature of the case. *Torrisi v. Tucson Elec. Power Co.*, 8 F3d 1370, 1376 (9th Cir 1993). "The degree of importance attached to each factor is determined by the nature of the claim, the type of relief sought and the facts and circumstances of each case." *Davis v. City & Cty. of San Francisco*, 890 F2d 1438, 1444-45 (9th Cir 1989).

## ANALYSIS

The Agreement in this case meets the legal standard for final court approval. As discussed at length in the parties' memoranda, each factor of the fairness analysis favors settlement on the terms negotiated by the parties.

## I.    Strength of Plaintiffs' Case

A key factor in considering the reasonableness of a settlement "is the strength of the plaintiffs' case on the merits balanced against the amount offered in the settlement." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,* 221 FRD 523, 526 (CD Cal 2004) (internal quotation marks and citation omitted). However, the court's role is not "to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice*, 688 F2d at 625.

Plaintiffs seek injunctive relief based on alleged violations of Title II of the ADA and Section 504 of the Rehabilitation Act. Plaintiffs had a reasonable likelihood of prevailing on those claims at trial, given the integration mandate of *Olmstead* applicable to non-residential settings and the State's undue reliance on segregated employment in the past. Although the State had promulgated two Executive Orders and new rules in response to this case and changing federal law and policy, plaintiffs' experts concluded that there were still significant deficiencies

8 – ORDER

in the State's employment service system for persons with I/DD in sheltered workshops.  Thus, this factor favors approval.

## II.  Risk and Expense of Further Litigation

If they did not settle, the parties faced a four week trial scheduled to begin on December 1, 2015.  Although they had already incurred significant litigation expenses, the cost of preparing for and handling the trial with a number of expert witnesses on both sides would have been enormous.  And no matter who won at trial, an appeal was likely, adding further costs.

Furthermore, despite the strength of their case, plaintiffs faced an uncertain outcome, given the State's "fundamental alteration defense" and its implementation of Executive Orders designed to comply with *Olmstead* with revisions occurring up to the eve of trial.  Even if plaintiffs prevailed, it would likely take several months before the Court issued a judgment.  In addition, the precise nature and scope of relief ordered by the Court may not have been as comprehensive or detailed as contained in the Agreement and could have taken potentially many more years to implement.  Thus, this factor strongly favors approval.

## III.  Risk of Maintaining Class Action Status Through Trial

After the Court denied intervention to some family members and repudiated any challenge to the class definition or its certification order, defendants did not renew their efforts to de-certify the class.  However, the State could have raised the issue in the future.  The Agreement avoids any such risk and immunizes the class certification order from attack by defendants.  On balance, this factor favors approval.

## IV.  Amount and Benefits of the Agreement

"[T]he critical component of any settlement is the amount of relief obtained by the class." *Bayat v. Bank of the West*, No. C-13-2376 EMC, 2015 WL 1744342, at *4 (ND Cal April 15,

2015) (citations omitted).  The Agreement is comprehensive and substantial, requiring the State to:  (1) create and implement a number of policies and practices to facilitate compliance with the ADA; (2) reduce the State's reliance on sheltered workshop settings; (3) ensure that a significant portion of class members obtain jobs in Competitive Integrated Employment; (4) establish a goal that individuals will work 20 hours per week or more and to invest in the systemic improvements necessary to achieve that goal; and (5) implement a number of additional systemic reforms to Oregon's employment service system necessary to ensure that the Agreement's outcomes will be achieved.  It also includes a monitoring and enforcement scheme to ensure that these promises will become a reality for the class members.

