UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

PAULA LANE, *et al*, on behalf of themselves
and all others similarly situated, and

UNITED CEREBRAL PALSY OF OREGON
AND S.W. WASHINGTON,

                Plaintiffs,

      v.

KATE BROWN, Governor of the State of
Oregon, *et al*,

             Defendants.

Case No. 3:12-cv-00138 -ST

JUDGMENT

UNITED STATES OF AMERICA,

            Plaintiff-Intervenor,

      v.

STATE OF OREGON,

            Defendant.


      Having determined that the proposed Settlement Agreement is fair, reasonable, and adequate, the court hereby enters a Final Judgment in this case:

      1. Entering the attached Settlement Agreement as an Order of this court;

2. Retaining ongoing jurisdiction to supervise the Settlement Agreement and retaining the authority to enter any orders that are just and proper to ensure substantial compliance with the Settlement Agreement or as permitted by the Settlement Agreement;

3. Retaining jurisdiction to enforce the Settlement Agreement until such time as the Court determines that defendants are in substantial compliance with the Settlement Agreement; and

4. Retaining jurisdiction to determine the amount of attorney's fees and costs that shall be paid to plaintiffs.

DATED January 27, 2016.

Janice M. Stewart
United States Magistrate Judge

2 – JUDGMENT

Attachment A

<u>Lane et al. v. Brown et al.</u>, United States District Court Case No. 3:12-cv-00138-ST

<u>SETTLEMENT AGREEMENT</u>

I.    <u>INTRODUCTION</u>

1.    The parties wish to settle *Lane, et al., v. Brown, et al.* ("the Action"). Plaintiffs include the class certified by the Court, United Cerebral Palsy of Oregon and Southwest Washington ("UCP"), and plaintiff-intervenor the United States of America ("United States"). In this Agreement, unless otherwise specified, the class, UCP, and the United States are referred to as "plaintiffs." Defendants are the State of Oregon, as well as state officials named in their official capacity, the Governor of the State of Oregon, currently Kate Brown, the director of the Oregon Department of Human Services ("DHS"), currently Erinn Kelley-Siel, director of the DHS Office of Developmental Disabilities Services ("ODDS"), currently Lilia Teninty, and the director of the DHS Office of Vocational Rehabilitation Services ("VR"), currently Trina Lee. Discovery in this Action has substantially completed and trial is scheduled for December 2015.

2.    This Agreement is made to resolve all claims and allegations in the Action under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973 ("Rehabilitation Act"), and the Supreme Court's decision in *Olmstead v. L.C.* Accordingly, through this Agreement, the Parties intend to promote and further the goal of community integration.

3.    Defendants dispute plaintiffs' allegations. This Agreement is not an admission of liability, and Oregon denies that it is in violation of the ADA, the Rehabilitation Act, or any other laws or regulations.

4.    The parties agree that Oregon has made substantial progress in providing employment services to and improving employment outcomes for individuals with intellectual and developmental disabilities ("I/DD") since passage of Oregon Executive Orders 13-04 and 15-01, including reducing the census of individuals with I/DD working in sheltered workshops during Fiscal Year 2015 from 2713 to approximately 1926 individuals with intellectual and developmental disabilities. The requirements of this Agreement reflect and take into account this substantial progress.

5.    The Parties represent and acknowledge that this Agreement is the result of extensive, thorough and good faith negotiations. The Parties further represent and acknowledge that the terms of this Agreement have been voluntarily accepted, after consultation with counsel, for the purpose of making a full and final compromise and settlement of any and all claims or allegations set forth in the Amended Complaint in the Action and the United States' Complaint in Intervention.

<u>Lane et al. v. Brown et al.</u>, United States District Court Case No. 3:12-cv-00138-ST

6.   The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1345; and 42 U.S.C. §§ 12131-12132. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

7.   This Agreement shall be interpreted in accordance with federal law and the laws of the State of Oregon. The venue for all legal actions concerning this Agreement shall be in the United States District Court for the District of Oregon, Portland Division (the "Court").

II.   <u>DEFINITIONS</u>

For the purposes of this Agreement only, the following terms have the following meanings:

1.   A "Career Development Plan" ("CDP") is part of an Individual Support Plan ("ISP") or Annual Plan regarding ODDS services. A "Career Development Plan" identifies the individual's employment goals and objectives, the services and supports needed to achieve those goals and objectives, the persons, agencies, and providers assigned to assist the person to attain those goals, the obstacles to the individual working in Competitive Integrated Employment in an Integrated Employment Setting, and the services and supports necessary to overcome those obstacles. Career Development Plans shall be based on person-centered planning principles.

2.   "Competitive Integrated Employment," consistent with the federal Workforce Innovation and Opportunity Act ("WIOA"), means work that is performed on a full-time or part-time basis (including self-employment) for which an individual:

   a.   Is compensated at a rate that:

      (1)   Meets or exceeds state or local minimum wage requirements, whichever is higher; and

      (2)   Is not less than the customary rate paid by the employer for the same or similar work performed by other employees who are not individuals with disabilities, and who are similarly situated in similar occupations by the same employer and who have similar training, experience, and skills; or

      (3)   In the case of an individual who is self-employed, yields an income that is comparable to the income received by other individuals who are not individuals with disabilities, and who are self-employed in similar occupations or on similar

2

<u>Lane et al. v. Brown et al.</u>, United States District Court Case No. 3:12-cv-00138-ST

           tasks and who have similar training experience, and skills; and

    b.    Is eligible for the level of benefits provided to other employees; and

    c.    Is at a location where the employee interacts with other persons who are not individuals with disabilities (not including supervisory personnel or individuals who are providing services to such employee) to the same extent that individuals who are not individuals with disabilities and who are in comparable positions interact with other persons; and

    d.    As appropriate, presents opportunities for advancement that are similar to those for other employees who are not individuals with disabilities and who have similar positions.

3.    Individuals with "I/DD" are persons who have an "Intellectual Disability," as defined in Oregon Administrative Rule ("OAR") chapter 411, division 320, or a "Developmental Disability," as defined in OAR chapter 411, division 320.

4.    "Individual Supported Employment", as defined in OAR Chapter 411, division 345, means an individual job in a competitive integrated employment setting in the general workforce that is compensated at or above the State minimum wage, including customized or self-employment.

5.    An "Integrated Employment Setting", as defined in OAR Chapter 411, division 345, is:

    a.    An employment setting that satisfies the requirements for Competitive Integrated Employment, as defined above; or

    b.    At a location where the employee interacts with other persons who are not individuals with disabilities (not including supervisory personnel or individuals who are providing services to such employee) to the same extent that individuals who are not individuals with disabilities and who are in comparable positions interact with other persons; and that, as appropriate, presents opportunities for advancement that are similar to those for other employees who are not individuals with disabilities and who have similar positions.

Employment in an Integrated Employment Setting cannot be facility-based work in a Sheltered Workshop, and cannot be non-work activities such as

3

<u>Lane et al. v. Brown et al.,</u> United States District Court Case No. 3:12-cv-00138-ST

day support activities. Employment in an Integrated Employment Setting will compensate individuals with I/DD at or above the minimum wage.

6.   "Mock sheltered workshop activities" are prevocational training activities (for example, folding, sorting, shredding, packaging, and labeling activities) that are:

    a.   Conducted during the school day;

    b.   Performed only by students with disabilities;

    c.   Closely resemble the vocational work tasks performed by adults with I/DD in Sheltered Workshops, including by being activities:
        (1)   designed to fulfill the demands of a contractor, business, charitable organization, school or school district, retail store, or other entity; and
        (2)   performed by individuals without compensation or in exchange for subminimum wages; and

    d.   Not part of an instructional sequence, such as teaching generalization of skills. Instructional sequence does not include instruction that consists solely of the activities described in all of (a), (b), and (c) above.

7.   "Oregon" or "The State" means the State of Oregon, including ODDS and VR, as administered through DHS, and the Oregon Department of Education ("ODE").