To the extent that defendants' efforts, and specifically the Executive Orders, embraced the employment services path and were designed to comply with *Olmstead* (and, therefore, created a risk to plaintiffs' case), the Agreement incorporates all improvements and systemic reforms that defendants voluntarily undertook, making them all binding and enforceable.  It also goes beyond Executive Order 15-01 in several key areas, including a reduction in the sheltered workshop census, a new payment structure, continuation of provider transformation grants at current levels, interagency collaboration, continuation of important training, technical assistance, and an expectation of reasonable outcomes (integrated, paid jobs in the community).  Mank Decl. (docket #353-1), ¶¶ 7-8, 10.  The Agreement was based in large part on the advice of plaintiffs' experts, all of whom believe the Agreement is significant, meaningful and reasonable. *Id*, ¶ 21; Asai Decl. (docket #353-2), ¶¶ 20-22; Morningstar Decl. (docket #353-3), ¶ 26.

In sum, the Agreement benefits over 2,000 individuals with I/DD (adults and youth) by allowing them to participate in Competitive Integrated Employment.  It is difficult to quantify that remedy.  However, the State's own fiscal expert projected that the cost of providing the

integrated employment and other benefits to class members required by Executive Order 15-01 – which is only a portion of defendants' obligation under the Agreement – at $173,000,000. Toner Decl. (docket #354), Ex. 1 (Report of Ralph Amador), p. 2. That is a very substantial benefit to the class.

Of course, the potential cost of the Agreement raises the specter as to whether, given the budget crises often facing governmental agencies, the State will be able to pay for it. The Agreement requires the State to "make diligent efforts to obtain necessary funding, appropriations, limitations, allotments, or other expenditure authority." Agreement, § XII.1. If the State fails to do so, then plaintiffs may enter into enforcement proceedings or rescind the Agreement. *Id*, § XII.2. However, the Agreement lists "a significant decrease in State revenue or federal funding" as an "Event Affecting Implementation" which is a complete defense to any enforcement proceedings brought by plaintiffs. *Id*, § XV. In other words, the State is not required to do the impossible based on lack of funding. Instead, it promises to use available funding in the manner required by the Agreement for the benefit of the class.

Because the relief obtained by plaintiffs in the Agreement is valuable and substantial, this factor weighs heavily in favor of final approval of the settlement.

## V.      Extent of Discovery and State of Proceedings

The extent of discovery completed and the state of the proceedings at the time of settlement is a strong indicator of whether the parties have sufficient understanding of each other's cases to make an informed judgment about their likelihood of prevailing. Typically, "[a] court is more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case." *Nat'l Rural Telecomm. Coop.*, 221 FRD at 527 (internal

quotation marks and citation omitted). For that reason, "[a] settlement following sufficient

discovery and genuine arms-length negotiation is presumed fair." *Id* at 528.

The parties reached the Agreement after completing extensive discovery and after the

evidentiary cut-off of July 6, 2015. By that late stage of the litigation, both sides had a strong

understanding of the strengths and weaknesses of each other's case. Thus, this factor strongly

favors approval.

## VI.    Experience and View of Counsel

"Parties represented by competent counsel are better positioned than courts to produce a

settlement that fairly reflects each party's expected outcome in litigation." *In re Pac. Enters.*

*Sec. Litig.*, 47 F3d 373, 378 (9th Cir 1995). The recommendations of counsel are, therefore,

given a presumption of reasonableness. *Boyd v. Bechtel Corp.,* 485 F Supp 610, 622 (ND Cal.

1979) (citations omitted).

Lead counsel for all of the parties are experienced lawyers. Some have extensive

backgrounds in disability law and others are experienced litigators in class action cases. All are

unanimous in recommending approval. Thus, this factor strongly favors approval.

## VII.    Presence of a Governmental Participant

The United States Department of Justice, Oregon Department of Justice, and several state

agencies participated in the litigation and also attended the settlement discussions. Thus, this

factor weighs heavily in favor of approval.