8.   "Related Employment Services" are services which are provided by ODDS or VR in conjunction with or after the completion of needed Supported Employment Services in order to enable an individual to maintain or advance in Competitive Integrated Employment. Services may include, but are not necessarily limited to, benefits counseling, transportation support, personal care supports (such as Activities of Daily Living, or ADL), environmental accessibility adaptations, behavioral supports, assistive technology, time management training, and social skills training as they relate to continued participation in Competitive Integrated Employment.

9.   "Self-Employment" is an option for achieving Competitive Integrated Employment and is recognized as a viable means of promoting independence and economic self-sufficiency. Self-Employment generally refers to one person owning and controlling the operations and management of an enterprise that reflects the owner's skills, interests, and preferred work environment. An individual in Self-Employment may or may not receive ongoing supports. Self-Employment yields an income that

4

is comparable to the income received by other individuals who are not individuals with disabilities, who are self-employed in similar occupations or on similar tasks, and who have similar training, experience, and skills.

10. A "Sheltered Workshop" is a facility in which individuals with I/DD are congregated for the purpose of receiving employment services and performing work tasks for pay at the facility. A Sheltered Workshop primarily employs individuals with I/DD and other disabilities, with the exception of service support staff. A Sheltered Workshop is a fixed site that is owned, operated, or controlled by a provider, where an individual has few or no opportunities to interact with non- disabled individuals, except paid support staff. A Sheltered Workshop is not Small Group Employment in an Integrated Employment Setting, and is not otherwise an Integrated Employment Setting.

11. "Small Group Employment" refers to work performed in regular business, industry, and community settings by groups of two to eight individuals with I/DD. It is not Competitive Integrated Employment, which is the much-preferred and optimal form of employment for Oregonians with I/DD, but it can have value as a way to offer additional opportunities for integration and employment. Small Group Employment support is provided in an Integrated Employment Setting and in a manner that promotes integration into the workplace and interaction between participants and people without disabilities. Small Group Employment must allow an individual to interact with non-disabled persons in a manner typical to the employment setting. The wage paid to the supported individual must meet or exceed State and local minimum wage requirements as specified in Competitive Integrated Employment, and the individual must maintain goals to pursue Competitive Integrated Employment opportunities.

12. "Supported Employment Services" provided or funded by ODDS or VR are individualized services that assist a person with I/DD to obtain and maintain work in an Integrated Employment Setting. Supported Employment Services are provided in a manner that allows a person with I/DD to work the maximum number of hours consistent with their interests and abilities in an Integrated Employment Setting and are individually planned, based on person-centered planning principles and evidence-based practices. Supported Employment Services may include post-secondary education and/or training to the extent they are reinforced in an individual's Individual Support Plan or Individual Plan for Employment services.   Such services include:

   a. Discovery, job development, job-finding, job carving, job coaching, job training, job shadowing, co-worker and peer supports, and re-employment support.

5

      b.     For transition-age youth with I/DD under the age of 16 or between the ages of 16 and 18 and not otherwise eligible for VR services, transitional services and supports, including: instruction, community experiences, the development of employment and other post school adult living objectives; school-based preparatory experiences; career preparation, and integrated work-based learning experiences such as site visits, job shadowing, soft skill and job skill development, internships, part-time employment, summer employment; youth development and leadership, including training in self-advocacy, self-determination and conflict resolution skills, peer and adult mentoring, and, where appropriate, daily living skills; connecting activities, including exposure to post-school educational and community services, transportation, benefits planning, and assistive technology.

13.     "Working-Age Individuals" are adults with I/DD who are 21 or older and who are no longer receiving public school services, and those with I/DD who are age 60 or older who choose to continue employment.

## III.    TARGET POPULATION

1.     The ODDS/VR Target Population includes:

      a.     Sheltered workshop workers. Working-Age Individuals with I/DD found eligible for ODDS employment services and who can reasonably be determined to have worked in Sheltered Workshops on or after January 25, 2012 ("Sheltered Workshop Target Population"); and

      b.     Transition-age individuals. Individuals with I/DD who at any time on or after January 25, 2012 until July 1, 2022 meet the below definition of transition-age, and who are found eligible for ODDS employment services as described in OAR chapter 411, division 345, or who are found eligible for ODDS and VR services ("Transition Age Target Population").

For the purpose of Section III(1)(b), "transition-age" means:

      (1)     Not older than 24 years of age.

      (2)     Not younger than 14 years of age. With respect to VR, persons who are under 16 years of age may receive employment services with DHS approval. With respect to ODDS, persons who are under 18 years of age may receive employment services with DHS approval.

Lane et al. v. Brown et al., United States District Court Case No. 3:12-cv-00138-ST

IV.    SHELTERED WORKSHOPS

    1.    By July 1, 2015, Oregon will no longer purchase or fund Sheltered Workshop placements for:

        a.    Transition-age youth with I/DD;

        b.    Any working age adult with I/DD who is newly eligible for ODDS or VR services; and

        c.    Any working age adult with I/DD who is already utilizing ODDS or VR services who is not already working in a Sheltered Workshop.

    2.    By June 30, 2017, Oregon will reduce the current number of individuals with I/DD in Sheltered Workshops from a census of approximately 1,926 individuals as of March 2015, using the counting methodology set forth in the July 2015 Employment First Data Report, to no more than 1,530 individuals, as set forth in Metric No. 9 of the Integrated Employment Plan, dated July 6, 2015.  By June 30, 2017, Oregon will decrease the number of hours adults with developmental disabilities receiving ODDS employment services are reported as receiving sheltered workshop services from approximately 93,530 hours in March 2015, as set forth in the July 2015 Employment First Data Report, to no more than 66,100 hours, as set forth in Integrated Employment Plan Metric No. 10.  The numbers of individuals with I/DD in Sheltered Workshops for the purposes of Integrated Employment Plan Metric No. 9 and hours for the purposes Integrated Employment Plan Metric No. 10 as of June 30, 2017 shall be calculated as set forth in the Integrated Employment Plan and the July 2015 Employment First Data Report.  Any enforcement proceeding under this Section IV(2) shall be subject to Section XVI of this Agreement.

V.    EXECUTIVE ORDER AND INTEGRATED EMPLOYMENT PLAN

    A.  Executive Order

    1.    Oregon shall substantially implement and maintain the terms and systemic improvements of Executive Order 15-01 (the "Executive Order").  Oregon shall have reasonable discretion and flexibility in devising and modifying the means to accomplish these systemic improvements.  "Substantially implement and maintain" does not require strict compliance with all terms nor preclude minor deviations from these provisions of the Executive Order.  Rather, deviations or modifications from the terms of the Executive Order may occur, provided any such deviations or modifications do not substantially defeat the stated purpose of the

7

Executive Order to "improve Oregon's delivery of employment services, with the goal of achieving competitive integrated employment for individuals with intellectual and developmental disabilities, consistent with their abilities and choices," or the general purpose of each Section of the Executive Order. After consultation with the parties and the Independent Reviewer, the State may, in its discretion, modify or revise the Executive Order.

B.  Executive Order Service Outcomes and Integrated Employment Plan Metrics

1.  Oregon shall achieve the Service Outcomes as set forth in Section IV.3 on page 9 of Executive Order 15-01 and Outcomes and Metrics Nos. 9 through 11 as set forth at pages 76-77 of the Integrated Employment Plan dated July 6, 2015. The State shall report the Executive Order Service Outcomes and Outcomes and Metrics Nos. 9 through 11 in the Integrated Employment Plan achieved annually.

   a.  By June 30, 2016, the State will provide or continue to provide Supported Employment Services and Related Services, as set forth in Section IV.3 of Executive Order 15-01, to all of the named plaintiffs who currently are in Sheltered Workshops or who desire and request Supported Employment Services. Such services are designed to allow individuals to work in Competitive Integrated Employment but are not a guarantee of employment.

2.  Metric No. 11 applies to newly obtained job placements in which employment has been retained for at least 90 days, regardless of whether a person subsequently loses his or her job.