## VIII.    Reaction of Class Members to Proposed Settlement

The number of class members who object to a proposed settlement "is a factor to be

considered when approving a settlement." *Mandujano v. Basic Vegetable Prods. Inc.*, 541 F2d

832, 837 (9th Cir 1976) (citations omitted). The absence of significant numbers of objectors

weighs in favor of finding the settlement to be fair, reasonable and adequate. *Couser v. Comenity Bank*, No. 12cv2484-MMA-BGS, 2015 WL 5117082, at *7 (SD Cal May 27, 2015) (citations omitted).

When initially certified, the class was estimated to include about 4,000 persons, but due to the State's implementation of the Executive Orders, declined by the time of the fairness hearing to around 2,000.[4]  In addition to mailing the notice of the Agreement to each class member, plaintiffs undertook affirmative efforts to disseminate information widely online and through email and social media, as well as through five open community forums held across the state which were attended by almost 100 persons.  Yet only 32 written objections were received prior to the fairness hearing.  Wilde Decl. (docket #355), Exs. 2 & 3.  Of those objections, 25 were from family members and/or guardians; five were from class members; two were from individuals who were not family members or class member, one of which was from a Wisconsin resident whose daughter is not a class member and also resides in Wisconsin (*id*, Ex. 3, pp. 1-9); and one was from a home care worker expressing concern about unnamed sheltered workshop employees with whom she worked in the community (*id*, pp. 71-72).  Two persons also presented objections orally at the fairness hearing, but they were family members who had previously filed written objections.

Almost none of the objections raised concerns about the employment services that would be provided under the Agreement.[5]  Instead, they objected to the effect that the Agreement

---

[4]  The number of persons in sheltered workshops decreased from about 2,713 persons in March 2014 to about 2,190 or 1,926, depending on the counting methodology used.  Oregon Department of Human Services, Employment First Report (July 2015), http://www.oregon.gov/dhs/employment/employment- first/DataReports/Data%20Report%20 Executive%20Order%20July%202015.pdf, pp. 12, 17.

[5]  Two objectors were worried about the pace of placement in community jobs and system capacity (Wilde Decl., Ex. 3, pp. 21, 82), and another had doubts about the steps involved in the process of moving from a sheltered workshop into the community (*id*, p. 66).  A few objectors questioned the effectiveness of services from the Office of Vocational Rehabilitation Services.  *See, e.g.*, *id*, pp. 15, 31.

would have on class members who want to continue working in a sheltered workshop.   Three class members worked in the same sheltered workshop that had already closed and preferred to continue working at that setting.  *Id*, pp. 88-90.  One of them had since found a new job with the assistance of the former workshop, but worked fewer hours than at the workshop.  *Id*, p. 88. Most of the family members filing objections stated that they did not believe that their son or daughter could work in an integrated community setting and speculated the same would be true for others.  *E.g., id*, pp. 12-13.  Most of these objectors had positive views about the services provided in sheltered workshops.

This Court shares the objector's concerns that not all persons with I/DD may, even if they wish, be able to work in an integrated employment setting due to the nature of their disabilities. The persons with I/DD who testified at the fairness hearing are wonderful role models who epitomize the benefits of Competitive Integrated Employment over segregated employment. However, many of them are fairly high functioning individuals who can work in an integrated setting without a full-time job coach and without disrupting the workplace.  Other persons with I/DD may not be as fortunate.

However, these objections reflect a mistaken belief that the Agreement requires closure of some or all of the sheltered workshops in Oregon.  In fact, the closure of sheltered workshops has been a policy of the State since issuance of Executive Order 13-04 in April 2013 and reiterated with the issuance of Executive Order 15-01 in January 2015, both of which ceased funding of new placements in sheltered workshops after July 1, 2015.  In addition, the July 2015 revised IEP reduces the sheltered workshop census to 1,530 by 2017.  Other states have taken similar steps, including Vermont, Massachusetts and Washington.  CMS recently issued policy guidance that permits states to take this step.  Dunbar Decl., Ex. 4, p. 11.