3.  Plaintiffs may not bring an enforcement proceeding based on the State's failure to achieve any of Executive Order Service Outcomes or Integrated Employment Plan Outcomes and Metrics Nos. 9 through 11 for any State Fiscal Year ("SFY") until the end of the three years starting with the SFY in which the annual outcome was not achieved. If, at the end of a three-year period, the State has complied with this Section by achieving the cumulative outcomes required as of the end of the three-year period, plaintiffs may not bring any enforcement proceeding based on the State's failure to achieve an annual outcome in Sections V(B) and VI(3) for the first year. If the State fails to achieve an annual outcome, the parties and the Independent Reviewer shall confer by telephone within 60 days of receiving notice of the failure to determine the reasons for the failure to achieve the annual outcome and potential actions that could be taken to remedy these factors. For example, under Metric No. 11, the State would be required to achieve 130 additional job placements in SFY 2016, 160 additional job placements in SFY 2017, and 170 additional job placements in SFY 2018, for a total of 460 additional jobs during the three-year

8

period. If 120 were obtained in SFY 2016, 160 in SFY 2017, and 180 in SFY 2018, for a total of 460 jobs, there would be no violation regarding SFY 2016. Similarly, if 120 jobs were obtained in SFY 2016 and 150 jobs were obtained in SFY 2017, but 190 were obtained in SFY 2018, there would be no violation regarding SFY 2016. If the State exceeds any of the annual performance outcomes in a given SFY, the excess amount shall be added to the total of newly obtained jobs in the following SFY, and will count towards satisfaction of the overall goal of 1,115 newly obtained jobs. Notwithstanding the above, if compliance with the annual outcomes falls below 50% of the annual outcomes in two consecutive years, plaintiffs may bring an enforcement proceeding without further delay.

4.    Any enforcement proceeding allowed under this Section shall be brought in Court, and the parties shall initially ask the Court to hear the matter by telephone on an expedited basis. Such dispute shall be submitted by letter submission, unless the Court allows otherwise. The conferral requirement and time allotted for responses and replies in the local rules for motions shall apply to any noncompliance letter. The Court shall determine the scope and means of discovery, if any, in enforcement proceedings, but the parties agree that the scope and means of discovery shall be as narrow and cost-effective as possible in all instances, and consistent with an expedited hearing schedule. The Court shall determine whether or not the hearing shall take place by telephone, and whether testimony is needed.

5.    The State may, in its discretion, modify or revise the Integrated Employment Plan (other than Outcomes and Metrics Nos. 9 through 11 as set forth in the Integrated Employment Plan dated July 6, 2015) without any prior consultation with the parties or the Independent Reviewer.

VI.    SUPPORTED EMPLOYMENT, RELATED SERVICES, AND COMPETITIVE INTEGRATED EMPLOYMENT

1.    ODDS and VR will establish and implement a policy that Supported Employment Services provided under this Agreement shall be individualized, evidence-based, flexible, offered in an Integrated Employment Setting, and available as needed and desired, but shall not be mandated as a condition of working or receiving services in an integrated employment setting.

2.    Supported Employment Services provided under this Agreement shall be based on an individual's capabilities, choices, and strengths and shall be individually tailored to each person. All persons who receive Supported Employment Services in an integrated employment setting under this Agreement will have a goal of working the maximum number of hours consistent with their abilities and preferences, without regard to the availability of employment opportunities.

9

Lane et al. v. Brown et al., United States District Court Case No. 3:12-cv-00138-ST

3.   Consistent with DHS' Integrated Employment Plan and the State's VR data, ODDS and VR will provide Supported Employment Services and Related Employment Services so that 1,115 Working-Age Individuals in the Sheltered Workshop Target Population as described in Section III(1)(a) will obtain Competitive Integrated Employment, in accordance with the following schedule:

a.   By June 30, 2015, the State provided Supported Employment Services and Related Employment Services so that 105 individuals receiving sheltered workshop services newly obtained Competitive Integrated Employment.

b.   By June 30, 2016, the State will provide Supported Employment Services and Related Employment Services, so that 130 additional individuals receiving sheltered workshop services newly obtain Competitive Integrated Employment.

c.   By June 30, 2017, the State will provide Supported Employment Services and Related Employment Services so that 160 additional individuals receiving sheltered workshop services newly obtain Competitive Integrated Employment.

d.   By June 30, 2018, the State will provide Supported Employment Services and Related Employment Services so that 170 additional individuals receiving sheltered workshop services newly obtain Competitive Integrated Employment.

e.   By June 30, 2019, the State will provide Supported Employment Services and Related Employment Services so that 170 additional individuals receiving sheltered workshop services newly obtain Competitive Integrated Employment.

f.   By June 30, 2020, the State will provide Supported Employment Services and Related Employment Services so that 150 additional individuals receiving sheltered workshop services newly obtain Competitive Integrated Employment.

g.   By June 30, 2021, the State will provide Supported Employment Services and Related Employment Services so that 130 additional individuals receiving sheltered workshop services newly obtain Competitive Integrated Employment.

h.   By June 30, 2022, the State will provide Supported Employment Services and Related Employment Services so that 100 additional individuals receiving sheltered workshop services newly obtain Competitive Integrated Employment.

4.    If the State exceeds an annual target in Section VI(3) for a given year, the excess number of individuals who obtain Competitive Integrated Employment in that year shall be added to the total of individuals who obtain Competitive Integrated Employment in the following year, and shall count towards satisfaction of the overall 1,115 individuals.

5.    For the Transition Age Target Population described in Section III(1)(b) of this Agreement, by July 1, 2022, Oregon will ensure that at least 4,900 individuals provided Employment Services pursuant to Section IV.3 of the Executive Order are transition-age individuals.

    a.    At least 50% of the individuals in the Transition-Age Target Population who receive Employment Services under Section IV.3 of the Executive Order and who apply and are found eligible for VR services shall receive, at a minimum, an Individual Plan for Employment with VR.

6.    The State will encourage and help facilitate Oregon school districts to continue and expand model(s) of evidence-based transition practices (e.g., the Seamless Transition Model, Project Search, Youth Transition Program) for the purpose of promoting and expanding transition services for the Transition Age Target Population and assisting in the achievement of competitive integrated employment for this population.

7.    Any individual in a Sheltered Workshop who states as part of the CDP process that he or she desires a job in an Integrated Employment Setting will receive Supported Employment Services and Related Employment Services that allow the individual an opportunity to obtain such a job. An opportunity is not a guarantee of employment.

8.    If an individual in the certified class is qualified for Competitive Integrated Employment and either services are not yet available or the individual is not able to obtain Competitive Integrated Employment, the individual will remain eligible for services to obtain Competitive Integrated Employment when such services are available.

9.    DHS shall adopt a rule requiring community developmental disabilities programs ("CDDPs") and support services brokerages to encourage individuals in the Sheltered Workshop Target Population to choose options other than sheltered employment.

    a.    If appropriate for the individual, these options shall include non-facility-based employment and integrated day options and community inclusion services, provided in settings other than Sheltered Workshops.

11

<u>Lane et al. v. Brown et al.</u>, United States District Court Case No. 3:12-cv-00138-ST

    b.   Integrated day options include, but are not limited to, services that include regular opportunities for community-based recreational, social, educational, cultural, and athletic activities, including community volunteer activities and training activities, as well as other regularly occurring non-facility based activities of a person's choosing that are provided in settings which allow individuals with disabilities to interact with individuals without disabilities in a community setting to the fullest extent possible for the individual.

    c.   Any enforcement proceeding brought under Section VI(9) is limited to whether DHS has adopted a rule as set forth in Section VI(9).