14 – ORDER

This policy of the State reflects a change in federal policy in recent years to reduce support for sheltered workshops.  In June 2011, the United States Department of Justice issued its "Statement on the Enforcement of the Integration Mandate"[6] which took the position that *Olmstead* and the ADA applied to sheltered workshops.  In September 2011, CMS issued a bulletin stating that it would not allow Medicaid funds to be used for "vocational services" delivered in sheltered settings.[7]  In January 2014, CMS issued a regulation that requires employment settings to be "integrated" and requires states to submit transition plans "to achieve compliance with this section" by 2019 42 CFR § 441.710(a)(1)(i), (2), (3).  In July 2014, the WIOA passed, including numerous provisions regarding vocational rehabilitation services, sheltered workshops, supported employment, informed choice, youth transition services, integrated employment and performance metrics.

To comply with this change in federal policy disfavoring sheltered workshops, the State has taken steps to encourage sheltered workshops to expand supported employment services, train their staff to provide these services, and convert their business models from segregated to integrated employment services.  In November 2014, the State awarded "transformation grants," totaling almost $2.2 million, to approximately 20 sheltered workshops for that purpose.  Several of the grantees promised to phase down or close their workshops, including some whether objectors or their family members worked.  Krieger Decl. (docket #356), ¶¶ 5-6.  That helps explain why many of the objectors are concerned about closure.

---

[6] United States Department of Justice, Civil Rights Division, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.* (June 22, 2011), http://www.ada.gov/olmstead/q&a_olmstead.htm.

[7] Centers for Medicare and Medicaid Services, CMCS Informational Bulletin, Updates to the § 1915(c) Waiver Instructions and Technical Guide Regarding Employment and Employment Related Services (Sept. 16, 2011), http://downloads.cms.gov/cmsgov/archived-downloads/CMCSBulletins/downloads/CIB-9-16-11.pdf.

However, the Agreement does not require any individual working in a sheltered workshop to leave if he or she wishes to stay.  To the contrary, by only mandating a reduction to 1,530 of the number of persons with I/DD who are served in sheltered workshops, the Agreement permits the continued existence of sheltered workshops throughout its term. According to the State's recent policy transmittal, persons currently in sheltered workshops can remain in that workshop, can return to that workshop within of year of leaving, or can transfer to another workshop.[8]  Although class members have the option of transferring to another sheltered workshop, some may be unable to do so due to transportation or other logistical difficulties. However, plaintiffs are hopeful that when presented with fully informed choices through the individualized process mandated by the Agreement, all class members will realize the benefits of, and obtain the employment services necessary, to obtain jobs in an integrated setting at a competitive wage.

The Agreement is designed to achieve a system-wide change over seven years by bringing many parties together and building on the State's infrastructure.  Whether it succeeds is yet to be seen.  However, if it does succeed, it will have achieved a substantial benefit for the class as a whole.  The best interests of the class as a whole must remain the Court's paramount consideration even though some class members believe that they will not receive all the individual relief to which they believe they are entitled.  Because the vast majority of the class supports and will benefit from the Agreement, this factor also favors approval of the settlement.

///

///

---

[8]  Oregon Department of Human Services, Office of Developmental Disability Services, Entry to Sheltered Workshops: Policy Changes for July 1, 2015 (June 23, 2015), http://www.oregon.gov/dhs/employment/ employment-first/Documents/FAQ-ShelteredWorkshops-Providers.pdf, pp. 3-4.  *See also* Oregon Department of Human Services Developmental Disabilities Services, Policy Transmittal APD-PT-15-022 (June 29, 2015), https://www.dhs.state.or.us/policy/spd/transmit/pt/2015/pt15022.pdf.

16 – ORDER

**<u>ORDER</u>**

For the reasons stated above, the Parties' Joint Motion for Final Approval of Proposed

Settlement Agreement (docket #352) is GRANTED.

DATED December 29, 2015.

_s/ Janice M. Stewart_
Janice M. Stewart
United States Magistrate Judge