## VII.   <u>ENHANCING EMPLOYMENT OUTCOMES</u>

1.   In order to maximize the integration of competitive employment opportunities, by no later than June 30, 2016, DHS will take the following actions:

    a.   DHS will establish and promote a goal that all persons with I/DD who want to work in the community will be afforded an opportunity to pursue competitive employment that allows them to work the maximum number of hours consistent with their abilities and preferences. DHS will issue guidance to VR counselors, ODDS staff, CDDPs, and brokerages that the recommended standard for planning and implementing Supported Employment Services will be the opportunity to work at least 20 hours per week. This guidance will recognize that based on individual choice, preferences, and circumstances, some people may choose to work at that level while others may not.

    b.   DHS will develop and seek approval by Centers for Medicare & Medicaid Services ("CMS") for reimbursement rates for supported employment services for outcome payments or other financial incentives to providers for individuals with I/DD who obtain Competitive Integrated Employment at a monthly average of at least 20 hours per week.

    c.   Subject to Section XI of this Agreement, DHS will continue to include in its Sheltered Workshop provider transformation grants a goal that individuals with I/DD obtain Competitive Integrated Employment and work the maximum number of hours consistent with their abilities and preferences. These DHS grants will continue to provide one-time performance-based payments to

<u>Lane et al. v. Brown et al.</u>, United States District Court Case No. 3:12-cv-00138-ST

           providers for each individual with I/DD who obtains Competitive Integrated Employment at least 20 hours per week.

      d.      DHS will issue guidance that the technical assistance provider(s) set forth in Section X(1) of this Agreement train employment professionals and job developers to assist individuals in finding, obtaining, and keeping jobs in Competitive Integrated Employment that the recommended standard for planning and implementing Supported Employment Services will be the opportunity to work at least 20 hours per week. This guidance will recognize that based on individual choice, preferences, and circumstances, some people may choose to work at that level while others may not.

2.      As set forth in Section XIII(a)(8) of this Agreement, starting July 1, 2016, and semi-annually (twice a year) thereafter, the State shall collect and report the percentage of individuals with I/DD who receive Supported Employment Services under this Agreement and who are working in an Integrated Employment Setting at least 20 hours per week. If the data reported by the State does not indicate that this percentage has increased by the percentage adopted by the Executive Order's Policy Group, the State and the Independent Reviewer will meet in good faith to discuss additional actions that may be taken to enhance the employment outcomes under this Agreement. The State shall not be required to take any actions recommended by the Independent Reviewer.

3.      Any enforcement proceeding under this Section VII shall be limited solely to whether DHS has taken the steps required by Section VII.

VIII.   <u>CAREER DEVELOPMENT PLANNING</u>

1.      Consistent with ODDS policy and administrative rules, all individuals in the Executive Order 15-01's ODDS/VR Target Population Section II(1)(a) shall have received a CDP by July 1, 2015. DHS shall determine whether all such CDPs have been developed and shall utilize performance-based contracting metrics to impose financial penalties on responsible entities that fail to develop a CDP for any person in Target Population III(1)(a) of the Agreement, after receiving notice and an opportunity to cure. Individuals in ODDS/VR Target Population Section III(1)(b) of the Agreement will receive a CDP prior to their expected exit from the school district. If an individual in ODDS/VR Target Population Section III(1)(b) leaves school prior to his or her expected exit, he or she will receive a CDP within one year of the unexpected exit. The provision of Employment Services will not be delayed or denied due to a lack of a CDP.

13

<u>Lane et al. v. Brown et al.</u>, United States District Court Case No. 3:12-cv-00138-ST

IX.   <u>TRANSITION PLANNING FOR YOUTH</u>

    1.    Consistent with ODE's authority under Oregon law, including, *inter alia*, Or. Rev. Stat. §§ 326.051 and 329.095, as well as Division 22 of the Oregon Administrative Rules, including, *inter alia*, Or. Admin. R. 581-022-1020, the ODE shall require that: (1) the transition planning process may begin as young as age 14, if deemed appropriate by the student's Individualized Education Plan team (including the student's parent(s)), and must begin not later than the start of the one-year period of a student's Individualized Education Plan during which the student reaches 16 years of age; (2) the transition planning process shall include information about, and provide opportunities to experience, Supported Employment Services in Integrated Employment Settings; (3) local educational agencies may not include Sheltered Workshops in the continuum of alternative placements and supplementary aids and services provided to students; and (4) school instructional curriculum shall not include mock sheltered workshop activities.

    2.    The State will develop a broad-based professional development plan for transition services that includes targeted technical assistance provided to agency personnel, school district personnel, and other practitioners. In determining whether a broad-based professional development plan is adequate, the Court's determination shall be limited to whether or not the plan represents a substantial departure from widely accepted professional judgment.

X.   <u>TRAINING</u>

    1.    Oregon shall, subject to the availability of sufficient funding, maintain until at least June 30, 2019, a technical assistance provider(s) to offer competency-based training, ongoing assistance, and support for evidence-based practices to agencies that offer Supported Employment Services. DHS shall make diligent efforts to secure sufficient funds for the obligations set forth in Section X.

XI.   <u>PROVIDER CAPACITY</u>

    1.    Oregon shall, subject to the availability of sufficient funding, maintain until at least June 30, 2019, grants for the transformation of existing sheltered workshop providers or the development of new Supported Employment Services providers or the expansion of existing providers that will assist individuals obtaining Competitive Integrated Employment and working in Integrated Employment Settings. DHS shall make diligent efforts to secure sufficient funds for the obligations set forth in Section XI.

<u>Lane et al. v. Brown et al.</u>, United States District Court Case No. 3:12-cv-00138-ST

XII.    <u>FUNDING</u>

     1.    The parties understand and agree that any agreement by the State, including any agreement on numerical performance outcomes, is contingent upon the receipt of funding, appropriations, limitations, or other expenditure authority from the Oregon Legislative Assembly.

     2.    Nothing in this Agreement will be construed as permitting any violation of Article XI, Section 7 of the Oregon Constitution or any other law regulating liabilities or monetary obligations of the State of Oregon. The State will make diligent efforts to obtain necessary funding, appropriations, limitations, allotments, or other expenditure authority. If Oregon fails to attain necessary funding, appropriations, limitations, allotments, or other expenditure authority to comply with this Agreement, plaintiffs retain all rights, including the right to enter into enforcement proceedings, or to withdraw consent to this Agreement, and revive any claims otherwise barred by operation of this Agreement. In the event claims are revived, defendants shall retain all rights, and all defenses shall be revived.

XIII.    <u>DATA COLLECTION AND REPORTING</u>

     1.    In place of Section XIII.2 of Executive Order 15-01, the State shall implement a data collection provision that includes:

          a.    Starting January 1, 2016, and semi-annually (twice a year) thereafter, ODDS and VR shall collect data and report to the Supported Employment Coordinator, the following additional data for individuals with I/DD in the ODDS/VR Target Populations, separated by Target Population, as defined in the Executive Order:

              (1) The number of individuals receiving Supported Employment Services in an integrated setting;

              (2) The number of individuals achieving Competitive Integrated Employment;

              (3) The number of individuals achieving Individual Supported Employment;

              (4) The number of new individuals who received Supported Employment Services in an integrated setting in the current State fiscal year;

              (5) The number of new individuals who achieved Competitive Integrated Employment in the current State fiscal year;

15

(6) The number of new individuals receiving Individual Supported Employment;

(7) The number of individuals working in the following settings: Competitive Integrated Employment, Individual Supported Employment, Self-Employment, Sheltered Workshop, and Small Group Employment;

(8) The number of hours worked per week, and hourly wages paid to those individuals, including the percentage of individuals with I/DD who receive Supported Employment Services under this Agreement and who are working in an Integrated Employment Setting at least 20 hours per week;

(9) The length of time each individual works in Competitive Integrated Employment and in other Supported Employment;

(10) The performance of employment professionals, providers, and job developers with respect to the number of hours worked in all new job placements; and

(11) The number and percentage of persons served under Section IV(3) of the Executive Order who are transition-age individuals, and the number of individuals in the Transition-Age Target Population served under Section VI(5) of this Agreement.

b.  Starting July 1, 2016, VR and ODDS will be responsible for annually reporting on the measurable progress made on the outcomes required under this Agreement to the Supported Employment Coordinator, as well as:

(1) The number of supported employment providers and the number of clients served by each provider;

(2) The number of providers providing employment services, including job coaches, job developers, employment specialists and benefits counselors; and

(3) The number of vocational rehabilitation counselors who assess and assist persons with I/DD for supported employment services.

c.  Beginning with the Post School Outcomes survey that will be conducted from July 2016 to September 2016, and in each Post School Outcomes survey thereafter until the termination of this Agreement, ODE will conduct its Post School Outcomes survey in a way that will allow ODE to collect and analyze data about the number of youth who

16

are enrolled in ODDS services who exited secondary school during the year in question, the number who exited with a job during that year, the number who received post-secondary educational services after exiting, and, where applicable, the types of employment individuals obtained after exiting (for example, Competitive Integrated Employment, Small Group Employment, and Self Employment). The Post School Outcomes survey will collect information for all school leavers for the year in question, and not a sampling.

XIV.    INDEPENDENT REVIEWER

1.    A neutral Independent Reviewer shall be selected to act as a subject matter expert and to assess compliance as specifically authorized by the terms of this Agreement, or as required by the Court. The Independent Reviewer should have prior experience administering a state government program that includes providing employment services to individuals with I/DD. The parties agree that the Independent Reviewer must not have served as an expert, consultant, monitor, or independent reviewer for any of the parties or their counsel in connection with this action. The Independent Reviewer shall be selected as follows:

a.    The parties shall attempt to jointly select an Independent Reviewer.

b.    If the parties are unable to agree on an Independent Reviewer, each party shall submit to the Court a list of up to three nominees, and the Court shall select an Independent Reviewer from those lists pursuant to Fed. R. Evid. 706(a).

c.    With respect to any Independent Reviewer proposed or nominated by any party in connection with Sections XIV(1)(a) and (1)(b), the nominating party must identify and describe each nominee's qualifications and experience, including listing and describing each instance in which the nominee has served as an expert, consultant, monitor, or independent reviewer in any action involving the parties.

d.    A similar process will apply to the replacement of the Independent Reviewer, as necessary.

2.    At defendants' request, the Independent Reviewer will be available to assist the defendants in implementing the provisions of the Agreement, including, at defendants' request, providing training and technical assistance. Such assistance may include recommendations to facilitate compliance; and identifying any obstacles to compliance and strategies to address such obstacles.

17

<u>Lane et al. v. Brown et al.</u>, United States District Court Case No. 3:12-cv-00138-ST

3.    Other than the assistance available at defendants' request under Section XIV.2 of this Agreement, the Independent Reviewer shall assess the defendants' progress in achieving substantial compliance through the following:

   a.    Conducting an annual review of the State's compliance with Sections IV(2), V(B)(1),and VI(3) of this Agreement;

   b.    Conducting a review of the State's compliance with Section VI(5) of this Agreement as of July 1, 2022;

   c.    Conducting an annual review of the State's substantial compliance on a systemic basis with the other terms of this Agreement and the Executive Order;

   d.    To the extent reasonably necessary, conducting reviews for individuals in the Sheltered Workshop Target Population in order to determine any systemic patterns or practices concerning the Supported Employment Services provided to those individuals; and

   e.    Issuing annual written reports reflecting the findings in this Section.

4.    The Independent Reviewer will afford the parties 45 days to comment on a draft report prepared pursuant to Section XIV(3)(e) above prior to submitting the report with the Court.

5.    The Independent Reviewer, and any hired staff or consultants may have periodic meetings and ex parte communications with, and make recommendations to, the Court and the parties; speak with stakeholders with such stakeholders' consent, on a confidential basis; and testify in this case regarding any matter relating to the implementation of this Agreement and the performance of his or her duties under this Agreement, including the Independent Reviewer's observations and findings.

6.    The Independent Reviewer, along with any staff hired by the Independent Reviewer for the purpose of assisting the Independent Reviewer with his or her responsibilities under this Agreement, shall be reimbursed up to a maximum of $250,000 per year by the State.

XV.    <u>EVENTS AFFECTING IMPLEMENTATION</u>

1.    In connection with any enforcement proceeding brought under this Agreement, the State may demonstrate an Event Affecting Implementation

18

Lane et al. v. Brown et al., United States District Court Case No. 3:12-cv-00138-ST

by showing the occurrence of an event that was not initiated, created, caused, or substantially contributed to by DHS or ODE and that substantially impaired or impeded the State from satisfying any of the requirements of this Agreement. A non-inclusive, illustrative list of examples of events that could substantially impair or impede the State from satisfying requirements in this Agreement, and thus constitute Events Affecting Implementation, includes a significant economic downturn or significant increase in the unemployment rate; changes in the number of available qualified individuals in the Sheltered Workshop Target Population; a significant decrease in State revenue or federal funding; or other reasonable factors, which need not be of the same character or degree as the preceding examples. In connection with Sections IV, V, and VI of this Agreement, defendants are not required to overcome an Event Affecting Implementation by increasing hiring individuals with I/DD for State employment.

2.    In any enforcement proceeding under this Agreement, after exhaustion of the dispute resolution process in Section XVI(A), plaintiffs shall bear the initial burden of proving a violation of a provision of the Agreement. The State shall then bear the burden of showing that an Event Affecting Implementation, if any, has occurred and substantially impaired or impeded the State from satisfying that provision of the Agreement.

3.    In addition to demonstrating an Event Affecting Implementation as a complete defense in an enforcement proceeding brought by plaintiffs under this Agreement, the State may, after exhaustion of the dispute resolution process in Section XVI(A), at any time and in its discretion, seek a declaration from the Court that an Event Affecting Implementation has occurred that substantially impaired or impeded the State from satisfying a specific provision of the Agreement, along with such other relief that is deemed proper by the Court. In any such proceeding seeking declaratory relief, the State shall bear the burden of showing that an Event Affecting Implementation has occurred and that it substantially impairs or impedes the State from satisfying a specific provision of the Agreement.

XVI.  ENFORCEMENT, MODIFICATION, AND TERMINATION

A.  Dispute Resolution Process

1.    If the United States and/or the plaintiffs believe that the State has failed to fulfill any obligation under this Agreement, the United States and/or the plaintiffs shall, prior to initiating any court proceeding to remedy such failure, give written notice to the State which sets forth with specificity the details of the alleged noncompliance.

19

<u>Lane et al. v. Brown et al.</u>, United States District Court Case No. 3:12-cv-00138-ST

      a.     The State shall have 45 days from the date of such written notice to respond in writing by denying that noncompliance has occurred, or by accepting (without necessarily admitting) the allegation of noncompliance and proposing steps that the State will take, and by when, to cure the alleged noncompliance.

      b.     If the State fails to respond within 45 days or denies that noncompliance has occurred, and after the parties confer in good faith, plaintiffs may seek an appropriate judicial remedy other than contempt.

2.     If the State agrees to cure the alleged deficiency, the State shall have an additional 90 days to cure or demonstrate that an Event Affecting Implementation has caused the State's failure at issue, unless a longer period is agreed to by the parties, which agreement will not be unreasonably withheld. The State may seek additional time from the Court if appropriate.   If the Parties fail to reach agreement on a plan for curative action, plaintiffs may seek an appropriate judicial remedy.

3.     If the State intends to file a motion or submit a letter to the Court requesting any judicial action, prior to initiating such request, the State shall give written notice to plaintiffs which sets forth with specificity the details of the proposed motion or letter.

      a.     Plaintiffs shall have 30 days from the date of such written notice to respond to the State in writing stating their views and any proposed alternatives, to the State's request.

      b.     The parties shall confer by telephone to discuss the response.

      c.     If plaintiffs fail to respond within 30 days, the State may submit the motion or letter to the Court.

B.   Enforcement

1.     Provided the State has substantially complied with and maintained substantial compliance with the terms of this Agreement, the Agreement shall terminate no later than July 1, 2022.  The Court shall retain jurisdiction over this matter during the effective period of this Agreement. For purposes of this Section, "substantial compliance" means something less than strict and literal compliance with every provision of this Agreement.  Rather, deviations from the terms of the Agreement may occur, provided any such deviations are unintentional and so minor as not to substantially defeat the object which the parties intend to accomplish, or to impair the structure of the Agreement as a whole.

20

2.    If, after exhausting the dispute resolution process in Section XVI, plaintiffs maintain that the State remains in violation of the obligation or requirement in question and that an Event Affecting Implementation does not excuse the alleged deficiency, any party shall then have 30 days to request a conference with the Court concerning the dispute, and the parties shall initially ask the Court to hear the matter by telephone on an expedited basis. Plaintiffs shall submit such dispute by letter submission, unless the Court allows otherwise. The conferral requirement and time allotted for responses and replies in the local rules for motions shall apply to any noncompliance letter.

3.    The Court shall determine the scope and means of discovery, if any, in enforcement proceedings, but the parties agree that the scope and means of discovery shall be as narrow and cost-effective as possible in all instances, and consistent with an expedited hearing schedule. The Court shall determine whether or not the hearing shall take place by telephone, and whether testimony is needed.

4.    In any enforcement proceeding allowed under this Agreement, plaintiffs shall bear the burden of proving a violation. In determining whether a violation of any provision in this Agreement has occurred, to the extent plaintiffs support any alleged violation with evidence regarding professional judgment or standards, the Court's determination shall be limited to whether the activity at issue represents a significant departure from that professional judgment or standard. Defendants shall have a complete defense if they can demonstrate to the Court that an Event Affecting Implementation excuses the State's failure to satisfy any obligation or requirement set forth in this Agreement.

5.    Plaintiffs may not bring any enforcement proceeding, under this Agreement in the Court before January 1, 2017. Plaintiffs agree that any enforcement action brought under this Agreement shall not be based upon actions or inactions that allegedly occurred prior to entry of this Agreement, including any alleged violations of the Executive Order.

6.    The State contends that it is in substantial compliance with the Executive Order as of the entry of this Agreement.

    a.    For the purposes of this Agreement, plaintiffs shall not challenge this contention or the State's implementation of the Executive Order as of the date of the Agreement, thereby precluding any enforcement proceedings based on practices that precede the entry of this Agreement.

    b.    After execution of this Agreement by the parties, but prior to the fairness hearing and entry of this Agreement, plaintiffs will

21

provide defendants with a list setting forth each instance in which plaintiffs allege that the State is in systemic breach of this Agreement or the Executive Order causing the State not to be in substantial compliance with this Agreement and the Executive Order at such time. Nothing in this Section is intended to establish that defendants agree that any of the instances listed by plaintiffs constitutes a systemic breach of this Agreement or the Executive Order causing the State not to be in compliance with this Agreement or the Executive Order, or to limit the ability of defendants to argue that the State is in substantial compliance with this Agreement and the Executive Order.

7. Plaintiffs may not seek contempt in the first instance for any violation of this Agreement. Any contempt action will be governed by the applicable standard in the District of Oregon.

8. Any enforcement proceedings shall relate solely to actions or inactions of the State that involve members of the Target Populations under this Agreement.

9. Enforcement proceedings shall be limited to systemic violations of the Agreement that cause the State not to be in substantial compliance with this Agreement or the Executive Order. Moreover, unless expressly set forth in this Agreement, the State shall not be required to provide a particular level of benefits, and plaintiffs will not bring enforcement proceedings that seek to impose a particular standard of care.

10. Any monitoring or enforcement proceedings related to alleged actions or inactions by the State regarding members of the Target Populations who are not members of the certified class shall be conducted or brought solely by the United States. Any monitoring or enforcement proceedings by counsel for the class and UCP shall be limited to the claims of the certified class corresponding to the relief sought in the Amended Complaint, and the corresponding rights under this Agreement of the certified class. As a result, any monitoring or enforcement proceedings related to alleged actions or inactions by ODE shall be brought solely by the United States.

C. Suspensions or Modifications

1. A suspension or excuse from compliance with any provision pursuant to an Event Affecting Implementation shall be subject to the standard imposed by Section XV of this Agreement.

2. The Court may modify this Agreement consistent with Fed. R. Civ. P. 60

for reasons other than an Event Affecting Implementation.

3.   Any agreed-to modification of this Agreement shall be executed in writing by the parties, shall be filed with the Court, and shall not be effective until the Court enters the modified agreement and retains jurisdiction to enforce it.

## XVII. GENERAL PROVISIONS

1.   The parties agree jointly to file this Agreement with the United States District Court for the District of Oregon, Portland Division and jointly request approval of the Agreement after a hearing conducted pursuant to Fed. R. Civ. P. 23(f). If approved, the Court shall enter the Agreement as an order of the Court, and retain jurisdiction over the Agreement. The Parties agree to cooperate in presenting the Agreement to the Court and urging its approval as fair and reasonable. The Effective Date of the Agreement shall be the date of entry by the Court.

2.   This Agreement is binding upon the parties, by and through their officials, employees, and successors for the term of this Agreement. If DHS or ODE enter into written contracts with outside providers for any of the services provided in this Agreement, DHS or ODE shall incorporate the provisions of this Agreement that directly relate to those services in such contracts. Plaintiffs shall not be third party beneficiaries of any such contracts.

3.   No person or entity is intended to be a third party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action, and, accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement in any civil, criminal, or administrative action.

4.   This Agreement is not intended to enforce the Individuals with Disabilities Education Act ("IDEA") or any implementing regulation or guidance, the Workforce Innovation and Opportunities Act ("WIOA") or any implementing regulation or guidance, or any regulation issued by CMS, or the State's obtaining approval of or performance of its CMS Transition Plan.

5.   Failure by any party to enforce this entire Agreement or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver, including of the party's right to enforce other deadlines and provisions of this Agreement.

6.   The parties shall promptly notify each other of any court or administrative challenge to this Agreement or any portion thereof, and shall defend

<u>Lane et al. v. Brown et al.</u>, United States District Court Case No. 3:12-cv-00138-ST

against any challenge to the Agreement.

7.    Except as provided in this Agreement, during the pendency of the Agreement, plaintiffs shall not file suit under the ADA or Section 504 of the Rehabilitation Act for any claim or allegation set forth in the Amended Complaint or the Complaint in Intervention.

8.    After notice to all class members, the Court will conduct a fairness hearing pursuant to Fed. R. Civ. P. 23(f) to decide whether the Agreement is a fair, adequate and reasonable resolution of the claims of the plaintiff class. Should the Court approve this Agreement, the Agreement shall preclude the Named Plaintiffs and the class from asserting any claims that are based on or arise out of the facts and practices alleged in the Amended Complaint.

9.    UCP releases and discharges the defendants named in the Amended Complaint from all potential liability, known or unknown, suspected or unsuspected, which exist or may have existed for all claims that have been or might have been asserted by UCP based on, related to, or arising out of the facts and practices described in the Amended Complaint, to the extent such facts or practices existed or may have existed prior to the effective date of the Agreement. This release shall not preclude or affect any right of UCP to assess defendants' compliance with the terms and provisions of this Agreement subject to this Section XVII and Section XVI(10) of this Agreement, or to enforce this Agreement subject to the terms and provisions of Sections XV and XVI of this Agreement.

10.   The U.S. Department of Justice ("USDOJ"), releases and discharges the State of Oregon from all potential liability, known or unknown, suspected or unsuspected, for all ADA and Section 504 claims of the United States Attorney General that have been or might have been asserted by the United States Attorney General based on, related to, or arising out of the practices described in the Amended Complaint and the Complaint in Intervention, to the extent such practices existed or may have existed prior to the effective date of the Agreement. This release shall not preclude or affect any right of the USDOJ to assess defendants' compliance with the terms and provisions of this Agreement subject to this Section XVII and Section XVI(10) of this Agreement, or to enforce this Agreement subject to the terms and provisions of Sections XV and XVI of this Agreement. USDOJ represents that it has authority to deliver this release on behalf of plaintiff-intervenor and that this release shall be effective.

11.   This Agreement, and any conclusions or determinations made by the Independent Reviewer pursuant to this Agreement, shall not be subject to the Federal Arbitration Act, 9 U.S.C. § 1 et seq.

24

<u>Lane et al., v. Brown et al.,</u> United States District Court Case No. 3:12-cv-00138-ST

12.   Nothing in this Agreement requires Oregon to take actions inconsistent with federal law or federal funding requirements.

13.   Neither the ADA, Section 504 of the Rehabilitation Act, nor their implementing regulations require Oregon to make Sheltered Workshops available.

14.   Plaintiffs' counsel shall have reasonable access to documents, records, and materials that are within the control and custody of the State and are necessary to assess the State's substantial compliance with this Agreement. Plaintiffs' counsel may also seek access to third-party programs that are funded by or through the State, including the programs' employees, facilities, services, documents, records, and materials.

   a.   The State will not interfere with plaintiffs' access to third-party programs under this Section.

   b.   Any access under this Section may continue until this case is dismissed, but shall be limited to the extent necessary to minimize undue burden and cost to the State.

   c.   Counsel for plaintiffs may not initiate any communications with State employees concerning the terms, implementation, or enforcement of this Agreement without prior permission of counsel for the State, unless plaintiffs obtain a Court order permitting such communications. Nothing in this provision is intended to inhibit the ability of the United States to carry out its law enforcement authority by conducting investigations, provided such investigations are not related to the claims in the Amended Complaint or Complaint in Intervention, or based on the monitoring or enforcement of this Agreement. Further, nothing in Section XVII(14) shall affect the release provided by plaintiff-intervenor in Section XVII(10) of this Agreement.

   d.   The Protective Order in this Action shall remain in place until the termination of this Agreement, and any documents, records, and materials made available to plaintiffs under this Section may be produced as confidential pursuant to the Protective Order.

15.   The United States and the State shall bear their own costs and attorney's fees. Counsel for the class may seek an award of reasonable attorney's fees and costs incurred in the prosecution of the claims in the Amended Complaint. The parties and the Court shall apply the reasonableness standard contained in <em>Hensley v. Eckhart,</em> 461 U.S. 424, 435 (1983).

25

Lane et al. v. Brown et al., United States District Court Case No. 3:12-cv-00138-ST

    a.    The parties agree to work in good faith to agree on the amount of the reasonable fees and costs that will be paid to counsel for the class pursuant to this Section.

    b.    In the event the parties do not reach agreement on the amount of the reasonable fees and costs that will be paid to counsel for the class pursuant to this Section by October 1, 2015, this Agreement shall remain in force, including the provisions of this Section, and counsel for the class shall submit a fee petition in this Action to Judge Janice M. Stewart for the recovery of fees and costs under this Section after the Court enters an order approving the Agreement. Defendants shall be entitled to present any and all objections to any fee petition submitted by counsel for the class. The Court's determination shall be based upon the applicable standard in the District of Oregon.

    c.    Plaintiffs' fee petition shall be subject to the procedures, rules, and substantive law applicable to fee petitions in the United States District Court for the District of Oregon. Rates will be based on a percentile of the rates stated in the Oregon State Bar Economic Survey. Plaintiffs may not seek any fees for time beyond that actually spent or costs beyond those actually incurred, and they shall not seek any fee multiplier or other enhancement.

    d.    The parties agree that Judge Stewart's decision on reasonable fees and costs shall be binding, and that no party will have any right to appeal her decision. The waiver in Section XVII(15) shall be limited to a decision by Judge Stewart on the reasonable fees and costs recoverable by plaintiffs under Section XVII(15), and shall not extend to any other decision concerning any other fees or costs issued by any other judge.

16.    The United States and the State shall bear their own costs and attorney's fees for any post-judgment monitoring. Subject to Section XVI(10) of this Agreement, counsel for the class may seek an award of no more than $90,000 per year for reasonable and necessary attorney's fees and costs incurred in the monitoring of the Agreement.

    a.    The parties agree that counsel for the class may not recover fees or costs for monitoring activities that are duplicative of the duties of the Independent Reviewer, as set forth at Section XIV of this Agreement.

<u>Lane et al. v. Brown et al.</u>, United States District Court Case No. 3:12-cv-00138-ST

    b.    The parties agree to work in good faith to agree on the amount of the reasonable and necessary monitoring fees and costs that may be paid to counsel for the class pursuant to this Section.

    c.    In the event the parties do not reach agreement on the amount of reasonable and necessary monitoring fees and costs recoverable under Section XVII(16), the class counsel may submit a fee petition to the Court for monitoring fees and costs.

    d.    For the purposes of Section XVII(16), monitoring shall not include activities undertaken in connection with enforcement proceedings brought by plaintiffs in order to enforce this Agreement. In the event plaintiffs bring such enforcement proceedings, they may seek an award of reasonable and necessary fees and costs incurred in bringing such enforcement proceedings ("enforcement fees"). In no event shall plaintiffs be entitled to recover under Section XVII(16)(d) any fees or costs for activities undertaken prior to the delivery by plaintiffs of written notice to defendants pursuant to Section XVI(A)(1) of this Agreement and the conclusion of defendants' time to respond and cure pursuant to Section XVI(A)(1)-(2) of this Agreement.

    e.    Any fee petition submitted by plaintiffs pursuant to Section XVII(16) shall be subject to the procedures, rules, and substantive law applicable to fee petitions in the United States District Court for the District of Oregon. Rates will be based on a percentile of the rates stated in the Oregon State Bar Economic Survey. Plaintiffs may not seek any fees for time beyond that actually spent or costs not actually incurred, and they shall not seek any fee multiplier or other enhancement. Defendants shall be entitled to present any and all objections to any fee petition submitted by plaintiffs.

    f.    Only Disability Rights Oregon and the Center for Public Representation may seek an award of post-judgment monitoring fees and costs pursuant to Section XVII(16).

17.    After the Court approves this Agreement, any discovery pursuant to the Federal Rules of Civil Procedure, including depositions, subpoenas, or requests for production of documents, may only be propounded after an order by the Court authorizing the discovery. The parties agree that the Court may enter such other protective orders as the Court deems appropriate.

18.    The signatures below of officials and attorneys representing the United

States, the class plaintiffs, and the State signify that these parties have given their final approval to this Agreement. Each party to this Agreement represents and warrants that the person who has signed this Agreement on behalf of his or her entity or clients is duly authorized to enter into this Agreement and to bind that party to the terms and conditions of this Agreement.

19. This Agreement and any documents incorporated by reference constitute the entire integrated Agreement of the parties. No prior or contemporaneous communications, oral or written, or prior drafts shall be relevant or admissible for purposes of determining the meaning of any provisions herein in any litigation or any other proceeding.

20. This Agreement may be executed in counterparts, each of which shall be deemed an original, and the counterparts shall together constitute one and the same Agreement, notwithstanding that each party is not a signatory to the original or the same counterpart. All references to signature or execution of the Agreement shall be calculated from the date on which the last party executed the Agreement.

21. The parties agree that, as of the date the Court approves and enters this Agreement as an order of the Court, for purposes of the parties' preservation obligations pursuant to Federal Rule of Civil Procedure 26, litigation is not "reasonably foreseeable" concerning the matters described in the Findings Letter issued to the State by the United States. To the extent that any party previously implemented a litigation hold to preserve documents, electronically stored information, or things related to the matters described in the Findings Letter issued to the State, the party is no longer required to maintain such a litigation hold. Nothing in this paragraph relieves any party of any other obligations imposed by this Agreement.

22. "Notice" under this Agreement shall be provided to the following or their successors:

Chief of the Disability Rights Section
United States Department of Justice
Civil Rights Division
1425 New York Avenue NW
Washington, DC 20005

United States Attorney's Office
1000 S.W. 3rd Ave.
Suite 600
Portland, OR 97204

28

Lane et al. v. Brown et al., United States District Court Case No. 3;12-cv-00138-ST

Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096

General Counsel
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096

Director of the Department of Human Services
Oregon Department of Human Services
500 Summer St. NE
Salem, OR 97301

Deputy Superintendent
Oregon Department of Education
255 Capitol St. NE
Salem, OR 97310

Center for Public Representation
22 Green Street
Northampton, MA 01060

Disability Rights Oregon
610 S.W. Broadway, Suite 200
Portland, OR 97205

Miller Nash Graham & Dunn, LLP
111 S.W. Fifth Avenue, Suite 3400
Portland, OR 97204

Perkins Coie, LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]


29

Lane et al. v. Brown et al., United States District Court Case No. 3:12-cv-00138-ST

CENTER FOR PUBLIC REPRESENTATION

Steven J. Schwartz
Cathy Costanzo
Bettina Toner
Anna Krieger
22 Green Street
Northampton, Massachusetts 01060
Telephone: (413) 586-6024
Fax: (413) 586-5711


DISABILITY RIGHTS OREGON


Robert C. Joondeph
Kathleen L. Wilde
Ted Wenk
610 S.W. Broadway, Suite 200
Portland, Oregon 97205
Telephone: (503) 243-2081
Fax: (503) 243-1738


MILLER NASH GRAHAM & DUNN LLP

Bruce A. Rubin
111 S.W. Fifth Avenue, Suite 3400
Portland, Oregon 97204
Telephone: (503) 224-5858
Fax: (503) 224-0155


PERKINS COIE LLP

Thomas R. Johnson
Joanna Perini
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209
Telephone: (503) 727-2000
Fax: (503) 727-2222


*Attorneys for Plaintiffs*

30

<u>Lane et al. v. Brown et al.</u>, United States District Court Case No. 3:12-cv-00138-ST

CENTER FOR PUBLIC REPRESENTATION

Steven J. Schwartz
Cathy Costanzo
Bettina Toner
Anna Krieger
22 Green Street
Northampton, Massachusetts  01060
Telephone:  (413) 586-6024
Fax:  (413) 586-5711

DISABILITY RIGHTS OREGON

Robert C. Joondeph
Kathleen L. Wilde
Ted Wenk
610 S.W. Broadway, Suite 200
Portland, Oregon  97205
Telephone:  (503) 243-2081
Fax:  (503) 243-1738

MILLER NASH GRAHAM & DUNN LLP

Bruce A. Rubin
111 S.W. Fifth Avenue, Suite 3400
Portland, Oregon  97204
Telephone:  (503) 224-5858
Fax:  (503) 224-0155

PERKINS COIE LLP

Thomas R. Johnson
Joanna Perini
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon  97209
Telephone:  (503) 727-2000
Fax:  (503) 727-2222

*Attorneys for Plaintiffs*

30

CENTER FOR PUBLIC REPRESENTATION

Steven J. Schwartz
Cathy Costanzo
Bettina Toner
Anna Krieger
22 Green Street
Northampton, Massachusetts  01060
Telephone:  (413) 586-6024
Fax:  (413) 586-5711

DISABILITY RIGHTS OREGON

Robert C. Joondeph
Kathleen L. Wilde
Ted Wenk
610 S.W. Broadway, Suite 200
Portland, Oregon  97205
Telephone:  (503) 243-2081
Fax:  (503) 243-1738

MILLER NASH GRAHAM & DUNN LLP

Bruce A. Rubin
111 S.W. Fifth Avenue, Suite 3400
Portland, Oregon  97204
Telephone:  (503) 224-5858
Fax:  (503) 224-0155

PERKINS COIE LLP

Thomas R. Johnson
Joanna Perini
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon  97209
Telephone:  (503) 727-2000
Fax:  (503) 727-2222

_Attorneys for Plaintiffs_

30

<u>Lane et al. v. Brown et al.</u>, United States District Court Case No. 3:12-cv-00138-ST

CENTER FOR PUBLIC REPRESENTATION

Steven J. Schwartz
Cathy Costanzo
Bettina Toner
Anna Krieger
22 Green Street
Northampton, Massachusetts 01060
Telephone: (413) 586-6024
Fax: (413) 586-5711

DISABILITY RIGHTS OREGON

Robert C. Joondeph
Kathleen L. Wilde
Ted Wenk
610 S.W. Broadway, Suite 200
Portland, Oregon 97205
Telephone: (503) 243-2081
Fax: (503) 243-1738

MILLER NASH GRAHAM & DUNN LLP

Bruce A. Rubin
111 S.W. Fifth Avenue, Suite 3400
Portland, Oregon 97204
Telephone: (503) 224-5858
Fax: (503) 224-0155

PERKINS COIE LLP

Thomas R. Johnson
Joanna Perini
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209
Telephone: (503) 727-2000
Fax: (503) 727-2222

*Attorneys for Plaintiffs*

30

Lane et al. v. Brown et al., United States District Court Case No. 3:12-cv-00138-ST

BILLY J. WILLIAMS
Acting United States Attorney
District of Oregon

ADRIAN BROWN
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, OR 97204

VANITA GUPTA
Principal Deputy Assistant Attorney General

EVE L. HILL
Deputy Assistant Attorney General
REBECCA B. BOND
Chief
SHEILA M. FORAN
Special Legal Counsel
ANNE RAISH
Deputy Chief
MAX LAPERTOSA
REGINA KLINE
H. JUSTIN PARK
NICHOLAS C. LEE
Trial Attorneys
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

Attorneys for Plaintiff-Intervenor,
United States of America

31

Lane et al. v. Brown et al., United States District Court Case No. 3:12-cv-00138-ST


BILLY J. WILLIAMS
Acting United States Attorney
District of Oregon


ADRIAN BROWN
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, OR  97204

VANITA GUPTA
Principal Deputy Assistant Attorney General

EVE L. HILL
Deputy Assistant Attorney General
REBECCA B. BOND
Chief
SHEILA M. FORAN
Special Legal Counsel
ANNE RAISH
Deputy Chief
MAX LAPERTOSA
REGINA KLINE
H. JUSTIN PARK
NICHOLAS C. LEE
Trial Attorneys
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC  20530

Attorneys for Plaintiff-Intervenor,
United States of America

31

Lane et al. v. Brown et al., United States District Court Case No. 3:12-cv-00138-ST

State of Oregon, and the following State officials, named in their official capacity:
Governor Kate Brown; Erinn Kelley-Siel, Director of the Oregon Department of Human
Services; Lilia Teninty, Director of the Oregon Office of Developmental Disabilities
Services; Trina Lee, Director of the Oregon Office of Vocational Rehabilitation Services


By: Frederick M. Boss
Deputy Attorney General
Oregon Department of Justice
1162 Court Street, NE
Salem, OR  97301


MARKOWITZ HERBOLD PC

By:
     John J. Dunbar, OSB #842100
     JohnDunbar@MarkowitzHerbold.com
     David B. Markowitz, OSB #742046
     DavidMarkowitz@MarkowitzHerbold.com
     Keith McIntire, OSB #126210
     KeithMcIntire@MarkowitzHerbold.com
     Lauren Blaesing, OSB #113305
     LaurenBlaesing@MarkowitzHerbold.com
     1211 SW Fifth Avenue, Suite 3000
     Portland, OR  97204
     Telephone (503) 295-3085
     Special Assistant Attorneys General


DEPARTMENT OF JUSTICE

By:
     Christina L. Beatty-Walters, OSB #981634
     Tina.BeattyWalters@doj.state.or.us
     1515 SW Fifth Avenue, Suite 410
     Portland, OR 97201
     Telephone (972) 673-1880
     Senior Assistant Attorney General, Trial
     Division, Special Litigation Unit

Lane et al. v. Brown et al., United States District Court Case No. 3:12-cv-00138-ST

State of Oregon, and the following State officials, named in their official capacity:
Governor Kate Brown; Erinn Kelley-Siel, Director of the Oregon Department of Human
Services; Lilia Teninty, Director of the Oregon Office of Developmental Disabilities
Services; Trina Lee, Director of the Oregon Office of Vocational Rehabilitation Services

By: Frederick M. Boss
Deputy Attorney General
Oregon Department of Justice
1162 Court Street, NE
Salem, OR 97301


MARKOWITZ HERBOLD PC

By: _____
     John J. Dunbar, OSB #842100
     JohnDunbar@MarkowitzHerbold.com
     David B. Markowitz, OSB #742046
     DavidMarkowitz@MarkowitzHerbold.com
     Keith McIntire, OSB #126210
     KeithMcIntire@MarkowitzHerbold.com
     Lauren Blaesing, OSB #113305
     LaurenBlaesing@MarkowitzHerbold.com
     1211 SW Fifth Avenue, Suite 3000
     Portland, OR 97204
     Telephone (503) 295-3085
     Special Assistant Attorneys General

DEPARTMENT OF JUSTICE

By: _____  8/28/15
     Christina L. Beatty-Walters, OSB #981634
     Tina.BeattyWalters@doj.state.or.us
     1515 SW Fifth Avenue, Suite 410
     Portland, OR 97201
     Telephone (972) 673-1880
     Senior Assistant Attorney General, Trial
     Division, Special Litigation Unit

32